**E-FILED**
Friday, 28 September, 2007  12:30:50 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

| | | |
|---|---|---|
| KIMBERLY WALLIS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | NO. 3:06-cv-03147-RM-CHE |
| | ) | |
| CARGILL MEAT SOLUTIONS | ) | Judge Richard Mills |
| CORPORATION, a Delaware Corporation, | ) | Magistrate Judge Charles H. Evans |
| | ) | |
| Defendant. | ) | |

---

**DEFENDANT'S MOTION AND
MEMORANDUM FOR PARTIAL SUMMARY JUDGMENT**

\4557175.2

Defendant, Cargill Meat Solutions Corporation (hereinafter, "CMSC"), by and through its attorneys, for its Motion and Memorandum for Partial Summary Judgment, pursuant to Rule 56(c) of the Federal Rules of Civil Procedure and Local Rule 7.1(D), respectfully requests that this Court grant judgment as a matter of law in its favor and against Plaintiff, Kimberly Wallis ("Plaintiff"), on her claim for disability discrimination under the Americans with Disabilities Act and on its Tenth and Eleventh Affirmative defenses.  In support of this Motion, CMSC states as follows:

## **INTRODUCTION**

Plaintiff was involved in a September 28, 2005 work-related accident while employed by Cargill Meat Solutions Corporation ("CMSC") and has subsequently sought and received workers' compensation benefits for the injuries she suffered in connection thereto.  Nevertheless, Plaintiff is apparently unsatisfied with those benefits and now seeks to recover additional monies for her injuries via Title VII of the 1964 Civil Rights Act, claiming that the accident was somehow caused by sexual harassment she purportedly endured during the summer of 2005. Plaintiff's attempt to circumvent Illinois law and thereby obtain double recovery for her injuries fails as a matter of law.   Indeed, pursuant to the election of remedies doctrine, Plaintiff's previous receipt of workers' compensation benefits bars her from recovering any additional damages for the injuries she suffered in connection to the September 28, 2005 accident. Regardless of the election of remedies doctrine, Plaintiff simply cannot demonstrate a causal connection between the prohibited behavior about which she complains and the accident and therefore cannot recover damages for the accident under Title VII.

Furthermore, Plaintiff cannot demonstrate that CMSC failed to reasonably accommodate her hearing impairment.  Plaintiff failed to request an accommodation or to complain about the

1

accommodation provided to her. Additionally, she testified that she was able to perform the essential functions of her job without accommodation. As a result, this Court should grant summary judgment to CMSC on its Tenth and Eleventh Defenses and on Plaintiff's Americans with Disabilities Act claim.

## UNDISPUTED MATERIAL FACTS

**Plaintiff's Employment at CMSC**

1.    CMSC owns and operates a pork processing facility in Beardstown, Illinois. (Plaintiff's Complaint (#1) at ¶ 7.)

2.    On March 1, 2004, Plaintiff began working at the facility as a production employee. (Deposition of Kimberly Wallis ("Plaintiff's Dep."), attached hereto as Exhibit A, at pp. 59, 62.)

3.    In or around June of 2005, Plaintiff bid for and was promoted into a Butt Skinner position in which she shaved pork using meat skinning machines. (*Id*. at p. 95; Complaint at ¶ 11.)

**Plaintiff's Failure to Request An Accommodation**

4.    Plaintiff is deaf and frequently communicates through sign language. (Complaint at ¶ 6.)

5.    However, Plaintiff can effectively communicate through her own speech and by reading the lips of people who are unfamiliar with sign language. (Plaintiff's Dep. at pp. 26-27.)

6.    Plaintiff was able to perform her Butt Skinner position without any accommodation relating to her deafness. (*Id*. at pp. 97, 272-73.)

7.    Plaintiff never requested CMSC to provide her with a sign language interpreter at any point during her employment. (*Id*. at pp. 97, 170, 267.)

8.    Nevertheless, CMSC provided Plaintiff with an interpreter - John Curry, then a CMSC trainer - on numerous occasions, including during her plant orientation and at least one meeting she had with her supervisors. (*Id*. at pp. 230, 263-64.)

2

\4557175.2

**Plaintiff's Harassment Allegations**

9.      Plaintiff was assigned to work on a shift with two other Butt Skinners, Juana Soto and Ismael Rivera.  (*Id*. at pp. 130-35, 137.)

10.      During each shift, these three employees rotated through each of three different skinning machines.  (*Id*.)

11.      Plaintiff contends that Rivera harassed her at work on a daily basis, beginning in July of 2005.  (Complaint at ¶ 15.)

12.      In particular, Plaintiff alleges that Rivera directed inappropriate sexual comments towards her, made unwanted physical contact with her person and threw small pieces of meat at her.  (Plaintiff's Dep. at pp. 161-63, 255.)

13.      Additionally, Plaintiff alleges that Rivera frequently failed to rotate through the three skinning machines.  (*Id*. at pp. 201, 212.)

**The September 28, 2005 Accident**

14.      On September 28, 2005, Plaintiff was working on the butt skinner.  (*Id*. at pp. 274-75.)

15.      Shortly after Plaintiff rotated from one skinning machine to another, she observed that Rivera had failed to rotate machines with Soto.  (*Id*. at pp. 275-77.)

16.      Plaintiff got the attention of a CMSC line supervisor, Stacy Garcia, and complained to her about Rivera's failure to rotate.  (*Id*. at pp. 276-84.)

17.      In order to lodge this complaint, Plaintiff removed her foot from the pedal that fed the pork through the skinning machine she was operating, stepped away from the machine and engaged in a 5 to 10 second conversation with Garcia.  (*Id*. at pp. 286-88.)

18.      Plaintiff returned to her machine immediately after the conversation ended, but was not concentrating on her work.  (*Id*. at pp. 289, 292.)

3

19.     While working the skinner, Plaintiff twice looked over her left shoulder to watch Garcia converse with Rivera, even though she was not close enough to them to read their lips.  (*Id*. at pp. 290-91.)

20.     Plaintiff concedes that her actions constituted a safety violation.  (*Id*. at p. 299.)

21.     A moment after Plaintiff returned her attention to her machine, she suffered an accident when her left hand got caught in the skinning machine she was operating.  (*Id*. at p. 292.)

22.     According to Plaintiff, the accident occurred because she was not concentrating on her work.  (*Id*.)

23.     Rivera did not sexually harass Plaintiff in any manner on the day the accident occurred (*Id*. at pp. 303-04.)  Plaintiff testified that Rivera's behavior "was nothing sexual that day …." (*Id*.)

24.     As a result of the accident, Plaintiff suffered the amputation of her pinky finger and damage to the thumb and index finger on her left hand.  (*Id*. at pp. 309, 332, 349-51, 356-58.)

**Plaintiff's Receipt of Workers' Compensation Benefits**

25.     CMSC rushed Plaintiff to the emergency room at Passavant Area Hospital moments after the accident.  (*Id*. at p. 309.)

26.     Over the next few days, Plaintiff underwent three different surgeries on her left hand, including emergency surgery on September 28, 2005 and a skin graft on October 1, 2005. (Plaintiff's April 19, 2007 Deposition ("Plaintiff's Dep. Part II"), relevant excerpts attached hereto as Exhibit B, at p. 44.)  CMSC paid for each of these procedures and the trip to the emergency room through workers' compensation.  (Plaintiff's Dep. at p. 312; Affidavit of Dawn Zackula ("Zackula Aff."), attached hereto as Exhibit C, at ¶¶ 4-5.)

\4557175.2

27.     Thereafter, Plaintiff continued to see numerous physicians for consultations and treatments relating to her hand and attended physical therapy sessions, all of which was paid for by CMSC.  (Plaintiff's Dep. at p. 312; Zackula Aff. at ¶ 6.)

28.     Beginning on November 15, 2005 and subsequently continuing on a monthly basis, Plaintiff has visited a clinical psychologist, Dr. Paul Packman, in connection to the September 28, 2005 accident.  (Plaintiff's Dep. Part II at pp. 8-9, 11; Zackula Aff. at ¶ 6.) CMSC has paid for each of these visits through workers' compensation.  (Plaintiff's Dep. at p. 312; Zackula Aff. at ¶ 6.)

29.     In total, CMSC has paid over $100,000 in medical expenses relating to the September 28, 2005 accident.  (Zackula Aff. at ¶ 7.)

30.     In addition, CMSC provided Plaintiff with temporary total disability benefits covering the period from January, 2006 through May 16, 2007.  (*Id*. at ¶ 8; Plaintiff's Dep. at p. 312.)  In total, CMSC has paid Plaintiff $27,706.62 in temporary total and permanent partial disability payments.  (Zackula Aff. at ¶ 8.)

31.     Plaintiff presently has a pending claim for additional permanent partial disability benefits in connection to her injuries.  (*Id*. at ¶ 9.)

**Plaintiff's Damage Claims**

32.     On July 13, 2006, Plaintiff filed the instant action, alleging that CMSC is liable to her for sexual harassment and disability discrimination.  (Complaint.)

33.     Plaintiff seeks substantial economic damages under Title VII in connection with the September 28, 2005 accident, claiming that the loss of her ability to work at CMSC was caused by Rivera's sexual harassment of her.  (Complaint at ¶¶ 6, 21, 22; Report of Thomas W. Langford ("Langford Report"), attached hereto as Exhibit D.)

\4557175.2

34.     In addition, Plaintiff seeks damages for the emotional distress she has suffered as a result of the accident.  (Plaintiff's Dep. at pp. 348-50.)

35.     All of the emotional distress that Plaintiff has purportedly suffered in connection to this case was caused by the September 28, 2005 accident and the injuries that resulted therefrom. (*Id*. at pp. 349-51, 356-58.)

**CMSC's Affirmative Defenses**

36.     On September 8, 2006, CMSC timely filed its Answer in which it denied each of Plaintiff's substantive claims for relief.  (Defendant's Answer and Additional Defenses (#8).)

37.     On February 9, 2007, the Court granted CMSC's Motion for Leave to Amend its Answer. Pursuant thereto, CMSC filed its Amended Answer and Additional Defenses, adding its Tenth and Eleventh Defenses.  (Defendant's Answer and Additional Defenses (#13), at p. 12.)

38.     In its Tenth Defense, CMSC asserts that the doctrine of election of remedies bars Plaintiff from recovering damages in connection to work-related injuries for which she has previously received worker's compensation benefits.  (*Id*.)

39.     In its Eleventh Defense, CMSC asserts that Plaintiff cannot recover for harm purportedly sustained as a result of the September 28, 2005 accident because she cannot demonstrate that the accident was proximately caused by CMSC's alleged discriminatory actions.  (*Id*.)

\4557175.2

## ARGUMENT

I.      **PLAINTIFF'S FAILURE TO ACCOMMODATE CLAIM FAILS BECAUSE PLAINTIFF FAILED TO REQUEST ANY ACCOMMODATION DURING HER EMPLOYMENT AND PLAINTIFF COULD PERFORM HER JOB WITHOUT ANY ACCOMMODATION.**

Although it is unclear to what accommodation Plaintiff claims she was entitled,[1] Plaintiff's failure to accommodate claim must fail because she failed to request any accommodation during her employment at CMSC.  In order to establish a *prima facie* case for failure to provide reasonable accommodation under the Americans with Disabilities Act (the "ADA"), an employee must demonstrate that she "is a disabled person as defined by the statute, that the employer knew about the disability and that … she is otherwise qualified to perform the essential functions of the job … with or without reasonable accommodation."  *Winfrey v. City of Chicago*, 259 F.3d 610, 614 (7th Cir. 2001).   "[T]he standard rule is that a plaintiff must normally request an accommodation before liability under the ADA attaches."  *Javanovic v. In-Sink-Erator Div. of Emerson Electric Co.*, 201 F.3d 894, 899 (7th Cir. 2000).

Here, Plaintiff admits that she never requested CMSC to provide her with a sign language interpreter or any other accommodation for her hearing impairment.[2]  Indeed, Plaintiff never requested a sign language interpreter to help her perform her duties, to help her understand what was said during safety meetings or to help her lodge complaints about Rivera's purported behavior.  (Plaintiff's Dep. at pp. 93, 95, 97, 170, 267.)  Moreover, despite Plaintiff's failure to request an accommodation, Plaintiff concedes that CMSC provided an interpreter, John Curry, during one of the meetings in which she complained about Rivera.  (*Id*. at pp. 230-31.)  Although

---

[1] Plaintiff's Complaint does allege, incorrectly, that CMSC failed to provide her with a sign language interpreter during the meetings in which she complained about Rivera's purported behavior.  (Complaint at ¶¶ 17-18.)

[2] For the purposes of this motion only, CMSC does not dispute that Plaintiff suffers from a disability.

\4557175.2

she now contends that Curry was slow in providing his interpretations, she admits that she did not complain to CMSC at the time about the adequacy of the interpretation and has not alleged that Curry's interpretations were otherwise inadequate.  (Plaintiff's Dep. at pp. 231, 235-36.) Accordingly, Plaintiff cannot succeed on a failure to accommodate claim.  *See Hunt-Golliday v. Metropolitan Water Reclamation District of Greater Chicago*, 104 F.3d 1004, 1013 (7th Cir. 1997) (holding that an employee who failed to request a reasonable accommodation cannot demonstrate a failure to accommodate).

Furthermore, Plaintiff's claim fails for the additional reason that she freely admits that she was able to safely perform her Butt Skinner position without the aid of a sign language interpreter.  (Plaintiff's Dep. at pp. 97, 272-73.)  Because Plaintiff could perform the essential duties of her position without an accommodation, she was not entitled to an accommodation under the ADA.  *See Rauen v. U.S. Tobacco Manufacturing Ltd. Partnership*, 161 F. Supp.2d 899, 904-05 (N.D. Ill. 2001), *aff'd,* 319 F.3d 891, 897 (7th Cir. 2003) (granting summary judgment on failure to accommodate claim where plaintiff could perform the essential functions without accommodation); *Black v. Wayne Center*, Nos. 99-1225, 99-1249, 2000 WL 1033026, at *3 (6th Cir. 2000) (holding that where an employee is able to perform her position without accommodation, she "cannot demonstrate the objective reasonableness of any desired accommodation").

For both of the forgoing reasons, CMSC is entitled to summary judgment on Plaintiff's ADA claim.  *See Rauen*, 319 F.3d at 897 (affirming summary judgment for employer on employee's failure to accommodate claim where employee could perform the essential functions of her position without accommodation); *Hunt-Golliday*, 104 F.3d at 1013 (affirming summary

8

judgment for employer on employee's failure to accommodate claim where employee failed to inform her employer of a need for accommodation).

## II.     THE DOCTRINE OF ELECTION OF REMEDIES BARS PLAINTIFF FROM RECOVERING DAMAGES IN CONNECTION WITH HER ACCIDENT.

Because Plaintiff has already chosen to accept workers' compensation benefits for the injuries she suffered in the September 28, 2005 accident, the election of remedies doctrine bars her from recovering additional damages for those same injuries under Title VII. The doctrine of election of remedies applies to situations, like the instant action, in which Plaintiff seeks double compensation for the same injuries. *See Hallahan v. N.I.S. Corp.*, 936 F.2d 1496, 1499 (7th Cir. 1991) (providing that compensating a plaintiff twice for the same wrong violates the election of remedies doctrine); *Preston v. Industrial Commission*, 773 N.E.2d 1183, 1190-91, 332 Ill. App. 3d 708 (3d Dist. 2002) ("[t]he doctrine of election of remedies applies when double compensation is threatened, the opposing party changes position in reliance on it, or *res judicata* applies; so that the election of a remedy is deemed an abandonment of another remedy"). It provides that where an individual chooses to pursue one of two inconsistent remedies for a single harm and "accepts the benefit of pursing the initial remedy," she is precluded from recovering pursuant to the second remedy. *Crown Life Insurance Co. v. American National Bank and Trust Co. of Chicago*, 35 F.3d 296, 299 (7th Cir. 1994); *see In re Witte*, 841 F.2d 804, 807-08 (7th Cir. 1988) (holding that the election of remedies doctrine prohibited a real estate vendor from recovering damages in connection to a vendee's default on an installment contract where the vendor already repossessed the real estate).

Workers' compensation benefits and tort damages are inconsistent remedies where they relate to the same work-related injury. *See Rhodes v. Industrial Commission*, 442 N.E.2d 509, 511, 92 Ill. 2d 467 (1982) (providing that the Workers' Compensation Act "serve[s] as a

\4557175.2

substitute for an employee's common law right of action and not as a supplement to it");
*Zurowska v. Berlin Industries, Inc.*, 667 N.E.2d 588, 591, 282 Ill. App. 3d 540 (1st Dist. 1996)
(holding that an employee's intentional tort claim against her employer was inconsistent with
and therefore barred by her previous "filing of a claim under the [Workers' Compensation] Act,
accompanied by the receipt of compensation under the Act").  Accordingly, the election of
remedies doctrine bars an injured employee from recovering damages under Title VII for injuries
for which she previously received workers' compensation benefits.  *See Hogue v. Sam's Club*,
114 F. Supp. 2d 389, 395 (D. Md. 2000) (providing that a Title VII plaintiff could not recover
damages under a harassment theory in connection to work-related injuries for which she
previously received workers' compensation); *Moniz v. Reitano Enterprises, Inc.*, 709 So. 2d 150,
153-54 (Fla. Dist. Ct. App. 1998) (same, also under Title VII); *see also Conex International
Corp. v. Cox*, 18 S.W.3d 323, 327 (Tex. App. 2000) (providing that an individual who accepts
workers' compensation benefits is barred "from any wrongful discrimination damages not fully
separate and independent from the injury damages").

In *Hogue*, the plaintiff was allegedly sexually harassed at work by her immediate
supervisor, including two incidents of purported sexual assault.  *Hogue*, 114 F. Supp. 3d at 392.
The plaintiff filed a claim for workers' compensation, seeking benefits for injuries she suffered
in connection to the second assault, and received "medical expenses and a specified sum for the
temporary total disability suffered" in connection to the incident.  *Id*.  Subsequently, Plaintiff
filed a Title VII action against her employer based upon her supervisor's purported actions,
including the two assaults.  *Id*. at 390.  The defendant filed a motion for summary judgment
based on the election of remedies doctrine, arguing that the plaintiff's previous receipt of
workers' compensation benefits barred her from recovering Title VII damages.  *Id*. at 393.  The

\4557175.2

court ruled that although the workers' compensation award would not bar the plaintiff from recovering Title VII damages for injuries that were not compensated in the award,[3] "[t]o the extent that her injuries [we]re covered in the Commission's ruling, Plaintiff is bound by the compensation award and barred by the election of remedies for those injuries. Plaintiff can only have but one recovery for those injuries already compensated for." *Id*. at 395.

Similarly, in *Moniz*, the plaintiff sought and received workers' compensation benefits for a shoulder, neck and psychological injuries she suffered as a result of a sexual assault in which she was bitten by her supervisor. 709 So. 2d at 151. While her claim for workers' compensation was pending, the plaintiff filed a court action in which she sought Title VII damages for the frequent acts of harassment by her supervisor, including the biting incident. *Id*. at 151-52. The court ruled that although the plaintiff could recover damages for the harassment to the extent that it could "be separated from the actual biting incident for which compensation" was already received, she could not "recover twice for the biting incident. She … elected her remedy by recovery though her workers' compensation claim," and was therefore barred from recovering for that incident under Title VII. *Id*. at 153.

Here, Plaintiff seeks damages under Title VII for the very same injuries she suffered in the September 28, 2005 accident for which she has already accepted workers' compensation benefits and is pursuing additional benefits. In particular, Plaintiff seeks economic damages for the physical injuries to her hand, back pay for the period of time during which she has purportedly been unable to work, front pay for the period of time during which she will allegedly continue to be unable to work and the alleged mental and emotional distress purportedly caused by the accident. (Plaintiff's Dep. at pp. 348-51, 358; Complaint at ¶ 22; Langford Report.)

---

[3] In particular, the court held that the plaintiff was "not barred from asserting her Title VII claim for any damages sustained outside of the [second sexual assault] as these injuries were not ruled upon by the [Workers' Compensation] Commission." *Id*. at 395.

\4557175.2

Plaintiff testified that **all** of the emotional distress that she has purportedly suffered in connection to this case was caused by the September 28, 2005 accident and the injuries that resulted therefrom. (Plaintiff's Dep. at pp. 349-51, 356-58.)

However, Plaintiff has already sought and accepted workers' compensation benefits for her injuries. Indeed, Plaintiff has accepted over $100,000 in compensation for medical expenses relating to her injuries, including three surgeries. (Plaintiff's Dep. at pp. 311-12; Zackula Aff. at ¶¶ 4-7.) Plaintiff also accepted permanent partial disability payments for the loss of her finger and approximately 17 months of temporary total disability payments, totaling over $27,000. (Plaintiff's Dep. at pp. 311-12; Zackula Aff. at ¶ 8.) In addition, Plaintiff has filed an Application for Adjustment of Claim before the Workers' Compensation Commission seeking additional permanent partial disability benefits. (Zackula Aff. at ¶ 9.) Thus, Plaintiff is attempting to use Title VII to augment workers' compensation benefits that are intended to be an exclusive remedy for workplace injuries. *See Rhodes*, 442 N.E.2d at 510-11 (providing that an employee's exclusive remedy for a workplace injury is the Worker's Compensation Act). The election of remedies doctrine bars such double recovery and, therefore, Plaintiff cannot recover in the instant action any damages relating to the September 28, 2005 accident, including lost wages, the physical injuries to her hand and any mental damages and/or emotional distress associated therewith. Consequently, the Court should grant summary judgment on CMSC's Tenth Defense.

## III. THE UNDISPUTED FACTS DEMONSTRATE THAT PLAINTIFF'S SEPTEMBER 28, 2005 ACCIDENT WAS NOT PROXIMATELY CAUSED BY SEXUAL HARASSMENT.

In addition to the fact that relief is barred by the election of remedies doctrine, under Title VII, an individual cannot recover compensatory damages for a particular harm unless she

demonstrates that the harm was proximately caused by behavior that violates the statute. *See Shick v. Illinois Department of Human Services*, 307 F.3d 605, 615 (7th Cir. 2002) ("under general tort principles governing causation which apply equally to Title VII, a plaintiff may only recover damages proximately caused by the defendant's [illegal] conduct"). "When, at best, the" possibility that the act about which the plaintiff claims caused the injury is "evenly balanced" with the possibility that it did not, "the court should enter judgment for the defendant on the ground that causation cannot be proved." *Harris v. Owens-Corning Fiberglas Corp.*, 102 F.3d 1429, 1433 (7th Cir. 1997) (affirming grant of summary judgment for defendant on grounds that plaintiff could not demonstrate that the defendant's purported negligence caused his injuries); *see Shick*, 307 F.3d at 614-15 (ruling as a matter of law that a plaintiff could not recover damages for front pay and emotional distress under Title VII where he could not demonstrate that those damages were proximately caused by his employer's purported illegal discrimination).

Here, Plaintiff cannot demonstrate that her September 28, 2005 work-related accident, and the physical and emotional injuries she has suffered as a result, was proximately caused by sexual harassment allegedly perpetuated by Rivera. Plaintiff concedes that Rivera was not harassing her in any fashion at the time the accident occurred. Indeed, Plaintiff testified that shortly before the accident she complained to Garcia not about harassment, but regarding Rivera's purported failure to rotate machines with Soto. (Plaintiff's Dep. at p. 284.) At the time of the accident, Rivera was not even in Plaintiff's physical vicinity, but was conversing with Garcia at a distance far enough away from Plaintiff that she could not read their lips. (*Id*. at pp. 290-92.) Moreover, Plaintiff conceded that Rivera's purported failure to rotate was not harassment and was not directed at her. (*Id*. at pp. 236, 278-79, 282, 284.)

\4557175.2

Furthermore, Plaintiff concedes that Rivera did not harass her sexually on the day the accident occurred. Plaintiff testified as follows:

> Q: Tell me specifically what Mr. Rivera did [on the day of the accident] that you believe was harassing.
>
> A: That's when he was grabbing my hands trying to get my attention because this was the day I wasn't even looking at him, I was just trying to ignore him and I thought – and so to get my attention he would grab my hand or he would take the meat and grab it away from me. So then I had to look over at him and get it back. I mean, I would – and this is where he was throwing the meat at my butt. It was nothing sexual that day because it was just basically torture is what he was doing.
>
> Q: Okay. So it was nothing sexual that day but you claim that he threw meat at your butt?
>
> A: Yes.

(*Id*. at pp. 303-04.) Additionally, Plaintiff did not complain to Garcia or any other supervisor on September 28, 2005 that Rivera sexually harassed her on that date. (*Id*. at pp. 278-79, 301.)

Finally, Plaintiff's testimony demonstrates that the cause of the accident was her own failure to pay attention to her work. Plaintiff testified that immediately after complaining to Garcia regarding Rivera, Plaintiff resumed her operation of her machine, but proceeded to turn her head and glance over her left shoulder on two separate occasions in an effort to watch Garcia and Rivera. (*Id*. at pp. 285-91.) Plaintiff concedes that her behavior constituted a violation of CMSC's safety policies and procedures. (*Id*. at p. 299.) The accident occurred shortly after Plaintiff glanced over her shoulder a second time during a period where she admits she was not paying attention to the performance of her duties. (*Id*. at pp. 291-92.) When asked to explain how the accident occurred, Plaintiff testified that "[o]bviously I was not concentrating." (*Id*. at p. 292.)

As a result, Plaintiff cannot demonstrate that the September 28, 2005 accident was caused by Rivera's purported sexual harassment. Therefore, CMSC is entitled to summary judgment on

14

its Eleventh Defense, barring Plaintiff from recovering any damages in connection to the injuries she suffered on September 28, 2005. *See Shick*, 307 F.3d at 614-15; *Hamilton v. V.E. Rodgers*, 791 F.2d 439, 444 (5th Cir. 1986) (holding as a matter of law that plaintiff could not recover damages in connection to employee's death where she could not demonstrate that employee's death was caused by workplace harassment).

## CONCLUSION

For the reasons noted above, the Court should grant judgment as a matter of law to CMSC on its Tenth and Eleventh Defenses and prohibit Plaintiff from recovering damages for all injuries suffered as a result of the September 28, 2005 accident, including damages for lost wages due to her inability to work, the physical injuries to her left hand and **all** mental and/or emotional distress injuries for which Plaintiff seeks damages in this action. In addition, CMSC is entitled to summary judgment on Plaintiff's claim that it failed to reasonably accommodate her disability.

Dated: September 28, 2007

/s/ Michael R. Phillips
MCGUIREWOODS LLP
Joel H. Spitz
Michael R. Phillips
John C. Gardner
77 W. Wacker Dr., Suite 4100
Chicago, IL 60601
(312) 849-8100 (telephone)
(312) 849-3690 (fax)
jspitz@mcguirewoods.com
mphillips@mcguirewoods.com
jgardner@mcguirewoods.com

\4557175.2

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 28th day of September, 2007, I electronically filed the foregoing ***Defendant's Motion and Memorandum for Partial Summary Judgment*** with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

> R Gerald Barris:
> rgbarris@sorlinglaw.com,bjbiondolino@sorlinglaw.com
>
> John A Kauerauf
> jakauerauf@sorlinglaw.com,smranson@sorlinglaw.com


/s/ Michael R. Phillips_____

MCGUIREWOODS LLP
77 W. Wacker Dr., Suite 4100
Chicago, IL 60601
(312) 849-8100 (telephone)

\4557175.2

KIMBERLY WALLIS, JANUARY 17 and 18, 2007

---

**Page 1**

1    IN THE UNITED STATES DISTRICT COURT
2    FOR THE CENTRAL DISTRICT OF ILLINOIS
     SPRINGFIELD DIVISION
3

KIMBERLY WALLIS,        )
4                        )
     Plaintiff,          )
5                        )
     -vs-                )  No. 06-CV-03147
6                        )
CARGILL MEAT SOLUTIONS   )
7    CORPORATION, a Delaware  )
     Corporation,        )
8                        )
     Defendant.          )
9
10
11
12
13        THE INTERPRETED DISCOVERY DEPOSITION
     of KIMBERLY WALLIS, the plaintiff herein, called by
14   the Defendant for examination pursuant to notice
     and pursuant to the provisions of the Code of Civil
15   Procedure and the Rules of the Supreme Court
     thereof pertaining to the taking of depositions,
16   taken before me, Jill A. Bleskey, CSR-RPR, License
     No. 084-004430, a Notary Public in and for the
17   State of Illinois, at Sorling, Northrup, Hanna,
     Cullen & Cochran, Ltd., 607 East Adams Street,
18   Suite 800, in the City of Springfield, County of
     Sangamon, and State of Illinois on the 17th day of
19   January, A.D., 2007, commencing at 11:23 a.m. and
     on the 18th day of January, A.D., 2007, commencing
20   at 8:50 a.m.
21   -----------------------------------
22          Jill A. Bleskey, RPR
            CSR #084-004430
23

ORIGINAL

---

**Page 2**

1              APPEARANCES
2    For the Plaintiff:
3    SORLING, NORTHRUP, HANNA, CULLEN & COCHRAN
       Attorneys at Law
4      607 East Adams Street, Suite 800
       Springfield, Illinois 62705
5      (217)544-1144
       BY: R. Gerald Barris
6
     For the Defendant:
7
     McGUIRE WOODS, LLP
8      Attorneys at Law
       77 West Wacker Drive, Suite 4100
9      Chicago, Illinois 60601
       (312)849-8100
10     BY: Mr. Joel H. Spitz
           and
11
     CARGILL MEAT SOLUTIONS CORPORATION
12     151 North Main Street
       Wichita, Kansas 67202
13     (316)291-2556
       BY: Ms. Angie Gregory
14
     ALSO PRESENT:
15
       Ms. Sheila Chapman, Interpreter
16     Ms. Missy Kinsel, Interpreter
       Mr. Junior Wallis, Father
17
              INDEX
18
     EXAMINATION CONDUCTED BY         PAGE
19
     Mr. Spitz              4
20   Mr. Barris             390
21
22
23

---

**Page 3**

1              INDEX OF EXHIBITS
2    EXHIBIT NUMBER                          PAGE
3    1 - November 15th, 2005 Evaluation from   39
       Dr. Packman
4    2 - New Employee Orientation Handbook     63
     3 - Beardstown Employee Handbook          69
5    4 - March 4, 2004 Orientation Test        78
     5 - July 2005 Safety Meeting Quiz         84
6    6 - Employment Application                98
     7 - May 4, 2004 Personnel Action Record  103
7    8 - December 13, 2004 Notice of 1st      106
       Written Warning
8    9 - July 14, 2005 Notice of 2nd Written  107
       Warning
9    10 - Printout of Attendance Point Status 109
       as of June 23rd, 2005
10   11 - Employee Statement Form of January  113
       18, 2005
11   12 - Supervisory Intake and Documentation 126
       Form
12   13 - Personnel Action Record for James   128
       Hinds
13   14 - Personnel Action Record for Ismael  190
       Rivera
14   15 - Charge of Discrimination            247
     16 - Complaint                           261
15   17 - Handwritten Notes dated September   279
       28th, 2005
16   18 - October 18, 2005 Statement of Injury 280
     19 - October 27, 2005 Independent Medical 293
17      Evaluation
     20 - December 15, 2005 Letter from Susan 323
18     Young
     21 - May 22, 2006 Letter from Susan Young 340
19

NOTE: Exhibits attached to transcripts.
20
21
22
23

---

**Page 4**

1              KIMBERLY WALLIS,
2          The witness, having been first duly
3    sworn upon her oath, testified as follows:
4          EXAMINATION CONDUCTED
5    BY: MR. SPITZ
6        Q.    Can you state and spell your full
7    name for the record, please?
8          BY: INTERPRETER CHAPMAN
9        A.    Kimberly, K-I-M-B-E-R-L-Y, Wallis,
10   W-A-L-L-I-S.
11       Q.    Let the record reflect that this is
12   the deposition of Kimberly Wallis taken pursuant to
13   the Federal Rules of Civil Procedure. And Ms.
14   Wallis, my name is Joel Spitz and I'm one of the
15   attorneys representing Cargill Meat Solutions in
16   the lawsuit that you filed and I'm going to be
17   asking you a series of questions today. And if for
18   any reason you don't understand my question or if
19   my question is unclear to you I would ask that you
20   let me know otherwise I'm going to assume that you
21   both heard and understood my question, okay?
22       A.    Yes.
23       Q.    Okay. And as you know, we have

---

EXHIBIT
A

KIMBERLY WALLIS, JANUARY 17 and 18, 2007

Page 25

1    Q.   Is it fair to say that your hearing
2 was better out of your left ear during the time
3 that you were in high school than it is today?
4    A.   I really can't answer that.
5    Q.   Okay. So you can't tell me if it
6 really got worse since high school or better or
7 changed at all, it's about the same?
8    A.   I'm not going to say it's worse but,
9 you know, I've noticed that there has been a
10 decrease.
11    Q.   Well, if you're not going to say it's
12 worse but you've noticed a decrease, I guess I
13 don't quite understand that, what you mean by that.
14    A.   Because I actually thought I could
15 understand better in high school than now,
16 everything seems more muffled to me.
17    Q.   Well, for example, --
18    A.   For example, in school I could
19 understand what they were saying but now I can't
20 understand what they say in school. I thought they
21 said cool and they were saying school or they were
22 saying cool, vice versa. I would misunderstand and
23 mix up some of the words.

Page 26

1    Q.   Would it be fair to say that despite
2 your hearing impairment that you can still
3 effectively communicate?
4    A.   No.
5    Q.   Can you communicate by sign language
6 and reading lips?
7    A.   Oh, yes.
8    Q.   And you've been doing --
9 communicating through sign language and reading
10 lips for a long time; is that right?
11    A.   Yes.
12    Q.   How long have you been using sign
13 language?
14    A.   Since I was three years old.
15    Q.   And how long have you been reading
16 lips?
17    A.   Since I was three years old.
18    Q.   Okay. Do you consider yourself to be
19 a good lip reader?
20    A.   Yes, I do.
21    Q.   And would it be fair to say that the
22 people that you know believe that you are good --
23 you're a good lip reader?

Page 27

1    A.   Yes.
2    Q.   Would you say that you can understand
3 the vast majority of what other people tell you by
4 reading their lips?
5    A.   Sure. I can understand a lot of the
6 times.
7    Q.   And so it would be fair to say that
8 you don't really need an interpreter most of the
9 time to be able to communicate with other people?
10    A.   No, that's not fair to say. I would
11 want an interpreter.
12    Q.   Okay. But you're able to read
13 someone's lips and understand what they're saying,
14 right?
15    A.   But the thing with reading lips is I
16 can miss the key words that make the whole sentence
17 make sense.
18    Q.   How did you communicate while you
19 were in college?
20    A.   I had interpreters.
21    Q.   You had an interpreter with you at
22 all times?
23    A.   Yes. If there was group meetings, we

Page 28

1 had interpreters in the group meetings.
2    Q.   How about during the classes?
3    A.   Oh, yes. The interpreters were there
4 in the classroom.
5    Q.   Okay. Did you take any classes that
6 were specifically tailored to the hearing impaired?
7    A.   What? I'm sorry, what was the
8 question?
9    Q.   Were there any courses that you took
10 in college that were specifically tailored to the
11 hearing impaired?
12    A.   No.
13    Q.   You took many college courses, I
14 assume, along with students that were not hearing
15 impaired?
16    A.   Yes.
17    Q.   And you took many college courses
18 along with students who didn't know sign language?
19    A.   Correct.
20    Q.   Are there any courses that you took
21 in college that there was no interpreter?
22    A.   Well, at Gallaudet all of the
23 professors signed on their own so we didn't need

7 (Pages 25 to 28)

KIMBERLY WALLIS, JANUARY 17 and 18, 2007

Page 57

1  medical condition, I do need to eat. We can make
2  it very quick, half hour, 45 minutes, and
3  reconvene. Would this be a good point?
4        MR. SPITZ: Sure. That's fine. We
5  can do that now.
6        MR. BARRIS: We're going to take a
7  break to go to lunch. We'll be back 1:15.
8        (At this point in the proceedings a
9  short recess was taken, after which the following
10  proceedings were conducted;)
11       BY: MR. SPITZ
12  Q.    Ms. Wallis, during the lunch break,
13  did you speak to anyone about this case?
14       BY: INTERPRETER KINSEL
15  A.    No.
16  Q.    Did you speak to your father?
17  A.    Talk to my father about the case,
18  yes. I mean, not about it but we talked.
19  Q.    What did you discuss with your father
20  about the deposition?
21  A.    I just asked my father what he
22  thought.
23  Q.    What'd he tell you?

Page 58

1  A.    'Cause, I mean, this is making me so
2  nervous. He just kind of smiled and nodded his
3  head like "um."
4  Q.    He didn't say anything to you?
5  A.    No.
6  Q.    Before the break, you indicated to me
7  that this is -- this case against Cargill is the
8  only lawsuit that you filed; is that correct?
9  A.    Yes.
10  Q.    Did you ever file a lawsuit against
11  Townsend?
12  A.    I can't answer that.
13  Q.    Did you ever file any type of charge
14  of discrimination or lawsuit against any employer
15  other than Cargill?
16  A.    No.
17  Q.    For any of the employers that you
18  worked at prior to coming to work at Excel or
19  Cargill, did you ever complain about
20  discrimination?
21  A.    No.
22  Q.    Were you ever fired from any job?
23  A.    No.

Page 59

1  Q.    And my understanding is that you
2  submitted an application for employment with Excel
3  in February of 2004?
4  A.    Correct.
5  Q.    And is Excel the company that was
6  ultimately acquired by Cargill Meat Solutions?
7  A.    Yes.
8  Q.    When did that acquisition take place?
9  A.    That was January 1st of 2005.
10  Q.    And I take it that when that
11  acquisition took place in January of 2005 that your
12  position remained the same, you just went from
13  working for Excel to working for Cargill?
14  A.    Correct.
15  Q.    And your job duties remained the same
16  despite the fact that Cargill Meat Solutions
17  purchased Excel?
18  A.    Yes.
19  Q.    And your benefits remained intact?
20  A.    Yes.
21  Q.    And so for all intents and purposes
22  your job remained exactly the same; is that right?
23  A.    Correct.

Page 60

1  Q.    At the time that you applied for a
2  position at Excel you already had your B.S.; is
3  that correct?
4  A.    Correct.
5  Q.    I take it that you knew you would not
6  be able to use the skills associated with your
7  degree in the position for which you applied at
8  Excel; is that correct?
9  A.    Correct.
10  Q.    Why did you apply at Excel?
11  A.    Because I heard it was a quick job,
12  as far as you could get it. And I needed a job
13  immediately, I had three kids. Oh, actually, I had
14  two and I was pregnant, one on the way. So I just
15  thought, well, why not work there, you know, while
16  I was looking for another job. And then hopefully
17  find a job that I was able -- that I would be able
18  to quit Cargill and then work at the new job that I
19  was going to get.
20  Q.    Was there any point in time after you
21  started at Excel and ultimately worked for Cargill,
22  that you applied for any position using your B.S.
23  Degree from Southern Illinois?

15 (Pages 57 to 60)

KIMBERLY WALLIS, JANUARY 17 and 18, 2007

Page 61

1    A.    I talked about my degree with
2  Cargill's human resource department, you know, I
3  mentioned that I had a degree and I thought maybe
4  they had a position for me using my degree.  And
5  they did set up an interview with me and then we
6  did interview.  But they had said that they had
7  found another person to fill that position so I
8  just continued my work at Cargill.
9    Q.    What position were you inquiring
10  about at Cargill?
11    A.    It would be -- it would have been a
12  secretary.
13    Q.    And when did you inquire about that
14  position?
15    A.    It would have been a few months after
16  I started working there.
17    Q.    Is there any point in time that you
18  looked for a job to use your B.S. Degree from
19  Southern Illinois University outside of Excel or
20  Cargill after you started there?
21    A.    I've sent out resumes.
22    Q.    My understanding is that you received
23  a conditional offer of employment from Excel on or

Page 62

1  about February 24th, 2004, does that sound about
2  right?
3    A.    March 4th?
4    Q.    Didn't you receive a conditional
5  offer of employment from them in February of 2004?
6    A.    But I started working March 1st.  I
7  got -- I had an interview the third week of
8  February.
9    Q.    And didn't you get an offer from
10  Excel to start the first week of March of 2004
11  assuming that you passed the appropriate tests in
12  order to be employed?
13    A.    I don't understand the question.
14    Q.    All right.  The position that you
15  were applying for was the remove blade bone
16  position; is that correct?
17    A.    Yes.
18    Q.    And you understood, when you applied
19  for that position, that you would be working on the
20  assembly line in the pork processing plant; is that
21  correct?
22    A.    Yes.
23    Q.    And at the time that you started

Page 63

1  employment at Cargill you received a packet of
2  orientation materials; is that right?
3    A.    Yes.
4          MR. SPITZ:  Mark this Number 2,
5  please.
6          (At this point in the proceedings the
7  Court Reporter marked, for purposes of
8  identification, Deposition Exhibit Number 2, after
9  which the following proceedings were conducted;)
10          BY:  MR. SPITZ
11    Q.    Showing you what's been marked as
12  Exhibit Number 2 --
13    A.    All right.  This is new.
14    Q.    -- which is a document entitled "New
15  Employee Orientation" and it's Bates stamped 25.
16          INTERPRETER KINSEL:  It's stamped
17  what, I'm sorry?
18          BY:  MR. SPITZ
19    Q.    Bates stamped, I'm just looking, 25
20  through 88.  And then there are two pages at the
21  end entitled Excel Orientation Checklist.  Have you
22  seen this before?
23    A.    Yes, I've seen this before.

Page 64

1    Q.    And this is the orientation guide
2  that you received during the time that you started
3  working at Excel; is that correct?
4    A.    Yes, correct.
5    Q.    And this is a photocopy of your
6  particular orientation handbook along with the
7  checklist at the end, correct?
8    A.    Yes, this is mine.
9    Q.    And as a new employee at the plant it
10  was part of your job to read and understand the
11  contents of this handbook; is that correct?
12    A.    Yes.
13    Q.    And you did, in fact, read and
14  understand the contents of this handbook; is that
15  true?
16    A.    Yes.
17    Q.    If you take a look at Page 21 of the
18  exhibit -- or I should say of the handbook.  You
19  see on that page at the top there's a heading that
20  says "EEO Harassment Policy," do you see that?
21    A.    Yes.
22    Q.    Can you read to yourself the first
23  paragraph and let me know when you're done reading

16 (Pages 61 to 64)

KIMBERLY WALLIS, JANUARY 17 and 18, 2007

Page 93

1    Q.    Okay.  Were you capable of performing
2  that job without a sign language interpreter?
3    A.    Yes.  Because I worked alone.
4    Q.    Did you ever request an interpreter
5  to help you perform that job?
6    A.    No.
7    Q.    Okay.  In June of 2004 you were moved
8  to a pack-off position; is that correct?
9    A.    A pack-off position?
10    Q.    All right.  You said that you held
11  this position of boxing products for approximately
12  one year; is that right?
13    A.    Approximately, yes.
14    Q.    Okay.  And I'm not going to hold you
15  to the dates, I'm just trying to get a sense of how
16  long this was.  What was your next job after you
17  were doing the packing job?
18    A.    Then I started with the butt
19  skinners.
20    Q.    Okay.  When did you start with the
21  butt skinners?
22    A.    Um, it was around May or June.
23    Q.    Of 2005?

Page 94

1    A.    Yes.
2    Q.    And my understanding is that you got
3  a raise in January of 2005 to $11.35 per hour, does
4  that sound right?
5    A.    Yeah.  The raise was 35 cents, it's
6  an annual raise.
7    Q.    Okay.  Was there any job that you
8  held between the time that you were boxing and when
9  you held the butt skinner position?
10    A.    The question is pretty vague because
11  I worked -- you know, I did lots of jobs.  They put
12  me around to lots of the spots, so...
13    Q.    Okay.  I understand that.  I'm just
14  trying to get a handle on what positions you held.
15  If we call one of the positions that you held for a
16  year boxing products, does that sound right?
17    A.    Sure, uh-huh.
18    Q.    Okay.  And then you held another
19  position at the company called butt skinner; is
20  that right?
21    A.    Yes.
22    Q.    Can you give me the name of any other
23  position you held other than those two?

Page 95

1    A.    They put me upstairs to work on neck
2  bones and -- I mean, they transferred me to neck
3  bones.  But, I mean, it wasn't anything that was
4  permanent.
5    Q.    When you were transferred upstairs to
6  work on neck bones, did you perform your job well?
7    A.    Yes.
8    Q.    And did you have the need for a sign
9  language interpreter in that job?
10    A.    No.  Because again, it was a job that
11  I did solo, it was only me.
12    Q.    And there was no -- you never
13  requested a sign language interpreter for that job,
14  I take it?
15    A.    No, I didn't need to.
16    Q.    Okay.  When you got the butt skinner
17  job, was that something that you bid on?
18    A.    Yes, I bid on that job.
19    Q.    Did you have any problems performing
20  your job as a butt skinner?
21    A.    Yes, I did.
22    Q.    What kind of problems did you have?
23    A.    Um, there would be some pieces of

Page 96

1  meat that were coming through so fast and they
2  would actually get stuck.  So we'd have to have the
3  meat more in a line but we'd have to do it so
4  quickly that -- because we couldn't have any meat
5  that had fallen on the floor or if we had some bad
6  meat -- the other workers would have to do more
7  work if there was bad meat on the line.  But on the
8  platform where you put the meat -- you put this
9  meat on a platform, like a conveyor belt, and it
10  wasn't a solid platform, it was wobbly, you know,
11  it would flex up and down.  And people complained
12  about that.
13    Q.    Did you need a sign language
14  interpreter to do your job as a butt skinner?
15    A.    I mean, I can't say.
16    Q.    Well, did you ever request --
17    A.    That job did require a lot of
18  communication.
19    Q.    What kind of communication did it
20  require?
21    A.    Like we had to tell each other, you
22  know, here's some bad meat, we got bad meat coming
23  up.  So then they'd have to continue working hard

24 (Pages 93 to 96)

KIMBERLY WALLIS, JANUARY 17 and 18, 2007

Page 97

1   to mix -- to get it out of the mix and they'd have
2   to make sure they're cleaning the machines. Or,
3   you know, if the fat -- if there's such thick fat
4   on the meat, we'd have to make sure -- we'd have to
5   thin it off and get rid of that or, you know, it's
6   time to rotate.
7       Q.   Do you believe that you were able to
8   effectively communicate with your co-workers on
9   those issues?
10      A.   Um, I thought I could.
11      Q.   All right. Did you ever request a
12  sign language interpreter to be able to help you
13  perform your job as a butt skinner?
14      A.   No.
15      Q.   Did you ever attempt to bid out of
16  the butt skinner job or transfer to another
17  position?
18      A.   No.
19      Q.   In June or July of 2005 my
20  understanding is that you received a raise to
21  $11.50 per hour; is that correct?
22      A.   Yes.
23      Q.   During the time that you worked at

Page 98

1   Excel and Cargill, did you have perfect attendance?
2       A.   No, I don't have perfect attendance.
3   I did not have perfect attendance because I have
4   three children.
5       Q.   Okay. Did you have any attendance
6   problems during the time that you worked at the
7   company?
8       A.   No.
9           MR. SPITZ: Mark this Number 6,
10  please.
11          (At this point in the proceedings the
12  Court Reporter marked, for purposes of
13  identification, Deposition Exhibit Number 6, after
14  which the following proceedings were conducted;)
15          BY: MR. SPITZ
16      Q.   Showing you what's been marked as
17  Exhibit Number 6 which is an employment application
18  that I believe you filled out. Have you seen this
19  before?
20      A.   Yes.
21      Q.   And if you take a look at the last
22  page of the application, that's your signature; is
23  that correct?

Page 99

1       A.   Yes.
2       Q.   And you signed this document on
3   February 18th, 2004; is that correct?
4       A.   Correct.
5       Q.   And if you look at the -- there's
6   four paragraphs above your signature on that last
7   page, do you see that?
8       A.   Yes.
9       Q.   And if you look at the first
10  paragraph it says, "I affirm that the above
11  information is true and complete," do you see that?
12      A.   Yes.
13      Q.   And then it states, "In the event of
14  employment I understand that any falsification,
15  omission, misrepresentation, or concealment of
16  information on this application during interviews
17  or any other time during the hiring process shall
18  be sufficient cause for immediate discharge." Do
19  you see that?
20      A.   Yes.
21      Q.   I take it that all of the information
22  included on this application is true and accurate;
23  is that right?

Page 100

1       A.   Yes.
2       Q.   All right. Let's go to the last page
3   again. The paragraph just above your signature is
4   a paragraph indicating that you understand that
5   your employment is at will and you could be
6   terminated at anytime and for any reason, do you
7   see that?
8       A.   Right here, this one?
9       Q.   Yes.
10      A.   Yes.
11      Q.   And so you understood that your
12  employment was at will; is that correct?
13      A.   Yes.
14      Q.   Let's take a look at Page 2 of the
15  application. And right in the middle of the page
16  there is a box that has two questions where you can
17  check either yes or no, do you see that?
18      A.   Yes.
19      Q.   And if you take a look at the second
20  question it states, "Have you been convicted of or
21  pled guilty to a misdemeanor crime." Do you see
22  that?
23          MR. BARRIS: Within the last seven

25 (Pages 97 to 100)

KIMBERLY WALLIS, JANUARY 17 and 18, 2007

Page 129

1    Q.    And so Mr. Hinds received a written
2    warning as a result of your complaint; is that
3    correct?
4    A.    Okay. I didn't know.
5    Q.    And were you satisfied with the
6    actions that were taken by Cargill with regard to
7    your January 18th, 2005 complaint?
8    A.    Yes, I was.
9    Q.    In other words, Mr. Hinds did not
10   treat you in an inappropriate manner after you
11   complained to the company, correct?
12   A.    Correct.
13   Q.    And Mr. Hinds' behavior is not part
14   of the claims that you are bringing against Excel
15   in this case, correct?
16   A.    Correct.
17   Q.    And so it appears that your complaint
18   on January 18th, 2005 was successful in stopping
19   the behavior; is that right?
20   A.    Yes.
21   Q.    And nobody from Excel or Cargill
22   retaliated against you as a result of your
23   complaint; is that right?

Page 130

1    A.    No.
2    Q.    All right. Now, I think you said
3    earlier that you moved to a butt skinner position
4    in June of 2005; is that right?
5    A.    Yes.
6    MR. BARRIS: If we're going to be
7    moving on, we've gone for an hour and ten minutes.
8    Is it possible to take a break for a senior
9    gentleman?
10   MR SPITZ: I think we can take a
11   break for anybody, --
12   MR. BARRIS: Okay, thank you.
13   MR. SPITZ: -- it doesn't have to be
14   a senior gentleman. Want to take ten minutes, five
15   minutes?
16   MR. BARRIS: Okay. Thank you.
17   (At this point in the proceedings a
18   short recess was taken, after which the following
19   proceedings were conducted;)
20   BY: MR. SPITZ
21   Q.    Ms. Wallis, you testified that you
22   moved to the butt skinner machine in June of 2005;
23   is that right?

Page 131

1    BY: INTERPRETER KINSEL
2    A.    Yes.
3    Q.    And what did that position involve?
4    A.    There was actually three different
5    machines. Two of the machines are ones that we use
6    every day and then there's one machine that is only
7    used to really get the -- if there's really thin,
8    thin fat, to get that. So that's when we have to
9    use that machine.
10   We're supposed to grab the right side
11   of the butt for the right side of the machine and
12   same for the -- left side of the butt for the left
13   side of the machine. We have to rotate or adjust
14   the blade for the thickness of it, we kind of
15   rotate it around the top of the meat and shove it
16   through. And then position wise, we rotate every
17   30 minutes. And I don't know -- do you want to
18   know anything more?
19   Q.    There was a single blade machine and
20   two double blade machines, right?
21   A.    There was two -- the blade on the one
22   machine -- there was two blades on the machine, one
23   is the top blade to skin off the fat and then the

Page 132

1    second blade is to cut off the skin of the meat.
2    Q.    Okay, all right. But you said that
3    there were three machines. And just so I'm clear,
4    one of the machines was a single blade and the
5    other two machines were double blade; is that
6    right?
7    A.    That one machine, I'm not sure how
8    many blades that one had. But that -- I just know
9    that machine takes away the thin -- I mean, if
10   there's thin fat on there, that's what it would get
11   rid of.
12   Q.    Okay. Of all the machines, would it
13   be fair to say that the single blade machine was
14   the easier to operate?
15   A.    I can't say that.
16   Q.    So it was just as hard to work the
17   double blade machine in your rotation as it was to
18   work the single blade, is that what you're saying?
19   A.    But we never really worked on that
20   machine that often because we always had really
21   thick fat. The fat was thick so it was very rare
22   that you found a piece of meat with thin fat on it.
23   So I would say we probably -- I've only touched

33 (Pages 129 to 132)

KIMBERLY WALLIS, JANUARY 17 and 18, 2007

Page 133

1  that machine -- I mean, like used it from when I
2  started working, I maybe used it -- operated it on
3  three or four times. Because the supervisor didn't
4  want us to be operating on that machine.
5      Q.    So other than three or four
6  occasions, during the time that you were working on
7  the butt skinner machines, you were only working on
8  the single blade, is that what you're saying?
9      A.    Could you please ask me the question
10  again?
11      Q.    Sure. What I'm -- my understanding
12  is during these 30 minute rotations you'd work 30
13  minutes on a single blade machine and then you
14  would go work 30 minutes on a double blade machine,
15  is that not how it worked?
16      A.    No. First we start 30 minutes on the
17  left side, then we'd rotate around to the other
18  side where we'd go to the other side, the right
19  side, and then we'd have a 30 minute break. That's
20  how the rotation was. So the third rotation was
21  basically on break. But when we did have to work
22  on the third machine then we weren't allowed to
23  have a break because we were working on that third

Page 134

1  machine, the thin fat machine.
2      Q.    And just so we're talking about the
3  same thing. Whether you were working on the left
4  slide or the right side, those were single blade
5  machines; is that right?
6      A.    Those were double blade, top and
7  bottom.
8      Q.    All right. So the -- most of the
9  time that you were working in this job was on a
10  double blade machine, whether it was on the left
11  side or the right side; is that correct?
12      A.    Correct.
13      Q.    And the only time that you would work
14  on the single blade machine was really a rare
15  circumstance and, in fact, I think you said only
16  three or four times during the entire time you
17  worked there; is that right?
18      A.    I'm not sure how many blades were on
19  that machine, that third machine. I don't know if
20  it was a single or if it was a double.
21      Q.    Did you ever work on a single blade
22  machine during the time that you were working in
23  butt skinning?

Page 135

1      A.    I don't know.
2      Q.    All right. Was the left side or the
3  right side more difficult to work on or was it
4  equal?
5      A.    I would say it was pretty much the
6  same.
7      Q.    Okay. Did you work in teams of
8  skinners?
9      A.    It was a team of three.
10      Q.    And so two of you would be working on
11  one machine where one other person would be working
12  on another machine?
13      A.    I just -- one person was working on
14  the left machine, another person was working on the
15  right side, that right machine, and then the third
16  person was supposed to be, like, technically on the
17  third machine. But there was never any sort of
18  meat that we had to do on that so that's when we
19  would have that as it would be like a break.
20      Q.    Okay. So it would be fair to say
21  that if you were working alone on a machine, that
22  would be more difficult than if you had another
23  team member working with you on the machine?

Page 136

1      A.    No, no, no. I don't understand the
2  question.
3      Q.    Would you ever work on a machine
4  along with one of your team members?
5      A.    Are you talking one machine? It's
6  one person per machine.
7      Q.    Okay. But you said there would be a
8  time period where the third machine no one would be
9  working on it, or it would be on break. So would
10  the other team member then help either the left
11  side or the right side?
12      A.    I don't understand.
13      Q.    All right. During the time that you
14  were working on butt skinning, and you would work
15  either on the left side or the right side for the
16  30 minute stint, would you be working alone or in
17  teams with someone else on that particular machine?
18      A.    You're right. I don't understand the
19  question so I can't answer it.
20      Q.    When you were working on a machine in
21  butt skinning was it just you on a machine?
22      A.    Yeah. It was only me, me on one
23  machine and the other person on the other machine.

34 (Pages 133 to 136)

KIMBERLY WALLIS, JANUARY 17 and 18, 2007

Page 137

1    Q.    And what I'm asking you is was there
2  ever an occasion where one of your team members
3  would assist you while you were working on a
4  machine?
5    A.    No.
6    Q.    Okay.  Who were your other team
7  members when you were in butt skinning?
8    A.    Juanita.  Juanita Soto, S-O-T-O, and
9  then Ismael Rivera and myself.
10    Q.    And you were supposed to be rotating
11  through the machines; is that correct?
12    A.    Yes.
13    Q.    Thirty minutes on the left side, 30
14  minutes on the right side, and then 30 minutes of
15  either break time; is that right?
16    A.    Right.
17    Q.    Okay.  And who was your supervisor in
18  that position?
19    A.    It was Fred Ross.
20    Q.    And who worked in the same vicinity
21  as you who was not in butt skinning?
22    A.    I don't know their names.
23    Q.    My understanding is that you began

Page 138

1  working with Mr. Rivera in July of 2005; is that
2  right?
3    A.    Yes.
4    Q.    And the two of you were friends at
5  first; is that right?
6    A.    Um, I would not call it friends.  I
7  wouldn't say friends.  But he had been hitting on
8  me.
9    Q.    Well, Mr. Rivera was friends with
10  your boyfriend and the father of your children,
11  right?
12    A.    No.  No, no.
13    Q.    They were never friends?
14    A.    No.
15    Q.    Did they know each other?
16    A.    No.
17    Q.    They never had met each other?
18    A.    No.
19    Q.    My understanding is that on August
20  10th, 2005 you complained to a supervisor that Mr.
21  Rivera had taken a picture of you with his cell
22  phone while both of you were on the production
23  floor; is that right?

Page 139

1    A.    While I was on the floor, yes.
2    Q.    Did you see the picture?
3    A.    No.  He was trying to show it to me
4  but I didn't want to look at it.  I didn't -- I
5  didn't want the sexual harassment going on anymore.
6    Q.    You have no idea what the picture
7  looked like?
8    A.    No.
9    Q.    You have no idea what the nature of
10  the picture was?
11    A.    No.
12    Q.    You have no idea whether you were
13  talking to someone else in the picture?
14    A.    No.
15    Q.    Do you know whether Mr. Rivera took
16  more than one picture?
17    A.    I don't know.
18    Q.    Do you know how many pictures Mr.
19  Rivera took?
20    A.    No.
21    Q.    Is there more than one occasion that
22  you claim Mr. Rivera took a picture of you?
23    A.    Could you please repeat that?

Page 140

1    Q.    Is there more than one occasion that
2  you claim Mr. Rivera took a picture of you on the
3  production floor?
4    A.    No.  It was just that one time as far
5  as -- that one time that he tried to show me.  And
6  that's what -- that scared me.
7    Q.    I take it that you have no idea what
8  was -- what that picture looked like; is that
9  right?
10    A.    Right.
11    Q.    And as far as you know, that picture
12  could have been of you talking to another person;
13  is that right?
14    A.    I don't -- I have no idea.
15    Q.    Did Mr. Rivera tell you why he had
16  taken a picture of you?
17    A.    He told my supervisor that he thought
18  I was beautiful, I don't know.
19    Q.    All right.  We'll talk about what --
20  how you know what he said to your supervisor.  I'm
21  asking you what he said to you.  Did he tell you
22  why he took the picture of you?
23    A.    No.

35 (Pages 137 to 140)

KIMBERLY WALLIS, JANUARY 17 and 18, 2007

Page 161

1  regarding Mr. Hinds and action had been taken
2  against him?
3      A.    Yeah.  That was a different shift.
4  The first shift, second shift, they're different.
5      Q.    And you contend these comments had
6  been made to you by Mr. Rivera.  Were they made
7  every day from the time he started until August
8  10th, 2005?
9      A.    Yes.  Yes.
10     Q.    And so at no point --
11     A.    Why do you say August the 10th?
12     Q.    At no point between July -- the first
13 week of July 2005 and August 10th, 2005 --
14     A.    That's why I'm getting confused.
15     Q.    Okay.  There was a time period where
16 you had a discussion in the lunchroom with Mr. Ross
17 regarding the picture on August 10th, 2005; is that
18 correct?
19     A.    Okay.
20     Q.    And you contend that Mr. Rivera had
21 engaged in these inappropriate statements to you
22 prior to August 10th, 2005, correct?
23     A.    Yes.

Page 162

1      Q.    And you contend that he made these
2  statements to you every single day from the time he
3  started until August 10th, 2005; is that right?
4      A.    Yes.
5      Q.    And after --
6      A.    Either sexually or harassing.
7      Q.    Well, what do you mean by "either
8  sexually or harassing," what do you mean by that?
9      A.    Because when it came to sexual I just
10 would kind of smile and shake my head and just go
11 on just so he would cooperate with us and not pick
12 on me and make me suffer.  So when I really ignored
13 him and I was fed up with him and frustrated,
14 wanted to be left alone, then he started harassing
15 me.
16     Q.    How did he harass you, what do you
17 mean by that?
18     A.    He'd grab the meat away from me and
19 pull it back where I would have to reach further to
20 get the meat, which was dangerous.  He would throw
21 the leftovers -- or throw all the meat that was
22 there together at the same time so I would have to
23 move even faster than normal.  And he refused to

Page 163

1  rotate.
2      Q.    When you had these conversations with
3  Mr. Ross between the first week of July, 2005 and
4  August 10th, 2005, did you mention to him these
5  things that were happening regarding the meat?
6      A.    Yes.
7      Q.    Okay.  And is it fair to say that
8  after the first few days that you began working
9  with Mr. Rivera and every day thereafter that you
10 had these discussions with Mr. Ross you referred to
11 not only inappropriate sexual comments but also the
12 meat situation?
13     A.    Yes.  Craig knows about it too.
14     Q.    I'm not asking about Craig, I'm
15 asking about your discussions with Mr. Ross.  Is it
16 fair to say that in every conversation you had with
17 him after that first week, after Mr. Rivera
18 started, up until August 10th, 2005, whenever you
19 spoke to Mr. Ross on the floor you mentioned not
20 only inappropriate sexual comments by Mr. Rivera
21 but in addition to that the issues with the meat;
22 is that a fair statement?
23     A.    Yes.

Page 164

1      Q.    And the first time you had the
2  conversation with Mr. Ross -- and I think you said
3  it may have been after a week that Mr. Rivera had
4  started -- there was absolutely no question in your
5  mind that you had been harassed by Mr. Rivera under
6  the antiharassment policy at Cargill; is that
7  correct?
8      A.    I don't understand.
9      Q.    Well, you said that he started
10 harassing you from the first time he began working
11 with you, correct?
12         THE WITNESS:  When he first started
13 working?
14         BY:  INTERPRETER CHAPMAN
15     A.    When he first started working?
16         BY:  MR. SPITZ
17     Q.    With you.
18         THE WITNESS:  He harassed me, yes.
19         BY:  INTERPRETER CHAPMAN
20     A.    He harassed me, yes.
21         BY:  MR. SPITZ
22     Q.    Is there any question in your mind
23 that the first day he began working with you that

41 (Pages 161 to 164)

KIMBERLY WALLIS, JANUARY 17 and 18, 2007

Page 169

1    Q.    And you never asked anyone to call
2  the 1-800 number on your behalf to mention the fact
3  that you had been harassed at employee assistance,
4  correct?
5    A.    That's correct.
6    Q.    All right. So you found Mr. Ross on
7  August 10th, 2005, right?
8    A.    Yes.
9    Q.    And you had a conversation with him
10  and Mr. Thornton; is that right?
11    A.    No. They both talked and then Fred
12  took me away with him.
13    Q.    Okay. Let me just ask you. Let me
14  go back to any conversation that you had with Mr.
15  Ross on the floor. Was there ever any occasion
16  during those conversations that you felt as though
17  Mr. Ross didn't understand what you were saying?
18    A.    I don't know.
19    Q.    Okay. Did you ever request Mr. Ross
20  to get you an interpreter for any conversations
21  that you had with him on the floor regarding Mr.
22  Rivera?
23    A.    They won't bring an interpreter in.

Page 170

1    Q.    That's not what I asked.
2    A.    They would say, try -- you try to
3  understand, let's write back and forth.
4    Q.    Okay.
5    A.    They won't bring in an interpreter.
6    Q.    All right. That wasn't my question.
7  My question was, at any point in time, during any
8  conversation that you claim you had every day
9  between sometime in July 2005 and August 10th, 2005
10  with Mr. Ross on the floor, did you ever ask him if
11  you could have a sign language interpreter?
12    A.    No. We talked one-on-one.
13    Q.    All right. This conversation on
14  August 10th, 2005 with Mr. Ross and Mr. Thornton,
15  where did that conversation take place?
16    A.    In the lunchroom.
17    Q.    All right. Was anyone else present
18  besides the three of you?
19    A.    It was not the three of us. Fred
20  brought me into the lunchroom, two people were
21  there, John Curry and Marlena McLaughlin.
22    Q.    And they were already sitting there?
23    BY: INTERPRETER KINSEL

Page 171

1    A.    Yes. They were on their break.
2    Q.    Okay. And Scott Thornton was not
3  part of this conversation?
4    A.    No. He had left.
5    Q.    Okay. And you had mentioned somebody
6  by the name of Marlene?
7    A.    Marlena, M-A-R-L-E-N-A.
8    Q.    What was her last name?
9    A.    I'm not sure of the spelling but it's
10  maybe M-C-G-L-A-U-G-H-L-I-N, McGlaughlin.
11    Q.    And what was her position at the
12  company?
13    A.    At first she was on the rib line and
14  then she moved over to the -- oh, the ham line.
15  The ham line, she was over at the ham line.
16    Q.    Okay. Was she a union non-exempt
17  employee or was she in management?
18    A.    No. She was a co-worker.
19    Q.    All right. And she was part of this
20  conversation that you had with --
21    A.    No. She saw everything though
22  because she's deaf.
23    Q.    Okay. Did you have a conversation

Page 172

1  with Mr. Ross in the lunchroom where Mr. Curry and
2  this woman, Marlena, were present?
3    A.    Yes.
4    Q.    All right. To the best of your
5  recollection, what was said between all of you
6  during that conversation?
7    A.    I was telling Ross the same thing
8  that I've been saying this whole time, that Ismael
9  likes me and that he's expecting me to do something
10  with him, I don't know what, but he's been
11  bothering me every day and he says things -- he's
12  saying things in detail now like he's saying things
13  like I want you and I know you want me.
14        I told Ross about -- I told him about
15  everything that he's been saying. I told him that
16  I'm scared, I told him about the pictures. I said,
17  you know -- I said, he's just like haunting me,
18  it's just getting too scary for me. When my
19  co-worker said -- my co-worker said that he said
20  where I lived, it just freaked me out and scared me
21  and I didn't know what he would be capable of.
22        So I told my supervisor that I want
23  this to stop. And I said, I'm going to get hurt if

KIMBERLY WALLIS, JANUARY 17 and 18, 2007

Page 201

1    A.    I don't know.
2    Q.    Was there any period of time in
3  September of 2005 that you complained to Mr. Ross
4  about Mr. Rivera and not properly rotating?
5    A.    Could you ask that again, please?
6    Q.    Sure. Did you ever complain to
7  anyone at Cargill that Mr. Rivera was not properly
8  rotating through the butt skinner machines?
9    A.    Several supervisors were aware of it.
10  Miguel Torres, Dave Long, all the supervisors were
11  aware of the problem.
12    Q.    My question was did you ever complain
13  to anyone that Mr. Rivera was not properly rotating
14  through the butt skinner machines?
15    A.    Yes. Dave Long and Miguel Torres and
16  Stacey Garcia.
17    Q.    How about Mr. Ross?
18    A.    And Ross, yeah, of course.
19    Q.    Have you now told me, in your
20  deposition today, all of the -- what you consider
21  to be inappropriate comments that Mr. Rivera made
22  to you during the time that you were employed at
23  Cargill?

Page 202

1    A.    Yes.
2    Q.    Are there any other inappropriate
3  comments that you claim anyone else made to you at
4  Cargill other than Mr. Rivera?
5    A.    I don't even know what I've already
6  told you and what I've said. He said he wanted to
7  meet me in the parking lot, he wanted to grab me
8  and kiss me. I would stay in the locker room for
9  10 or 12 minutes hoping he would leave before I
10  came out.
11    Q.    Okay. My question was whether -- is
12  there anyone else besides Mr. Rivera that you claim
13  made any inappropriate comments to you during the
14  time you were employed at Cargill?
15    A.    Several.
16    Q.    Okay. Who else do you contend,
17  besides Mr. Rivera, made any inappropriate comments
18  to you?
19    A.    Several. I mean, there were a lot of
20  people would say something to me.
21    Q.    Who?
22    A.    But when I'd say stop then they'd
23  leave me alone.

Page 203

1    Q.    Who?
2    A.    I don't know their names. They're
3  all Hispanic, they've got weird names.
4    Q.    All right. Just so I'm clear. We
5  talked earlier in your deposition about the
6  complaint you made regarding Mr. Hinds, correct?
7    A.    Yeah.
8    Q.    And we've now talked about all of the
9  ways in which you believe Mr. Rivera engaged in
10  inappropriate conduct, correct?
11    A.    I don't understand.
12    Q.    Okay. You've already told me all of
13  the ways in which Mr. Rivera engaged in
14  inappropriate conduct and Mr. Hinds, correct?
15    A.    Yeah.
16    Q.    All right. And you told me that
17  there's other people that may have said things to
18  you but you don't recall their names, right?
19    A.    Right.
20    Q.    All right. So as you sit here today,
21  there's no particular person that you can identify
22  that you haven't already told me about that you
23  contend made any inappropriate comments to you

Page 204

1  while you were employed at Cargill; is that right?
2    A.    I'm not sure if I understand your
3  question.
4    Q.    All right. You mentioned that there
5  may have been some people who spoke Spanish and had
6  funny names that made comments to you but you don't
7  recall their names; is that correct?
8    A.    That's correct.
9    Q.    Okay. Can you at least identify for
10  me what comments that you claim they made to you?
11    A.    They would say -- they would make
12  gestures like I had big boobs and I'd -- they would
13  use the -- that gesture to talk about pussy and I
14  just dropped it.
15    Q.    Well, did you tell them to stop?
16    A.    Yeah. I said, oh, just go away. And
17  then they did. One guy would come up to me and
18  grab me while I was walking on break and I said, I
19  don't like it. And I walked away and he left me
20  alone.
21    Q.    Who was that?
22    A.    I don't know his name.
23    Q.    When was that?

51 (Pages 201 to 204)

KIMBERLY WALLIS, JANUARY 17 and 18, 2007

Page 209

1  if they were aware of exactly what was going on
2  because they were all Hispanic and they all speak
3  Spanish. But they know I was very frustrated.
4      Q.    Okay. My question to you is -- I
5  just want to make sure -- it's not a trick
6  question. I just want to make sure that I know who
7  you contend are the people that you complained to
8  at Cargill regarding Mr. Rivera. And I think
9  you've told me today all of the people you
10 complained to and you've told me about all those
11 conversations; is that a fair statement?
12     A.    To the best of my knowledge.
13     Q.    All right. Is there anything that
14 you can recall that was said during any of those
15 discussions with Mr. Ross or Mr. Cagle or anyone
16 else that you haven't yet told us about here today
17 regarding complaints involving Mr. Rivera?
18     A.    At this moment, no.
19     Q.    All right.
20     A.    I'm so tired. My mind -- my brain is
21 just -- that's why I keep asking you to repeat
22 again. I'm just physical -- I'm just exhausted.
23     Q.    All right. Was there any point in

Page 210

1  time that you took notes, during the time that you
2  were employed at Cargill, regarding Mr. Rivera's
3  conduct towards you?
4      A.    No, I didn't keep a record.
5      Q.    Why not?
6      A.    I was too -- I was too busy. I have
7  three little children, I have to pay attention to
8  them.
9      Q.    Was there --
10     A.    But I do cry and complain, I was
11 crying and complaining to my boyfriend. I've cried
12 and talked to my family over the phone. But me, as
13 far as myself documenting it, no, I have not done
14 that. I don't have time for myself, not with three
15 kids.
16     Q.    What did you tell your boyfriend
17 about Mr. Rivera?
18     A.    I told him that he keeps talking to
19 me saying these things to me and that he took a
20 picture of me and he's been trying to -- you know,
21 wants to meet me outside.
22     Q.    When is the first time you had a
23 discussion with your boyfriend about Mr. Rivera?

Page 211

1      THE WITNESS: When?
2      BY: INTERPRETER KINSEL
3      A.    When is the first time? When he
4  first started working with me.
5      BY: MR. SPITZ
6      Q.    Okay. Would you talk to your
7  boyfriend about Mr. Rivera every day?
8      A.    No, not every day. When it was
9  really getting worse. You know, I try not to bring
10 my problems from work to home. But, man, when it
11 was really a bad one, so frustrating, and I just
12 was like -- I just needed to get it off my chest
13 then I would tell him.
14     Q.    And you would cry when you were
15 talking to your boyfriend?
16     A.    Oh, yes.
17     Q.    Did you tell your boyfriend
18 everything regarding Mr. Rivera's conduct towards
19 you?
20     A.    Oh, yeah.
21     Q.    And what was your boyfriend's
22 reaction?
23     A.    He was upset. He wanted to see

Page 212

1  Rivera, he wanted me to show him who he was. But I
2  didn't want to do that, I wanted to keep it
3  separate.
4      Q.    There was a period of time where you
5  thought that Mr. Rivera was not properly rotating
6  on the shift; is that right?
7      A.    Right.
8      Q.    What specifically was he doing, was
9  he just late in rotating or he wasn't rotating at
10 all?
11     A.    He refused to rotate. There's a
12 difference between being late in rotating and
13 refusing to rotate all together. I mean, he
14 refused to rotate. He'd stand there and have that
15 look on his face like, yeah, right, I'm not coming
16 over there, like, you know, get away. Or he'd walk
17 and talk with the other people and then when he'd
18 see the supervisor come he'd run get on the line.
19     Q.    Okay. So it's your contention that
20 he actually failed to rotate?
21     A.    Yes.
22     Q.    How many times?
23     THE WITNESS: Many times.

53 (Pages 209 to 212)

KIMBERLY WALLIS, JANUARY 17 and 18, 2007

Page 229

1    A.    After the picture, I can't recall
2  when.
3    Q.    Well, how long after the meeting with
4  Mr. Ross and Mr. Rivera in the office did this
5  third meeting take place?
6    A.    Possibly the end of August.
7    Q.    Okay. Who called the meeting?
8    A.    Fred Ross.
9    Q.    And as you sit here today, you can't
10 tell me whether the meeting took place in either
11 August or September?
12   A.    It was the end of August because I
13 was hurt the beginning of September -- at the end
14 of September.
15   Q.    Can you tell me why in your complaint
16 you referred to the meeting and indicated it took
17 place sometime in September of 2005 when you now
18 claim it was in August?
19      BY: INTERPRETER KINSEL
20   A.    I don't know. I don't know. The
21 dates are confusing.
22   Q.    Okay.
23   A.    I can't recall the exact dates. I

Page 230

1  only remember, you know, the harassment and I can
2  remember the accident and the torture that I had to
3  endure, my suffering. I don't remember the dates,
4  that's -- I'm sorry, I just don't remember the
5  dates.
6    Q.    Okay. So as you sit here today, you
7  can't tell me whether this meeting took place in
8  August or September; is that right?
9    A.    No, I cannot tell you that.
10   Q.    All right. Where did the meeting
11 take place?
12   A.    It was in the office, in the main
13 office.
14   Q.    And who attended the meeting?
15   A.    It was Fred Ross, it was Craig
16 Deibal, and then the interpreter was there, John
17 Curry. And then he had meetings individually with
18 each of us.
19   Q.    When you say meetings with each of
20 us, who are you referring to?
21   A.    He had meeting with myself, he had a
22 meeting with Rivera, and then one with Juanita.
23   Q.    So first there was a meeting that you

Page 231

1  were there, Mr. Ross was there, Mr. Deibal was
2  there, and Mr. Curry?
3    A.    Yes.
4    Q.    And how long did that meeting last?
5    A.    I'm assuming 15, 20 minutes. I
6  wasn't paying attention to the clock.
7    Q.    And to the best of your recollection,
8  what did Mr. Ross say, what did you say, what did
9  Mr. Deibal say, and what did Mr. Curry say during
10 that meeting?
11   A.    Now, Curry was interpreting for me,
12 interpreting what they were saying. Not
13 everything, mind you, because he couldn't keep up
14 with what they were saying. Fred Ross, according
15 to what I understand from what John Curry
16 interpreted, was saying that -- he was just going
17 over the rules as far as the procedures of how it
18 works with the rotation and how this job
19 requires -- demands our attention and
20 concentration.
21      And then I just said, this is how I
22 feel. I said, I can't cooperate with that guy, he
23 likes me too much, he won't leave me alone, he's

Page 232

1  bothering me endlessly, he's been taking the meat
2  away from me, he's been grabbing my hand. I told
3  him, you know, I said, -- and Fred's response, I
4  know, I know, I know, I'll take care of it, I'll
5  take care of it. And then they said, okay, okay.
6  You're going to be okay? And I said -- and then he
7  said, I'm going to talk to other ones.
8    Q.    Okay. What did Craig Deibal say?
9    A.    And I also remember -- the one that I
10 think also happened. He also had mentioned
11 about -- he said I said something that Juanita said
12 that I said she was lazy and I didn't want to work
13 with her because she had called off of work the day
14 before. And that really puzzled me because I never
15 even said those comments. And I said that has to
16 be Rivera saying that. So -- my opinion is who
17 cares if she misses work, so what. I mean, Fred
18 was like, oh, okay, well, then I'll talk to each
19 one of them as well.
20   Q.    What did Craig Deibal say?
21   A.    I don't recall what he had said.
22   Q.    Okay. Did John Curry say anything?
23   A.    No. He was the interpreter, he was

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087  800.708.8087  FAX: 312.704.4950

KIMBERLY WALLIS, JANUARY 17 and 18, 2007

Page 233

1  interpreting what Fred was saying. He was trying
2  to interpret, he was trying to keep up anyway.
3      Q.    Okay. Had you requested for John
4  Curry to be there?
5      A.    No. Fred made sure he was there.
6      Q.    And did you believe that Fred was
7  taking your issues seriously during this meeting?
8      A.    I thought so.
9      Q.    And you don't recall anything that
10 Craig Deibal said?
11     A.    I don't -- he didn't say too much, he
12 was basically there to listen. I don't really
13 remember, but...
14     Q.    Who is Craig Deibal?
15     A.    As Fred introduced me to him, he said
16 that that was Fred's boss.
17     Q.    Okay. Do you consider Craig Deibal
18 to be an honest and truthful person?
19     A.    I don't know. I don't know him
20 because he was new.
21     Q.    I take it that you were not there
22 when Fred had a follow-up meeting with Mr. Rivera
23 and Ms. Soto; is that right?

Page 234

1      A.    No, I was not there in their
2  meetings.
3      Q.    All right. So you don't know what
4  was said during their meetings and you don't know
5  how long their meetings lasted?
6      A.    Correct. Yeah, I don't know that.
7      Q.    How did the meeting end that you
8  attended with Mr. Ross, Mr. Deibal, and Mr. Curry?
9      A.    It was just that, you know, I
10 understand the rules and I understand the
11 procedures. And I said -- you know, I told him
12 about my problem and he said, I will take care of
13 it. Fred Ross said, I will take care of it, and
14 that was it.
15     Q.    How did you feel when you left the
16 meeting?
17     A.    I was hoping that meeting would mean
18 something because he had brought in Craig.
19     Q.    Well, did you feel better that Craig
20 was there?
21     A.    I don't know because, like I said,
22 he's new. It seems like at least somebody above
23 Fred is hearing my complaints.

Page 235

1      Q.    Did you complain about Mr. Curry
2  during the meeting?
3      A.    About who?
4      Q.    John Curry, in any way.
5      THE WITNESS: Complain about him?
6      BY: INTERPRETER KINSEL
7      A.    Complain about him?
8      BY: MR. SPITZ
9      Q.    Yes.
10     A.    Why would I complain about him?
11     Q.    Is there anything else that you can
12 recall was said during that meeting other than what
13 you've told us here today?
14     A.    At this moment, no.
15     Q.    Okay. I take it that you did not
16 complain to anyone during that meeting that you
17 were having difficulty understanding what was being
18 discussed?
19     A.    I was just being patient with John
20 because he is trying.
21     Q.    Okay. And then I take it that you
22 didn't complain to anyone at the meeting that you
23 didn't understand what was being discussed,

Page 236

1  correct?
2      THE WITNESS: I could understand him.
3      BY: INTERPRETER CHAPMAN
4      A.    I could understand him. It's just
5  that he couldn't keep up with everything.
6      BY: MR. SPITZ
7      Q.    All right. But my question was
8  different. My question was, you never complained
9  to anyone?
10     A.    No, I never complained.
11     Q.    And during that meeting, you didn't
12 specifically discuss any sexual inappropriate
13 conduct by Mr. Rivera, you were talking about his
14 rotating on the line; isn't that true?
15     A.    Correct, to my knowledge.
16     Q.    As a result of that meeting, Cargill
17 established a machine rotation schedule to be used
18 by the butt skinners; is that right?
19     A.    Right.
20     Q.    And was what was the schedule?
21     THE WITNESS: A schedule?
22     BY: INTERPRETER KINSEL
23     A.    A schedule? Oh, I don't know about

59 (Pages 233 to 236)

KIMBERLY WALLIS, JANUARY 17 and 18, 2007

Page 253

1    A.    I am to everyone.
2    Q.    Did you ever flirt with anyone at
3  Cargill?
4    A.    Define flirt.  I have always smiled,
5  I would say, Hi, how are you.  But flirt, no.
6    Q.    Were you ever interested in anyone at
7  Cargill who you worked with?
8    A.    I may look and smile but I never
9  would do anything because I have a boyfriend, I
10  have kids.
11    Q.    Were you ever interested romantically
12  in anyone at Cargill who you worked with?
13    A.    No.
14    Q.    Are there any other comments that you
15  made to Mr. Rivera other than "Fuck you"?
16    A.    Um, I don't remember.
17    Q.    Did you ever see Mr. Rivera engage in
18  any inappropriate conduct with any other employee
19  besides you?
20    A.    I never paid attention.
21    Q.    Did you ever see Mr. Rivera not on
22  the line, in other words in the break room?
23    A.    Yes.

Page 254

1    Q.    And was it your impression that Mr.
2  Rivera had any friends at Cargill?
3    A.    I don't pay attention.
4    Q.    My understanding from your testimony
5  in this deposition is that you claim that Mr.
6  Rivera made all of these comments while you were on
7  the line; is that right?
8    A.    That's correct.
9    Q.    There was no place other than the
10  line where you claim he made any inappropriate
11  comments?
12    A.    There was one time in the parking lot
13  when he caught me.
14    Q.    When was that?
15    A.    And he would try to walk and catch up
16  with me but I'd get to my car.  And then he would
17  say, I know your hair is sexy, that's why I like
18  women with long hair.  And a lot of times I
19  wouldn't even listen, I just would watch to see
20  where he was and kept walking fast.  And he'd say,
21  why are you running away, why are you running away,
22  and I would just hurry off to my car.
23    Q.    When did this occur in the parking

Page 255

1  lot?
2    A.    I don't know.  I just remember the
3  incident.
4    Q.    Okay.  You can't tell me what month
5  that occurred?
6    A.    No.  It has to be within those three
7  months because that's when we were working
8  together.
9    Q.    How would you know what he was saying
10  if you were trying to walk away, wouldn't you have
11  to see his lips to understand what he was saying?
12    A.    I would catch some of the things but
13  I wouldn't catch everything.
14    Q.    You indicated yesterday that at some
15  point in time you believe Mr. Rivera tossed meat at
16  you; is that right?
17    A.    Little pieces of fat.  I don't know
18  what you call it.  It wasn't a big butt but it was
19  a little piece of fat, leftovers, that had been cut
20  off, he would throw them at me and hit me.
21    Q.    When did that happen?
22    A.    I don't know.
23    Q.    You can't tell me the month or the

Page 256

1  day?
2    A.    No.
3    Q.    How many times did it happen?
4    A.    I do recall that he did that on the
5  day of the injury.  Because he was mad at me
6  because I wouldn't even look at him, I just
7  pretended that he didn't even exist.
8    Q.    All right.
9    A.    And that's when he got mad.  I
10  remember that day.
11    Q.    All right.
12    A.    But others, maybe twice it happened.
13    Q.    Okay.  And we're going to talk about
14  the day of the accident.  But I guess let's put
15  that aside for a second.  You think there were
16  maybe two times prior to that date that he threw
17  meat?
18    A.    Yes, uh-huh.
19    Q.    Did anybody witness that?
20       THE WITNESS:  Not that I know of.
21       BY: INTERPRETER CHAPMAN
22    A.    Not that I know of.
23       BY: MR. SPITZ

64 (Pages 253 to 256)

KIMBERLY WALLIS, JANUARY 17 and 18, 2007

Page 261

1    MR. SPITZ: Sixteen, please.
2    (At this point in the proceedings the
3  Court Reporter marked, for purposes of
4  identification, Deposition Exhibit Number 16, after
5  which the following proceedings were conducted;)
6    BY: MR. SPITZ
7    Q.    Showing you what's been marked as
8  Exhibit 16 which is the complaint that was filed in
9  this case. Have you seen this before, Ms. Wallis?
10   A.    Yes.
11   Q.    And is all of the information in this
12 complaint true and accurate?
13   A.    I'm assuming it is.
14   Q.    You reviewed it before it was filed
15 with the Federal Court; is that right?
16   A.    Yes.
17   Q.    And you reviewed --
18   A.    There was some terms in this document
19 that I didn't understand, but...
20   Q.    Okay. But with regard to the factual
21 allegations of the complaint, you understood it and
22 it was factually accurate before it was filed; is
23 that right?

Page 262

1    A.    Yes.
2    Q.    Let's take a look at Page 9,
3  Paragraph 30. That paragraph states, "From the
4  date of her employment with the defendant,
5  plaintiff was fully capable of and could fully
6  perform the essential job functions of her jobs as
7  transferring product and/or meat skinner." Do you
8  see that in Paragraph 30?
9    A.    Yes.
10   Q.    Do you agree with that statement?
11   A.    Sure. Where I worked, yes.
12   Q.    So when you stated earlier that you
13 may need an interpreter to explain some of the
14 details of the job, that would be for a position
15 different from what you did at the plant?
16   A.    Yes.
17   Q.    Okay. You didn't need an interpreter
18 to do your job, correct?
19   THE WITNESS: No.
20   BY: INTERPRETER KINSEL
21   A.    No. I had a deaf man that was
22 helping me with the butt skinner, John Ressler.
23   BY: MR. SPITZ

Page 263

1    Q.    And there was never any point in time
2  when you worked at Cargill that you ever asked for
3  a sign language interpreter, correct?
4    THE WITNESS: Have I ever asked?
5    BY: INTERPRETER KINSEL
6    A.    Have I ever asked? Yes, yes.
7    BY: MR. SPITZ
8    Q.    Right.
9    A.    Yes, I have asked for sign language
10 interpreters.
11   Q.    When specifically have you asked?
12   A.    In the orientation I asked and during
13 the meetings when they said, oh, the interpreter
14 wasn't available. They said, well, we can try and
15 do this, we can write if you don't understand, we
16 can try and do this.
17   Q.    During -- if I understand then,
18 during the orientation process you asked for a sign
19 language interpreter; is that correct?
20   A.    Yes. And they told me they used John
21 Curry.
22   Q.    Okay. And were you given a sign
23 language interpreter during the orientation?

Page 264

1    A.    John Curry.
2    Q.    Okay. And was there any other
3  occasion that you asked specifically for a sign
4  language interpreter?
5    A.    In the meeting.
6    Q.    What meeting?
7    A.    For my complaints with Dave Callihan.
8  And I did and that's when they said, oh, he's busy
9  right now. And also -- well, yeah.
10   Q.    Okay. You said that there was a
11 meeting with Dave Callihan that you asked for a
12 sign language interpreter?
13   A.    Yes.
14   Q.    When was that meeting?
15   A.    Oh. That was about when I was late
16 on the line.
17   Q.    Yesterday I showed you a personnel
18 action form that you were written up for being late
19 on the line, do you remember that?
20   A.    Yes.
21   Q.    And that was -- the meeting that
22 you're talking about related to that particular
23 occasion?

66 (Pages 261 to 264)

KIMBERLY WALLIS, JANUARY 17 and 18, 2007

Page 265

1   A.    Yes.
2   Q.    And you had a meeting with Dave
3   Callihan and who else?
4   A.    The Union.  And his name, I do not
5   recall.
6   Q.    All right.  And what was the response
7   on that occasion when you asked for a sign language
8   interpreter?
9   A.    The interpreter is busy.  The
10  interpreter was not available is what the response
11  was.
12  Q.    All right.  Have you now told me all
13  of the occasions where you asked for a sign
14  language interpreter?
15  A.    To my knowledge, yes.
16  Q.    Did you attend safety meetings at
17  Cargill?
18  A.    Yes.  And I never understood them.
19  Q.    You went once a month; is that right?
20  A.    Yes.
21  Q.    And you took safety exams based on
22  those meetings, correct?
23  A.    That's when they would tell us the

Page 266

1   answers.
2   Q.    And you passed those tests based on
3   what you had understood at the meetings?
4   A.    No, I didn't understand.  I even told
5   them, I said, I don't understand everything that's
6   going on.  And they're like, oh, this isn't
7   important was their response.
8   Q.    Who did you tell at a safety
9   meeting --
10  A.    I told Dave and I told Fred, the two
11  supervisors that I've had experience with.
12  Q.    Why didn't you ask for a sign
13  language interpreter if you didn't understand?
14  A.    They wouldn't bring one in.  I said,
15  you know, I don't understand anything.  And they're
16  like, oh, it's nothing, don't worry about it, it's
17  nothing, it's not important.  It's not important,
18  it's about safety.  But they're like, but you're
19  doing fine.  Okay.
20  Q.    How would you know that they wouldn't
21  bring in a sign language interpreter if you never
22  asked for one during the safety meetings?
23  A.    I don't have to ask.  I mean, when

Page 267

1   I'm saying I don't understand -- I mean, when the
2   Spanish people are saying I don't understand there
3   is immediate call that they get a Spanish
4   translator to come in and when I say I don't
5   understand they're like, oh, don't worry, you'll be
6   all right, you'll be fine.
7   Q.    There was never any occasion during a
8   safety meeting at Cargill where you specifically
9   requested a sign language interpreter, isn't that
10  true?
11      THE WITNESS:  No.
12      BY:  INTERPRETER KINSEL
13  A.    No.
14      BY:  MR. SPITZ
15  Q.    You agree with me, you never asked
16  for that, right?
17      THE WITNESS:  I made it obvious.
18      BY:  INTERPRETER KINSEL
19  A.    I made it obvious.
20      BY:  MR. SPITZ
21  Q.    But you never asked, right?
22  A.    I didn't have to ask, they should
23  know.  They should have them ready.

Page 268

1   Q.    Is it your contention that you did
2   not know how to adequately and properly use the
3   machines safely?
4   A.    No, I think I did very well on the
5   machines.
6   Q.    Okay.  Well, as I understand it, you
7   indicated that you told them that you may not have
8   understood everything?
9   A.    Yes.
10  Q.    Does that mean that you don't believe
11  that you could adequately and safely operate the
12  machines?
13  A.    Well, I think it's important to
14  understand.  If everyone is supposed to understand,
15  I mean, I think I should be able to understand.
16  Q.    Is it your contention that you could
17  not -- because you didn't understand everything
18  that was said at the safety meeting, that you could
19  not adequately and properly operate the machines at
20  Cargill, is that your testimony here today?
21  A.    I don't know.
22  Q.    Okay.  So as you sit here today, you
23  can't even tell me whether you could adequately,

67 (Pages 265 to 268)

KIMBERLY WALLIS, JANUARY 17 and 18, 2007

Page 269

1  properly, and safely operate the machines at
2  Cargill; is that your testimony?
3     A.    I think I'm being safe.
4     Q.    And do you think that you were able
5  to adequately and properly operate the machinery
6  while at Cargill?
7     A.    Could you repeat the question?
8           MR. SPITZ: Could you read it back
9  for me, please?
10          (At this point in the proceedings the
11  Court Reporter read aloud the aforesaid question,
12  after which the following proceedings were
13  conducted;)
14          BY: INTERPRETER CHAPMAN
15    A.    I don't understand the question.
16          BY: MR. SPITZ
17    Q.    Do you think that you were able to
18  adequately, properly, and safely operate the
19  machinery at Cargill, were you able to do that?
20    A.    Without understanding Cargill's
21  desire to have -- to prevent the safety, no.
22    Q.    Okay.
23    A.    I think I should know -- I think I

Page 270

1  should have known everything as far as what was
2  going on.
3     Q.    Okay. So just so I understand your
4  testimony here today, and correct me if I'm wrong.
5  You're saying that because you couldn't understand
6  everything that was said during the monthly safety
7  meetings, you were not able to adequately and
8  safely operate the machinery at Cargill? That's
9  your testimony, right?
10    A.    I am just following what they told me
11  what I was supposed to do.
12    Q.    Okay. That doesn't answer my
13  question though. My question was, just so I
14  understand what you're saying here today, you're
15  telling me that you couldn't understand everything
16  that was said at the safety meeting and therefore
17  you couldn't adequately, properly, and safely
18  operate the machinery at Cargill, right?
19    A.    I don't know. I still don't
20  understand the question.
21    Q.    As you sit here today, -- well, let
22  me ask you this. What is it about my question you
23  don't understand?

Page 271

1     A.    Because it doesn't make sense. If I
2  don't understand the safety meeting then I probably
3  can't operate on the machine safely. I mean, is
4  that -- I don't get it.
5     Q.    Okay. Well, that helps me to
6  understand why you're confused about my question.
7  It sounds like me like what you're saying is since
8  you couldn't understand everything that was said at
9  the safety meeting you couldn't properly operate
10 the machinery and you couldn't do it safely, right?
11    A.    Safety is because -- I mean, you had
12 to use gloves. I would say that I think I have
13 enough knowledge to work on the machines. And I
14 felt like I was doing a good job.
15    Q.    And do you feel like you were doing a
16 good job in a safe manner?
17    A.    Yes, they liked my work.
18    Q.    And did they like your work and did
19 you feel you were doing a good job in a safe
20 manner?
21    A.    I didn't feel safe.
22    Q.    Do you believe that you were
23 operating the machinery in a safe manner?

Page 272

1     A.    No.
2     Q.    Did you ever tell anyone at Cargill
3  that you believed you were not operating the
4  machinery in a safe manner?
5     A.    Are you saying that I was not
6  operating the machine in a safe way? No, I feel
7  that I'm operating the machine in a safe way. But
8  the methods of the materials they're using, that
9  they use, I know that was not safe.
10    Q.    Okay. What I'm asking you -- and I
11 don't want to -- I'm not trying to confuse you, I
12 just want to make sure I understand what you're
13 saying. You're telling me that you were operating
14 the machinery in a safe manner?
15          THE WITNESS: Yes.
16          BY: INTERPRETER KINSEL
17    A.    Yes.
18          BY: MR. SPITZ
19    Q.    And you knew, yourself, how to
20 operate the machinery in a safe manner?
21          THE WITNESS: Yes.
22          BY: INTERPRETER KINSEL
23    A.    Yes, yes.

68 (Pages 269 to 272)

KIMBERLY WALLIS, JANUARY 17 and 18, 2007

Page 273

BY: MR. SPITZ

1
2    Q.    All right.  And -- okay.  Is there
3    any way in which you believe Cargill should have
4    accommodated you due to your alleged disability?
5    A.    Is there any -- now, what'd you say,
6    could you repeat the question?  Is there any
7    accommodations?
8    Q.    Right, correct.  Is there any
9    accomodation that you believe Cargill should have
10   given you while you were employed there?
11   A.    Not on the line, no.  But I think
12   they should have had interpreters during the
13   training, no matter what.  I mean, they have
14   Spanish interpreter trainers, they have African
15   interpreter trainers, but where's the deaf trainer?
16   Q.    During the safety meetings?
17   THE WITNESS: Anytime.
18   BY: INTERPRETER KINSEL
19   A.    Anytime.
20   BY: MR. SPITZ
21   Q.    There were occasions where John Curry
22   was helpful in signing for you and also occasions
23   where, I believe, you indicated that someone else

Page 274

1    who was deaf was helping you on the line; is that
2    right?
3    BY: INTERPRETER CHAPMAN
4    A.    Correct.
5    Q.    Did you find John Curry to be
6    helpful?
7    A.    He's trying.
8    Q.    Okay.  You like John Curry?
9    A.    He seems to be very nice.
10   Q.    You said that there were African
11   interpreters?
12   A.    Yes.
13   Q.    What do you mean --
14   A.    Trainers.
15   Q.    What do you mean by that?
16   A.    They translated for the African
17   people.  He would train the African people.
18   Q.    Any particular language?
19   A.    French.
20   Q.    Now, as I understand it, you were
21   involved in an accident at the Beardstown plant on
22   September 28th, 2005; is that right?
23   A.    Yes.

Page 275

1    Q.    And your left hand was caught in the
2    butt skinner machine while you were performing your
3    duties; is that right?
4    A.    Correct.
5    Q.    And this accident occurred at some
6    point after 10:30 a.m.; is that right?
7    A.    I remember 10:50, thereabouts.
8    Q.    Ten, five, oh?
9    A.    Yes.  Between 10:45 and 10:50.
10   Because I remember I rotated at 10:45.
11   Q.    And some point shortly after the
12   accident you spoke to Stacey Garcia, a plant
13   supervisor; is that right?
14   A.    After the accident?
15   Q.    Yes.
16   THE WITNESS: At the hospital?
17   BY: INTERPRETER CHAPMAN
18   A.    At the hospital?
19   BY: MR. SPITZ
20   Q.    Well, did you at any point in time on
21   September 28th, 2005 speak to Stacey Garcia?
22   A.    She came to visit me at the hospital.
23   Q.    Okay.  Did you speak to Stacey Garcia

Page 276

1    at any point in time before your accident on
2    September 28th, 2005?
3    A.    No.  She was new.  Not new to the
4    plant but new to the line.
5    Q.    So there was never any occasion on
6    September 28th, 2005, other than at the hospital,
7    that you spoke to Stacey Garcia; is that right?
8    A.    I talked to her.  I'm the one that
9    called Stacey to the line because Mr. Rivera
10   wouldn't rotate.
11   Q.    Okay.  And that was on September
12   28th?
13   A.    Yes.
14   Q.    Okay.  What time did you call her to
15   the line?
16   A.    As soon as I got on the machine.  She
17   was coming and I waved her down, got her attention,
18   and pointed behind me to Mr. Rivera and made the
19   gesture that he would not rotate.
20   Q.    Okay.  Did you actually speak to Ms.
21   Garcia?
22   A.    Yeah.
23   Q.    Or make a gesture?

69 (Pages 273 to 276)

KIMBERLY WALLIS, JANUARY 17 and 18, 2007

Page 277

1     A.    When she came to me and asked me what
2   happened. And I told her, he refuses to rotate, I
3   rotated and he said, I won't rotate. And she
4   talked to him.
5     Q.    And this is right after you had
6   started that day on the line?
7     A.    Yes.
8     Q.    How long had you been working on the
9   line that day before you had this conversation with
10  Ms. Garcia?
11    A.    As soon as I stepped on the machine
12  he walked off. He was supposed to rotate and he
13  just shook his head, nope. And I waved down the
14  supervisor and she came immediately.
15    Q.    Okay. So you were first starting on
16  the job that day when this happened or you were
17  just starting a rotation?
18    A.    Just starting a rotation.
19    Q.    Okay. And have you now told me
20  everything you can think of that was said between
21  you and Ms. Garcia when she approached you after
22  you flagged her down?
23    A.    Yes. To my knowledge, yes.

Page 278

1     Q.    All right. She was not actually your
2   usual line supervisor; is that right?
3     A.    No, she wasn't.
4     Q.    She was training on the butt skinner
5   line; is that right?
6     A.    Yes.
7     Q.    And as I understand it, Mr. Rivera
8   was supposed to rotate with Ms. Soto; is that
9   right?
10    A.    Yes, that's correct.
11    Q.    And that was your only complaint
12  about Mr. Rivera to Ms. Garcia before the accident
13  was that he was refusing to rotate; isn't that
14  true?
15    A.    She came to the line and said the
16  meat is not supposed to be on the floor, what
17  happened. And I said, I didn't do it; I said, Mr.
18  Rivera did it. Then she talked to Mr. Rivera.
19  Just try to keep the meat off the floor. She was
20  just trying to figure out how to get us to work.
21    Q.    Okay. In other words, you didn't
22  tell Ms. Garcia that day that Mr. Rivera was
23  harassing you in any way, you were complaining to

Page 279

1   her about the rotation; is that right?
2           THE WITNESS: At that moment.
3           BY: INTERPRETER CHAPMAN
4     A.    At that moment.
5           MR. SPITZ: Seventeen.
6           (At this point in the proceedings the
7   Court Reporter marked, for purposes of
8   identification, Deposition Exhibit Number 17, after
9   which the following proceedings were conducted;)
10          BY: MR. SPITZ
11    Q.    And, in fact, Ms. Wallis, you did not
12  complain at any point in time to Ms. Garcia on
13  September 28th, 2005 that Mr. Rivera was harassing
14  you in any way, correct?
15          THE WITNESS: Harassing me, no.
16          BY: INTERPRETER CHAPMAN
17    A.    Not harassing me, no.
18          BY: MR. SPITZ
19    Q.    Showing you what's been marked as
20  Deposition Exhibit Number 17 which appears to be
21  some handwritten notes dated September 28th, 2005.
22  Have you seen this before?
23    A.    Yes, I did.

Page 280

1     Q.    Okay. And these are your notes?
2     A.    Yes.
3     Q.    And when did you prepare these notes?
4     A.    I didn't write that.
5     Q.    Okay. Who wrote this?
6     A.    Juanita.
7           THE WITNESS: Her interpreter.
8           BY: INTERPRETER CHAPMAN
9     A.    Her interpreter who translated for
10  her, Gabrielle.
11          MR. SPITZ: Okay. Eighteen.
12          (At this point in the proceedings the
13  Court Reporter marked, for purposes of
14  identification, Deposition Exhibit Number 18, after
15  which the following proceedings were conducted;)
16          BY: MR. SPITZ
17    Q.    I'm showing you what's been marked as
18  Exhibit 18 which appears to be a statement of
19  injury from October 18th, 2005. Have you seen this
20  before?
21    A.    Yes. It was a bad day.
22    Q.    October 18th, 2005 was a bad day?
23    A.    Yes. With the visit from John Curry,

70 (Pages 277 to 280)

KIMBERLY WALLIS, JANUARY 17 and 18, 2007

Page 281

1  yes. I cried, I was upset. He said, just get it
2  over with, just get it over with. He even helped
3  me to write it because I was just really upset and
4  crying.
5       Q.    Okay. Where were you when you wrote
6  this?
7       A.    At my house.
8       Q.    John Curry came to your house to ask
9  you to fill this out?
10      A.    Yes. They asked John to come.
11      Q.    And is all of the handwriting on this
12  document your handwriting?
13      A.    Yes, it's my handwriting.
14      Q.    All right. And you signed it on
15  October 18th, 2005; is that right?
16          THE WITNESS: Correct.
17          BY: INTERPRETER CHAPMAN
18      A.    Correct.
19          BY: MR. SPITZ
20      Q.    And is all of the information in this
21  document true and accurate?
22      A.    Yes.
23      Q.    And so it's accurate to say, as it

Page 282

1  does in the middle of the document, "I rotated with
2  Ismael Rivera on the left side;" is that right?
3       A.    Yes.
4       Q.    "Ismael was to rotate with Juana Soto
5  on the right;" is that right?
6          THE WITNESS: Correct.
7          BY: INTERPRETER CHAPMAN
8       A.    Correct.
9          BY: MR. SPITZ
10      Q.    "Ismael refused to rotate with
11  Juana," correct?
12          THE WITNESS: Correct.
13          BY: INTERPRETER CHAPMAN
14      A.    Correct.
15          BY: MR. SPITZ
16      Q.    And I called the supervisor, Stacey
17  Garcia, and explained to her about Ismael's refusal
18  to rotate"?
19      A.    Yes.
20      Q.    At that time were you supposed to
21  rotate on to the easier machine?
22      A.    Not me. Juana was supposed to
23  rotate.

Page 283

1       Q.    And that would have meant that Mr.
2  Rivera was supposed to go back to working on the
3  more difficult machine; is that right?
4       A.    Correct.
5       Q.    And the idea was that you'd be 30
6  minutes on the difficult machine and then 30
7  minutes on the easier machine, no?
8       A.    No. One hour on the difficult
9  machine, 30 minutes on the easy machine.
10      Q.    That's right. So there were three
11  machines. You would work 30 minutes on the one
12  machine that was difficult, 30 minutes on another
13  machine that was difficult, and then 30 minutes on
14  the easier machine?
15      A.    Yes.
16      Q.    And at the time of the accident you
17  had worked just on 30 minutes on the difficult
18  machine and you were scheduled to go another 30
19  minutes on another difficult machine?
20      A.    No. I just finished my 30 minutes on
21  the easy machine and I was going to Ismael's to get
22  on the tough machine.
23      Q.    Okay. And then Ismael was supposed

Page 284

1  to go on to one of the tough machines?
2       A.    The other tough machine.
3       Q.    And Juana was supposed to go on the
4  easy machine. And that's what you were complaining
5  to Stacey Garcia about?
6       A.    That's correct.
7       Q.    Did Mr. Rivera tell you why he wasn't
8  rotating?
9       A.    No. He just said, nope, not going to
10  do it, with the attitude.
11      Q.    Was he just lazy or didn't want to
12  work, what is your impression?
13      A.    I feel it was revenge. Just --
14  'cause I wouldn't talk to him, just kind of blew me
15  off.
16      Q.    When he -- he didn't say anything to
17  you when he refused to rotate that day, did he?
18      A.    No. His body language and expression
19  said it all.
20      Q.    And so the issue was that Mr. Rivera
21  was failing to properly rotate with Ms. Soto not
22  with you, that was the issue, right?
23      A.    Correct.

71 (Pages 281 to 284)

KIMBERLY WALLIS, JANUARY 17 and 18, 2007

Page 285

1      MR. SPITZ:  This might be a good time
2   to take a five minute break, is that okay?
3      MR. KAUERAUF:  Sure.  Would you like
4   a break?
5      MR. SPITZ:  Okay.
6      (At this point in the proceedings a
7   short recess was taken, after which the following
8   proceedings were conducted;)
9      BY: MR. SPITZ
10     Q.     Ms. Wallis, when you were
11  communicating with Ms. Garcia about Mr. Rivera's
12  refusal to rotate on the line, I take it that you
13  had to look at Ms. Garcia's mouth in order to
14  communicate with her?
15     BY: INTERPRETER KINSEL
16     A.     Yes.  I took my foot off the pedal
17  and I told her, quickly.  I mean, I talked to her
18  and then I went back and continued my work.
19     Q.     But you had to take your foot off the
20  pedal and then turn towards her and you had to look
21  at her mouth; is that right?
22     A.     Yes, uh-huh.
23     Q.     And that was so you could read her

Page 286

1   lips; is that right?
2      A.     Correct.
3      Q.     And you faced away from the machine
4   in order to speak with her?
5      A.     Correct.  As long as you take your
6   foot off, yeah.
7      Q.     Okay.  Did you turn your body and
8   your head in order to face her or was she standing
9   in a place that she was in your line of sight when
10  you took your foot off the pedal?
11     A.     I don't remember.
12     Q.     You don't recall if she -- if, when
13  you took your foot off the pedal, you were looking
14  right at her or if you actually turned to speak to
15  her?
16     A.     I just remember I took my foot off
17  the pedal and then quickly spoke to her and then
18  went right back to working.
19     Q.     And you don't remember if you turned
20  your body or not to speak to her?
21     A.     Oh, she came up to me.  She had to
22  walk up the step and then I lifted my foot off the
23  pedal.  Yes, then I did turn so I could talk to her

Page 287

1   and then I turned my body back towards the machine
2   and put my foot back on the pedal and then started
3   working again.
4      Q.     And when you took your foot off the
5   pedal, did you step away from the machine when you
6   turned to speak to her?
7      A.     Yes, yes.
8      Q.     Did you turn off the machine?
9      A.     No, I did not turn off the machine.
10  But when you took your foot off the pedal, the
11  rollers stop.
12     Q.     Did you lock the machine out?
13     A.     No.
14     Q.     And the machine was still running
15  while you were speaking to Ms. Garcia; is that
16  correct?
17     A.     It was off.
18     Q.     No.  Didn't you continue to skin meat
19  while you were speaking with her?
20     A.     No.
21     Q.     There was no time on September 28th,
22  2005 when you were skinning meat and speaking to
23  Ms. Garcia at the same time?

Page 288

1      A.     Not at the same time, no.
2      Q.     Okay.  So if Ms. Garcia --
3      A.     I would push the meat -- you know, I
4   would grab the meat, push it through.  And then
5   when I -- if I wasn't touching the meat or not
6   looking, no, then I could look back at her.  And
7   then when I was done speaking to her I went back to
8   grabbing the meat and pushing it through.
9      Q.     So you would speak to her, push the
10  meat through, go back to speaking, push the meat
11  through, and it would be a rotation like that?
12     A.     No, it was not a continuous
13  conversation.  I just told her in the beginning
14  exactly what had happened and then I went back to
15  my line -- my work.  And then I think Ms. Garcia
16  and -- Juana and Rivera, they were arguing.
17     Q.     Okay.  So after you spoke to Ms.
18  Garcia -- well, strike that.  First you took your
19  foot off the pedal, then you turned towards Ms.
20  Garcia, you spoke to her.  How long did you speak
21  to her, was it a matter of just a few seconds?
22     A.     Oh, it was just five seconds, five or
23  ten seconds.  I just said, Ismael is refusing to

72 (Pages 285 to 288)

KIMBERLY WALLIS, JANUARY 17 and 18, 2007

Page 289

1  rotate.
2      Q.    All right.  And then you turned back
3  toward the machine, put your foot on the pedal and
4  continued to work; is that right?
5      A.    Yeah.  Then I continued my job.
6      Q.    Okay.  And then you looked over and
7  watched Ms. Garcia go up to Mr. Rivera to speak
8  with him about refusing to rotate?
9      A.    No.  I didn't watch that, no.
10     Q.    Well, did you turn --
11     A.    But I -- you know, I wasn't watching
12 but I glanced -- I mean, I glanced to see.
13     Q.    Okay.  Did you turn your whole body
14 to see what she was doing?
15     A.    No.  Just my head.
16     Q.    Okay.  So you continued to work on
17 the machine and while you were working on the
18 machine you turned your head to see what Ms. Garcia
19 was doing?
20     A.    No.  Because I did not have the meat
21 in front of me.  So when I looked and I could --
22 when I looked back to grab the meat I could push it
23 through.  But there was no meat there to grab.

Page 290

1  Sometimes there's kind of a five second span of
2  where there's meat and no meat.  And so when I
3  looked back I could see them and then some meat had
4  come in front of me and then I grabbed it.  But I
5  was not pushing and looking at the same time, I was
6  not doing that.
7      Q.    Okay.  Could you tell what Ms. Garcia
8  and Mr. Rivera were discussing?
9      A.    No.
10     Q.    Okay.  Were you looking to see if you
11 could read their lips?
12     A.    No, I couldn't do that.  I can't read
13 lips that far away, at a distance.
14     Q.    Well, then why where you looking?
15     A.    I wanted to see what Stacey was
16 doing.
17     Q.    Did you watch them as they spoke to
18 one another?
19     A.    No.  No, I can't -- I mean, I can't
20 understand what they're saying.
21     Q.    Okay.  But did you watch them
22 conversing in some way even though you couldn't
23 understand what they were saying?

Page 291

1      A.    No.  I would glance back and then I
2  went back to my work.  I got the meat, grabbed it
3  and put it through.  And then if there was no meat
4  I'd look behind me to see what was going on and
5  then when the meat would come in front of me I'd
6  grab the meat, push it through the machine.  But
7  when there was meat coming in, no, I would not look
8  back.
9      Q.    Okay.  In order to look to see what
10 they were doing, did you look over your left
11 shoulder or your right shoulder?
12     A.    I looked over my left shoulder.
13     Q.    How many times would you say you
14 looked over your left shoulder?
15     A.    Twice.
16     Q.    And as I understand it, the accident
17 occurred shortly after or during the time that you
18 looked at Ms. Garcia and Mr. Rivera?
19     A.    It happened after I looked.
20     Q.    Were you looking away from your work
21 at the time the accident occurred?
22     A.    No.
23     Q.    So the accident occurred when you

Page 292

1  were looking right at the machine?
2      A.    Yes, it did.
3      Q.    How did it occur if you were looking
4  right at the machine?
5      A.    Obviously I was not concentrating.
6  It was -- I was very -- it was very upsetting
7  moment, I was just so aggravated.
8      Q.    So in your mind the accident had
9  nothing to do with you looking away?
10     A.    No.
11     Q.    You were looking right at the machine
12 when it occurred?
13     A.    Yes, I was.  I was looking while I
14 had the meat on the platform.
15     Q.    You know somebody by the name of Dr.
16 Gordon?
17     A.    I looked at the files and I tried to
18 remember who that doctor is but I just can't
19 recall.  I don't remember the face anyway.
20     Q.    Okay.  Is it possible that you saw
21 someone by the name of Dr. Gordon?
22     A.    Yeah.  One time in Jacksonville.  I
23 mean, I remember the name.  I mean, if that's the

73 (Pages 289 to 292)

KIMBERLY WALLIS, JANUARY 17 and 18, 2007

Page 297

1 that you were speaking with Ms. Garcia or trying to
2 get her attention?
3      A.     I said that I was on the line and my
4 foot was off the pedal so when I took it off for
5 five seconds and talked to her or spoke to her and
6 then I went back and started working again, is what
7 I said.
8      Q.     Did you take your eyes off of the
9 work that you were performing when the accident
10 occurred?
11      A.     No.
12      Q.     Is it a safety violation to take your
13 eyes off of the task that you were performing at
14 the plant?
15      A.     Yes.  If you have the meat on your
16 hand, yes, that is a violation.
17      Q.     Okay.  So if the machine is running
18 and you don't have the meat on your hand, there's
19 no reason to keep your eyes on the machine?
20      A.     Well, no, you should be paying
21 attention.  You should be paying attention, your
22 body should be there at all times paying attention.
23      Q.     Well, as a matter of fact, even if

Page 298

1 you don't have meat on your hand, you should be
2 looking at the machine as opposed to glancing over
3 your shoulder, correct?
4      A.     Correct.
5      Q.     And you admit that there were
6 occasions shortly before the accident that you
7 continued to glance over your shoulder when you
8 were looking at Ms. Garcia and Mr. Rivera, correct?
9      A.     Not with the meat on my hands, no, I
10 did not look away.
11      Q.     I understand that.
12      A.     Because, I mean, it's easy to lift
13 your foot on and off the pedal, you know, stop,
14 look back, put it back on, I mean, that's easy to
15 do that.  You don't have to keep your foot on the
16 whole time and be looking around.  It's a simple
17 thing to just step off, look back, you know.  But
18 the power is off when -- when we power it off is
19 when we go on our break and that's when we power it
20 off.  But, you know, you can take your foot off,
21 look back, and put it back on, start doing the meat
22 again --
23      Q.     Is it a safety violation to split

Page 299

1 your attention between the task that you are
2 supposed to perform at work and something else?
3      A.     -- if the machine's not on.  If the
4 machine is on -- I'm sorry, if the machine is on
5 it's a safety violation.
6      Q.     Is it your contention that you did
7 not engage in any safety violation by looking
8 continually over your left shoulder at Ms. Garcia
9 and Mr. Rivera?
10      A.     Yes.
11      Q.     It is a safety violation or it's not
12 a safety violation?
13      A.     It is a safety violation.
14      Q.     Okay.  So you believe that you
15 engaged in a safety violation by doing that,
16 correct?
17      A.     Yeah, I guess.
18      Q.     And you knew that you weren't
19 supposed to be doing that, right?
20      A.     Yes.
21      Q.     And nobody asked you to look over
22 your shoulder and away from the machine, correct?
23      A.     Yeah.  No one asked me.

Page 300

1      Q.     That was your choice to do that?
2      A.     Correct.
3      Q.     I haven't seen anywhere in any
4 documents that you've submitted in this case that
5 you claim that Mr. Rivera harassed you in any way
6 on September 28th, 2005; isn't that true?
7      A.     Could you please repeat that?
8      Q.     Sure.  You're not claiming in this
9 case, I take it, that Mr. Rivera harassed you in
10 any way on September 28th, 2005.  What you're
11 complaining about is that he failed to rotate?
12      A.     No.  I did tell my attorney that he
13 was harassing me that day.
14      Q.     Okay.
15      A.     I told the other people at the
16 hospital that this could have been prevented
17 because of Rivera's, you know, continual
18 harassment.  And the one person who referred me to
19 go see the attorney was the two employees --
20 bosses -- the main bosses of Excel and they were
21 shocked when they heard what I was saying.  But
22 Craig, he had already known.
23      Q.     Okay.  That's not what I asked you,

75 (Pages 297 to 300)

KIMBERLY WALLIS, JANUARY 17 and 18, 2007

Page 301

1  ma'am, not even close. I asked you a different
2  question. My question to you was, I haven't seen
3  anywhere in any document that Mr. Rivera harassed
4  you in any way on the date of the accident. You've
5  already told me the ways in which you believe he
6  harassed you, that's not what I'm talking about.
7  I'm talking about on the day of the accident,
8  September 28th, 2005.
9      A.    Because Excel never even asked me
10  what had happened that day, they just wanted to
11  know about the accident.
12     Q.    Okay. You told me at the time of the
13  accident that you had complained to Ms. Garcia
14  about Mr. Rivera not rotating. Is there anytime on
15  September 28th, 2005, well before that or anytime
16  before that, that you claim Mr. Rivera harassed
17  you, on that date particularly?
18     A.    I did not tell anyone at Cargill
19  before on that day, no. But after that day I did
20  tell them what happened.
21     Q.    Okay. That's not my question. And
22  let me know if you don't understand my question in
23  any way but I have a different question. My

Page 302

1  question is -- and just so we're clear. You've
2  told me, I believe, all the ways in which you
3  believe Mr. Rivera harassed you and who you
4  complained to. I'm talking about just the day of
5  the accident, and I haven't seen anything
6  indicating that you believe he harassed you on that
7  particular day. And so you don't believe that he
8  harassed you on just that day?
9      A.    Yeah. No. He was. I was not able
10  to have the opportunity to write anything. I
11  haven't even, you know, talked to Cargill. They
12  knew about the problems but they weren't asking me
13  to write anything like as far as a harassment
14  report. So, I mean, you're right, I don't have
15  anything.
16     Q.    All right. You told me that the
17  accident occurred around 10:50 a.m.?
18     A.    Yes.
19     Q.    And that shortly before that is when
20  you had your discussion with Ms. Garcia and you
21  were looking over your shoulder and looking at Ms.
22  Garcia and Mr. Rivera, correct?
23     A.    Yes.

Page 303

1      Q.    And you were telling me that you had
2  talked to Ms. Garcia about Mr. Rivera failing to
3  rotate?
4      A.    Right.
5      Q.    Right. Is it your contention that
6  that day -- and as I understand it you started your
7  shift at six a.m.; is that correct?
8      A.    Correct.
9      Q.    Okay. Did Mr. Rivera, on just that
10  day -- I'm only asking about September 28th, 2005.
11  Is it your contention that he harassed you in any
12  way other than failing to rotate on the shift, did
13  he harass you in any way on that particular day?
14     A.    Yes, he did.
15     Q.    All right. Tell me specifically what
16  Mr. Rivera did that day that you believe was
17  harassing.
18     A.    That's when he was grabbing my hands
19  trying to get my attention because this was the day
20  I wasn't even looking at him, I was just trying to
21  ignore him and I thought -- and so to get my
22  attention he would grab my hand or he would take
23  the meat and grab it away from me. So then I had

Page 304

1  to look over at him and get it back. I mean, I
2  would -- and this is when he was throwing the meat,
3  this is where he was throwing the meat at my butt.
4  It was nothing sexual that day because it was just
5  basically torture is what he was doing.
6      Q.    Okay. So it was nothing sexual that
7  day but you claim that he threw meat at your butt?
8      A.    Yes.
9      Q.    What time that day did he throw meat
10  at your butt?
11     A.    I don't -- it was in the morning.
12     Q.    So you can't tell me whether it was
13  at six a.m. or at ten a.m., you have no clue?
14     A.    Yeah. It was in the morning.
15     Q.    And you claim that he grabbed your
16  hand?
17     A.    Yeah. He was grabbing my hand trying
18  to get me to look.
19     Q.    Okay. And this is while you were --
20     A.    And I was shaking it off and I was
21  saying -- you know, I was shaking my hand away from
22  him so he would let go and I was saying stop.
23     Q.    Okay. And this was during the time

76 (Pages 301 to 304)

KIMBERLY WALLIS, JANUARY 17 and 18, 2007

Page 309

1    occurred you'd claim they're lying?
2        A.    How did I get a 40 minute break?  I
3    only got a 30 minute break.
4        Q.    Well, you said it was possible that
5    you were late.  What I'm asking you is if somebody
6    claimed that you were 40 minutes late would you
7    claim they're lying?
8        A.    I don't know.
9        Q.    As a result of the accident your
10   pinky finger was amputated and your left hand was
11   injured; is that right?
12       A.    Yes.
13       Q.    Okay.  And you were rushed to the
14   emergency room?
15       A.    Yes.
16       Q.    And then over the next few days you
17   underwent surgeries on your hand; is that right?
18       A.    Yes.
19       Q.    And then, as I understand it, there
20   were numerous people from Cargill that visited you
21   in the hospital?
22       A.    Yes.
23       Q.    And John Curry visited you there,

Page 310

1    Fred Ross, and Craig Deibal; is that right?
2        A.    Yes.
3        Q.    Somebody by the name --
4        A.    And Sam.
5        Q.    That's Sam Nggalari?
6        A.    Yeah.
7        Q.    Somebody by the name of Lisa Jokisch?
8        A.    Yes.
9        Q.    Somebody by the name of Hinds?
10       A.    He stopped by?
11       Q.    Mr. Webster?
12       A.    I don't know who that is.
13       Q.    Anyone else that you can think of who
14   came to see you in the hospital?
15       A.    Stacey Garcia.  Cagle, Terry Cagle.
16   Fred Ross, Sam, Craig Deibal.  My family.  That's
17   all I can remember.  Oh, Gene Acree, Gene Acree.
18       Q.    Did Cargill send you a bouquet of
19   flowers or anything?
20       A.    No flowers, a teddy bear.
21       Q.    And was there anyone --
22       A.    For my kids.
23       Q.    And was there anyone else for Cargill

Page 311

1    who contacted you at the hospital or called you
2    there?
3        A.    Not that I can recall.
4        Q.    Who paid for your medical bills?
5        A.    Cargill.  Workmans comp.
6        Q.    And since the time that you suffered
7    the injury you have received workers compensation;
8    is that right?
9        A.    Um, not right after I got out of the
10   hospital, no.  I got it -- let's see, it started
11   October or December, I can't recall.  But it wasn't
12   right after I got out of the hospital.
13       Q.    The workers compensation that you've
14   received from Cargill was for the injuries that you
15   suffered to your hand; is that right?
16       A.    Yes, that's correct.
17       Q.    Okay.  And you also received workers
18   compensation for your medical bills associated with
19   your hand injury; is that right?
20       A.    I don't know if they paid my bills, I
21   still get bills in my mail.  I still get medical
22   bills in my mail.
23       Q.    All right.  But you haven't paid for

Page 312

1    any medical bills yourself --
2        THE WITNESS:  No.
3        BY:  INTERPRETER CHAPMAN
4        A.    No.
5        BY:  MR. SPITZ
6        Q.    All right.  And just so we're clear,
7    if you just let me finish my question for the
8    record.  There hasn't been one medical bill that
9    you paid yourself since the time of the accident,
10   those have all been paid by Cargill; is that true?
11       A.    True.
12       Q.    And you received workers compensation
13   for your period of temporary disability; is that
14   right?
15       THE WITNESS:  Correct.
16       BY:  INTERPRETER CHAPMAN
17       A.    Correct.
18       BY:  MR. SPITZ
19       Q.    And then Cargill also offered to send
20   you to psychological counseling after the accident;
21   is that right?
22       A.    Yeah.
23       Q.    Okay.  And that was when you saw Dr.

78 (Pages 309 to 312)

KIMBERLY WALLIS, JANUARY 17 and 18, 2007

Page 329

1  pain for a very long time. I couldn't use my hand,
2  it was very hard to even adjust and get used to
3  just one hand. I mean, it changed my lifestyle.
4      Q.    Okay. And I'm not disputing that.
5  I'm just asking you if there's been anytime since
6  September 28th, 2005 that you've actually been able
7  to work at all?
8          THE WITNESS: No.
9          BY: INTERPRETER KINSEL
10     A.    No.
11         BY: MR. SPITZ
12     Q.    Okay. So even as of today, you
13 aren't able to work today as a result of the
14 injury?
15     A.    I still have pain in my hand, I don't
16 think I can, you know, suffer with this pain at
17 work.
18     Q.    Okay. And I'm not disputing that you
19 have pain. Don't get me wrong, I'm not trying to
20 do that. I'm just trying to find out if you can
21 work. And it sounds like, due to the pain and your
22 injury, you haven't been able to work at all, even
23 up to today, since the time of the accident; is

Page 330

1  that right?
2      A.    I'm sorry. Could you say that again,
3  please?
4      Q.    Sure. I just want you to understand,
5  I'm not disputing that you have pain, that's not
6  what I'm asking about. I'm just trying to find out
7  if you are really able to work since the accident.
8  And it sounds like what you are telling me is that
9  you haven't been able to work since the accident?
10     A.    I can work but I have limited
11 mobility of my hand. I can't type and that's what
12 I wanted mostly, you know, I want to work on
13 computers. I can.
14     Q.    Okay. But just so I understand, you
15 got your degree from Southern Illinois University
16 in computers; is that right?
17         THE WITNESS: Correct.
18         BY: INTERPRETER KINSEL
19     A.    Correct.
20         BY: MR. SPITZ
21     Q.    Okay. And since the time of the
22 accident, you don't believe that you could work in
23 computers because of the pain from your hand; is

Page 331

1  that right?
2          THE WITNESS: And mentally.
3          BY: INTERPRETER KINSEL
4      A.    And mentally. And emotionally, I
5  just cry all the time. I basically hide myself, I
6  can't laugh anymore.
7          BY: MR. SPITZ
8      Q.    I understand that. I guess what I'm
9  asking you is with regard to work. What type of
10 work do you believe you can do?
11         THE WITNESS: I have no clue.
12         BY: INTERPRETER KINSEL
13     A.    I have no clue.
14         BY: MR. SPITZ
15     Q.    All right. Is there any date that
16 you can think of since the time of the accident, a
17 particular date, that you believe you could start
18 working?
19         THE WITNESS: Maybe now.
20         BY: INTERPRETER CHAPMAN
21     A.    Maybe now.
22         BY: MR. SPITZ
23     Q.    Well, when do you believe you could

Page 332

1  first start working, just now, right now, as in
2  today, or sometime recently?
3          THE WITNESS: Soon, I hope.
4          BY: INTERPRETER CHAPMAN
5      A.    Soon, I hope.
6          BY: MR. SPITZ
7      Q.    Is there any day you can think of,
8  prior to today and after the accident, that you
9  could actually work?
10     A.    No.
11     Q.    Are you able to use your left hand
12 with any degree at all?
13         THE WITNESS: I only have two
14 fingers.
15         BY: INTERPRETER CHAPMAN
16     A.    I only have two fingers. The
17 other -- the thumb and the index finger I have
18 limited movement and there's no feeling. Pretty
19 much, I can't do a lot with it. I just use my
20 right hand all the time.
21         BY: MR. SPITZ
22     Q.    Have you made any effort to look for
23 a job since September 28th, 2005?

83 (Pages 329 to 332)

KIMBERLY WALLIS, JANUARY 17 and 18, 2007

Page 345

1   to hospitals and clinics; is that right?
2       THE WITNESS: Yes.
3       BY: INTERPRETER CHAPMAN
4   A.   Yes.
5       BY: MR. SPITZ
6   Q.   And I take it you've also undergone
7   some type of physical therapy; is that right?
8       THE WITNESS: I did.
9       BY: INTERPRETER CHAPMAN
10  A.   I did.
11      BY: MR. SPITZ
12  Q.   But regardless of the therapy, you
13  will have some permanent disability in your hand;
14  is that correct?
15      THE WITNESS: Yes.
16      BY: INTERPRETER CHAPMAN
17  A.   Yes.
18      BY: MR. SPITZ
19  Q.   And you told me before that you've
20  received some workers compensation for the injury;
21  is that right?
22  A.   I'm sorry?
23  Q.   You told me before that you've

Page 346

1   received workers compensation for the injury?
2   A.   Yes, partly. I've been suspended
3   twice --
4   Q.   Okay.
5   A.   -- from workmans comp.
6   Q.   Have you received disability payments
7   from workers compensation as a result of the
8   injury?
9   A.   I only got one check from them.
10  Q.   How much was the check?
11  A.   So I don't know if it's disability or
12  workmans coverage, I don't know, I don't know the
13  difference.
14  Q.   And was part of that payment to
15  compensate you for the period of time that you were
16  unable to work?
17  A.   Workmans comp, that's all I'm
18  getting.
19  Q.   Well, some of the payments were to
20  compensate you for the permanent injury that you
21  suffered?
22  A.   I don't know the difference. I just
23  know that I'm getting a check that says workmans

Page 347

1   comp.
2   Q.   How much have you received in workers
3   compensation payments?
4   A.   $525 every two weeks.
5   Q.   And you're still getting that today?
6   A.   No.
7   Q.   When did that stop?
8   A.   October 15th, I believe, was my last
9   check.
10  Q.   Of 2006?
11      THE WITNESS: Yes.
12      BY: INTERPRETER CHAPMAN
13  A.   Yes, 2006.
14      BY: MR. SPITZ
15  Q.   I take it that you're not seeking
16  damages from Cargill relating to this injury,
17  correct?
18      THE WITNESS: Could you repeat,
19  please?
20      BY: INTERPRETER CHAPMAN
21  A.   Repeat that again, please.
22      BY: MR. SPITZ
23  Q.   Sure. You've received payments from

Page 348

1   workmans compensation as a result of your injury to
2   your hand. I take it that in this case you're not
3   claiming or seeking damages as a result of a
4   physical injury to your hand, are you?
5   A.   I don't understand that question.
6   Q.   Are you claiming damages in this case
7   as a result of permanent injuries to your hand?
8   A.   Yes.
9   Q.   Well, isn't that the damages that
10  you're seeking against the manufacturer of the
11  machine, Townsend?
12  A.   To my knowledge, yes.
13  Q.   Okay. Just so I understand. This
14  case against Cargill, for what you consider to be
15  harassment, you're not seeking damages in this case
16  as a result of the physical injury to your hand,
17  those are damages that you're seeking against
18  Townsend; is that right?
19  A.   I don't know.
20  Q.   Okay. I take it you're not seeking
21  to have Cargill pay for the medical expenses that
22  have already been paid pursuant to --
23      INTERPRETER CHAPMAN: Let him finish.

87 (Pages 345 to 348)

KIMBERLY WALLIS, JANUARY 17 and 18, 2007

Page 349

1  Please, say that again.
2       BY: MR. SPITZ
3    Q.    Okay. You're not seeking to have
4  Cargill pay for the medical expenses that have
5  already been paid pursuant to workers compensation,
6  are you?
7    A.    No.
8    Q.    And you're not seeking to have
9  Cargill compensate you for the period that you have
10  been unable to work, right?
11       BY: INTERPRETER KINSEL
12   A.    Yes, I would like them to pay for me
13  the time that I missed work.
14   Q.    Okay. Well, you've been compensated
15  through workers compensation for the time that
16  you've been unable to work; is that correct?
17   A.    Partly. But it's been suspended a
18  few -- it's been suspended twice so it hasn't been
19  consistent.
20   Q.    You have a claim in this case for
21  emotional distress damages; is that right?
22   A.    Yes.
23   Q.    And you claim that your emotional

Page 350

1  distress began as a result of the September 28th,
2  2005 accident; is that right?
3       THE WITNESS: Yes.
4       BY: INTERPRETER KINSEL
5    A.    Yes.
6       BY: MR. SPITZ
7    Q.    And would you say that the symptoms
8  and emotional distress that you've suffered from
9  were probably strongest in the days and weeks
10  immediately following the accident?
11       THE WITNESS: Yes.
12       BY: INTERPRETER KINSEL
13   A.    Yes.
14       BY: MR. SPITZ
15   Q.    And you've had nightmares of the --
16   A.    Yes.
17   Q.    -- accident and the fact that your
18  hand was stuck in the machine; is that right?
19   A.    Yes, I do.
20   Q.    All right. And do you still have
21  those nightmares today regarding your hand being
22  stuck in the machine?
23   A.    Yes. Last night I was thinking about

Page 351

1  it just because we were talking about it.
2    Q.    All right. And you also had
3  nightmares within a matter of a week and two weeks
4  and even a month of the accident; is that right?
5    A.    Oh, yes.
6    Q.    And these are nightmares as a result
7  of the -- getting your finger and hand caught in
8  the machine; is that right?
9    A.    Right.
10   Q.    And the other symptoms that you have
11  of emotional distress occurred as a result of the
12  accident and your injury; is that right?
13       THE WITNESS: Correct.
14       BY: INTERPRETER KINSEL
15   A.    Correct.
16       BY: MR. SPITZ
17   Q.    What symptoms of emotional distress
18  do you suffer from as a result of the accident and
19  injury?
20       THE WITNESS: Not eating.
21       BY: INTERPRETER KINSEL
22   A.    Not eating. I cry all the time,
23  yelling at my children. I just want to be alone

Page 352

1  all the time. I'm hiding in my home all the time.
2  My moods always fluctuate, you know, it's down and
3  then up a little bit, but pretty much down. I'm
4  just embarrassed. I hide my hand all the time.
5  I'm afraid -- I just -- I don't want to be out
6  there.
7       BY: MR. SPITZ
8    Q.    Okay. You indicated today that you
9  took Zantac and I can't remember the name of the
10  other medication. Can you tell me what that is?
11   A.    Cymbalta.
12   Q.    Cymbalta, that's right. How long
13  have you been taking Cymbalta?
14   A.    I started taking it, I would say,
15  around October of 2005.
16   Q.    So after the accident?
17   A.    Yes.
18   Q.    And Cymbalta is what type of
19  medication?
20   A.    It's an antidepressant and it's also
21  supposed to help with the pain.
22   Q.    And who prescribed that medication?
23   A.    Dr. Packman did.

88 (Pages 349 to 352)

KIMBERLY WALLIS, JANUARY 17 and 18, 2007

Page 353

1    Q.    Okay. But you didn't see Dr. Packman
2  until sometime after October 2005; isn't that
3  right?
4    A.    Okay.
5    Q.    So you started taking that when you
6  first started seeing Dr. Packman?
7    A.    Yeah. The first -- yeah, when I
8  first started seeing Dr. Packman.
9    Q.    All right. Is there any doctor,
10  prior to seeing Dr. Packman, who prescribed that
11  medication for you?
12    A.    No. Dr. Beatty, he gave me some
13  medication but it wasn't Cymbalta.
14    Q.    Do you know what medication it was?
15    THE WITNESS: Vicodin.
16    BY: INTERPRETER KINSEL
17    A.    Vicodin.
18    BY: MR. SPITZ
19    Q.    And that was for the pain of your
20  accident?
21    A.    Yes, that was for the pain.
22    Q.    All right. And who prescribed Zantac
23  for you?

Page 354

1    A.    Dr. Packman did.
2    Q.    Did you take Zantac anytime prior to
3  being prescribed that medication from Dr. Packman?
4    A.    No.
5    Q.    And is there anytime prior to October
6  of 2005 that you took any anti-depressants?
7    A.    No.
8    Q.    Are there any other medications that
9  you've taken since September 28th, 2005 other than
10  Cymbalta, Zantac, and the other medication, maybe
11  Vicodin, that Dr. Beatty prescribed?
12    A.    Dr. Packman actually tried two
13  different kind of medications and it was basically
14  for the seizure. But he found that that medication
15  was also supposed to help with the nerves, the pain
16  from the nerves. But he couldn't figure out why I
17  still had the pain. And two medications I couldn't
18  take, the first one made my skin itch terribly and
19  I'd wake up from the itching and the second one
20  caused me to vomit so much. And then recently he
21  prescribed me Vicodin to see if that would help.
22    Q.    Did it help?
23    A.    Yes. But still, you know, I have --

Page 355

1  it's a weird pain, it's like inside, kind of like a
2  throbbing kind. Yeah, I don't know.
3    Q.    Has any doctor specifically indicated
4  that you suffer from depression?
5    A.    Dr. Stillings, I think he said that I
6  was going through some depression. And Dr.
7  Packman, and then Dr. Gordon.
8    Q.    Has any doctor indicated to you that
9  you suffer from any other condition other than
10  depression since September 28th, 2005?
11    A.    Like what do you mean?
12    Q.    Well, for example, has any doctor
13  told you that you suffer from Posttraumatic Stress
14  Disorder?
15    A.    Dr. Packman has said that.
16    Q.    Okay. And that was as a result of
17  the accident?
18    A.    Yes.
19    Q.    So Dr. Packman has indicated to you
20  that you suffer from depression and Posttraumatic
21  Stress Disorder as a result of the September 28th,
22  2005 accident; is that correct?
23    THE WITNESS: Correct.

Page 356

1    BY: INTERPRETER KINSEL
2    A.    Correct.
3    BY: MR. SPITZ
4    Q.    And all of the doctors that you've
5  seen since September 28th, 2005 have indicated to
6  you that whatever symptoms that you have of
7  emotional distress are due to the accident that
8  occurred on September 28th, 2005?
9    A.    Yes.
10    Q.    Has any doctor told you that you
11  suffer from any emotional distress unrelated to the
12  September 28th, 2005 accident?
13    A.    No.
14    Q.    Do you believe that you suffer from
15  any type of emotional distress unrelated to the
16  September 28th, 2005 accident?
17    A.    Well, my recent separation from the
18  kids' father.
19    Q.    All right. That's created some
20  stress for you?
21    A.    No. I was upset but that's what I
22  wanted.
23    Q.    Okay. You wanted to separate from

89 (Pages 353 to 356)

KIMBERLY WALLIS, JANUARY 17 and 18, 2007

Page 357

1   him?
2       A.    Yes.
3       Q.    Why is that?
4       A.    Because I don't want to hurt the
5   relationship.
6       Q.    You don't want to hurt what
7   relationship?
8       A.    I don't cook like I used to cook, I
9   don't clean, I don't make myself look pretty
10  anymore, I mean.  I don't want to go out with him
11  anymore.
12      Q.    And so you ended the relationship?
13      A.    Yes, I did.
14      Q.    And that's been stressful for you?
15      A.    I'm not going to say mainly from that
16  but I was upset that I made that choice.
17      Q.    You were upset that you made the
18  choice?
19      A.    Yes.  Because of this, because of my
20  hand.  Because this is -- this is what's making me
21  push everyone away from me.
22      Q.    Is there anything -- any other reason
23  that you believe you suffer from any emotional

Page 358

1   distress unrelated to the accident on --
2       A.    No.
3       Q.    Well, let me just finish the
4   question, if that's okay.  Is there any reason why
5   you believe you suffer from emotional distress
6   other than the accident on September 28th, 2005 or
7   the breakup with your boyfriend?
8             THE WITNESS:  No.
9             BY: INTERPRETER KINSEL
10      A.    No.
11            BY: MR. SPITZ
12      Q.    Are there any other diagnoses that
13  you've received from your doctors relating to any
14  conditions that you have other than what you've
15  told us here today?
16      A.    Not that I'm aware of.
17      Q.    Have you sought any counseling as a
18  result of emotional distress?
19      A.    I want some counseling.
20      Q.    Okay.  But have you seen any
21  psychologist at any point in time since September
22  28th, 2005 for counseling relating to emotional
23  distress?

Page 359

1       A.    No.
2       Q.    And Cargill offered to send you to
3   psychological counseling, correct?
4       A.    Yes.  They offered to -- yeah,
5   offered for me to go see a psychologist.
6       Q.    Okay.  But you refused to do that; is
7   that right?
8       A.    I didn't refuse, I just -- I have no
9   confidence.
10      Q.    Okay.  So you chose not to?
11      A.    Right.
12      Q.    Has Dr. Packman ever told you that
13  any Posttraumatic Stress Disorder or depression are
14  clearly causally related to the work injury that
15  you sustained on September 28th, 2005?
16      A.    Correct.
17      Q.    And so Dr. Packman determined that
18  you suffered from Posttraumatic Stress Disorder and
19  depression as a result of the September 28th, 2005
20  injury; is that correct?
21      A.    Correct.
22      Q.    Do you consider Dr. Packman to be a
23  truthful and honest person?

Page 360

1       A.    I can't say but, I mean, yes.
2       Q.    How often do you even today do you have
3   nightmares about the accident?
4       A.    It's almost every day.  I just have a
5   hard time falling asleep because it's almost like I
6   shake myself because I just can't stop thinking
7   about it.  It's almost on a daily occurrence that I
8   think about it.
9       Q.    Okay.  And what specifically are you
10  thinking about, is it when your hand was caught in
11  the machine?
12      A.    I think about, like, losing my hand
13  and I repeatedly see my pinky just dangling off my
14  hand.  I just cannot stop thinking of that picture
15  in my mind.
16      Q.    And is that --
17      A.    And my hand being stuck on the
18  machine.
19      Q.    Is that the -- is that like a
20  recurring nightmare you have?
21      A.    Yes.
22      Q.    And how often do you get those
23  nightmares?

90 (Pages 357 to 360)

KIMBERLY WALLIS,  APRIL 19, 2007

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2         FOR THE CENTRAL DISTRICT OF ILLINOIS

3                SPRINGFIELD DIVISION

4

5

6   KIMBERLY WALLIS,

7            Plaintiff,

8       vs.                        No. 06 CV 03147

9   CARGILL MEAT SOLUTIONS
    CORPORATION, a Delaware
10  Corporation,

11           Defendant.

12

13

14

15      THE CONTINUED DEPOSITION of KIMBERLY WALLIS

16  called as a witness pursuant to notice and

17  pursuant to the provisions of the Federal Rules

18  of Civil Procedure pertaining to the taking of

19  depositions, taken before SUE A. PHELPS, CSR,

20  State of Illinois, at 607 E. Adams Street,

21  Springfield, Illinois, on the 19th day of

22  April, 2007, commencing at 9:30 a.m.

23

EXHIBIT
B

KIMBERLY WALLIS, APRIL 19, 2007

**Page 6**

1  because I'm answering your question. I'm
2  actually in my head interpreting and giving
3  visual nods to the interpreter to say that,
4  yes, I'm understanding the question so it's not
5  technically answering your question.
6  Q. Thank you for telling me that. I appreciate
7  that. Have you been working since the date of
8  your last deposition which was January 18th I
9  believe, 2007?
10 A. No, I have not been working.
11 Q. Have you applied for any employment?
12 A. No, I have not.
13 Q. What have you been doing for income since that
14 time?
15 A. I have SSI. I also collect food stamps and
16 TANF. Cash.
17 Q. Can you explain to me what TANF is?
18 A. It's Temporary Assistance for Needy Families.
19 Q. Have you attended any school?
20 A. No. No, I have not.
21 Q. And have you applied to attend any school or
22 get any kind of training or education since
23 your last deposition?

**Page 7**

1  A. No.
2  Q. Is SSI based on you having a disability?
3  A. Because I'm deaf.
4  Q. When did you apply for those benefits?
5  A. Oh, after I had my injury.
6  Q. Did you apply with the Social Security
7  Administration?
8  A. Yes.
9  Q. Was your application based in any way on the
10 injury that occurred to you at the Cargill
11 plant?
12 A. No. It -- I actually did not have to apply.
13 The case had not been closed. It was not
14 closed. It was not closed so they went ahead
15 and just started giving it to me again after
16 I -- after I got hurt.
17 Q. So you're entitled to those benefits based on
18 your being deaf.
19 A. Correct.
20 Q. Has any -- Let me strike that. Have you
21 applied for any benefits -- disability benefits
22 or insurance other than worker's comp based
23 upon the injury that happened at Cargill?

**Page 8**

1  A. I tried to apply for unemployment, but they
2  said -- they said I was not able to get it
3  because I -- I had to have a psychiatrist
4  release.
5  Q. Have you applied for any kind of Social
6  Security or state disability benefits?
7  A. I'm not sure if I understand that question.
8  Q. Have you applied to get any benefits from the
9  government based upon the injury that occurred
10 at Cargill?
11 A. No. No.
12 Q. What medical treatment have you received since
13 the time of your last deposition?
14 A. I just saw the psychiatrist and I go see him
15 once a month.
16 Q. When's the last time you saw him?
17 A. Let's see. It was March 19th.
18 Q. Did you see him also in February?
19 A. Yes.
20 Q. How long do you plan to continue seeing him?
21 A. Until I feel as -- that I'm ready to be on my
22 own.
23 Q. So you don't have an end date right now?

**Page 9**

1  A. No, I do not.
2  Q. And this is Dr. Packman, the psychiatrist
3  you're seeing?
4  A. Yes.
5  Q. Other than Dr. Packman have you received any
6  medical treatment since January 19th?
7  A. I did go see Dr. Wayne Stillings but that was
8  through Cargill. Their request. And that's
9  all that I have seen since January. As I
10 recall it was since January.
11 Q. Was it around January 15th that you saw
12 Dr. Stillings?
13 A. Yes.
14 Q. When you see Dr. Packman, what do you do at
15 your sessions with him?
16 A. He asks me how I'm feeling. He'll ask me what
17 I'm going through right now. He asks me if I'm
18 suffering, what kind of suffering I'm going
19 through. Do I have any pain in my hand.
20     He's asked me do I have flashbacks and
21 then when I -- I have to explain what kind of
22 flashbacks I'm having. He asked me to explain
23 my nightmares that I'm having at night.

3 (Pages 6 to 9)

KIMBERLY WALLIS, APRIL 19, 2007

Page 10

1    And he also thinks I should see a social
2  worker, a counselor type, to help me be able to
3  get -- get my feelings out, help to express my
4  emotions.
5  Q. Have you gone to see a social worker or
6  counselor?
7  A. Not yet.
8  Q. Does Dr. Packman ask you about things that are
9  going on in your life?
10  A. Yeah. He asks me what's going on at home. He
11  asks me how I'm doing, you know, with the kids.
12  Yeah, he just asks me just a bunch of different
13  questions. How -- How I'm doing with the
14  father of my children. How I'm getting along
15  with my mother because right now I'm living
16  with my mother.
17    And he asks if I'm -- do I -- have I been
18  doing other activities. Have I been leaving
19  the house, have I been going out or have I just
20  been staying home all the time.
21  Q. And when he asks you those kind of questions,
22  do you give him truthful answers?
23  A. Yes.

Page 11

1  Q. Do you ever hold back or not tell Dr. Packman
2  something because you don't want to talk to him
3  about it?
4  A. Of course.
5  Q. What kind of things do you not want to talk to
6  him about?
7  A. I don't like to talk about the man who was
8  harassing me.
9  Q. Anything else?
10  A. No. It's just basically I don't -- I don't
11  talk -- I don't like to talk about the man who
12  was harassing me.
13  Q. And you're talking about Ishmal Rivera
14  (phonetic)?
15  A. Correct.
16  Q. Is that the only thing that you hold back from
17  Dr. Packman or is there anything else?
18  A. I mean, right now I can't think of anything
19  that I -- anything else that I hold back.
20  Q. Who is paying for your treatment with
21  Dr. Packman?
22  A. Workman's comp.
23  Q. You saw Dr. Packman for the first time on

Page 12

1  November 15th, 2005. Does that sound correct
2  to you?
3  A. Yes.
4  Q. And from the records that we've received it
5  looks like you've been seeing him every month
6  at least since then. Is that right?
7  A. Correct.
8  Q. It appears from these records that you started
9  out seeing him twice a month for a couple
10  months and then once a month. Is that correct?
11  A. Yeah. At the beginning I saw him probably --
12  yeah, I remember seeing him more often.
13  Probably a couple times a month.
14  Q. And have you consistently been seeing him once
15  a month since November, 19 -- I'm sorry --
16  November, 2005?
17  A. Yes.
18  Q. Is he currently prescribing you any medication?
19  A. To me? Dr. Packman?
20  Q. Yes.
21  A. Yes.
22  Q. What kind of medication does he currently
23  prescribe?

Page 13

1  A. He's prescribing all my medication.
2  Q. What?
3  A. Ambien. There's Vicodin, Xanax, and Cymbalta.
4  Q. Do you take all those medicines every day?
5  A. I actually haven't taken Ambien for awhile
6  because I'm finding myself so sleepy and not
7  being able to wake up with my kids and, you
8  know, they're getting up, walking around and
9  I'm not awake so, you know, I had to stop
10  taking that. And -- And I'm finding --
11  noticing that I -- and starting to be able to
12  fall asleep but it's just hard to stay asleep
13  all night.
14  Q. What about the Vicodin and the Xanax and
15  Cymbalta?
16  A. I take those three medications every day.
17  Q. Once a day?
18  A. The Cymbalta is once in the morning -- well,
19  actually twice in the morning. It's a
20  30-milligram each. 30-30. And then the Xanax,
21  I take that every day. Probably two times a
22  day. I take that for helping me calm down. It
23  also helps kind of help the pain because, you

4 (Pages 10 to 13)

KIMBERLY WALLIS, APRIL 19, 2007

Page 42

1           (The requested portion of the
2           record was read back by the
3           Court Reporter.)
4  BY MR. PHILLIPS:
5  Q. And you didn't see Dr. Newmeisser until the
6    fall, right?
7       MR. BARRIS:  Can we take a short break
8  and I'll see if my assistant can get this
9  record for you?  See what we have from him.
10     MR. PHILLIPS:  Okay.
11       (Whereupon a short recess was
12       taken and proceedings resumed as
13       follows.)
14     MR. PHILLIPS:  Would you read back the
15  last question?
16       (The requested portion of the
17       record was read back by the
18       Court Reporter.)
19     THE WITNESS:  Yes.
20  BY MR. PHILLIPS:
21  Q. And you didn't see any other doctors for your
22    hand between Dr. Brown and Dr. Newmeisser; is
23    that right?

Page 43

1  A. No.
2  Q. Since you talked with Dr. Brown have any other
3    doctors talked to you about having further
4    surgeries on your hands?
5  A. No.
6  Q. Prior to Dr. Brown hadn't you also seen
7    Dr. Green for your hand?
8  A. No.  Dr. Green is the person who did the
9    surgery, but prior to Dr. Brown I was seeing
10    Dr. Beatty in Edwardsville.
11  Q. Besides Dr. Brown and Dr. Beatty were there
12    other doctors you had seen for your hand at
13    that time?
14  A. No.
15  Q. Those were the two?
16  A. Yes.
17  Q. Is it correct that you have not had any further
18    surgeries on your hand since seeing Dr. Brown?
19  A. That's correct.
20  Q. And is it correct that you told Dr. Brown that
21    you did not want to have the surgeries that he
22    had discussed with you?
23  A. I don't remember what I said but I knew that I

Page 44

1  was not comfortable and said that I was not
2  ready for the surgery, and he was very upset
3  and got angry at me and said stop playing with
4  my schedule.
5      And I was like what do you mean?  This is
6  my first surgery and I'm not ready.  You know,
7  I'm not playing with your schedule.  And he
8  said, okay, fine, and he left the room.
9  Q. How many surgeries had you had on your hand to
10    that point?
11  A. I've had three surgeries.
12     MR. PHILLIPS:  Would you mark this as 21?
13       (Whereupon Wallis Exhibit
14       No. 21 was marked for
15       identification.)
16  BY MR. PHILLIPS:
17  Q. Could you read the typewritten portion of
18    Exhibit 21?  Does this describe the meeting you
19    had with Dr. Brown in which you told him that
20    you decided to postpone your surgery?
21  A. No.  No.  He was very upset.
22  Q. So he said some other things that are not in
23    his notes; is that right?

Page 45

1  A. Yes.
2  Q. But you did have an appointment with him when
3    you told him you decided you weren't ready to
4    have surgery; is that correct?
5  A. That's correct.
6  Q. And is it correct that he told you -- Strike
7    that.  Is it correct that he discussed with you
8    again the possible surgeries that he had
9    planned as indicated in these notes?
10  A. I would say -- I think this is a little
11    confusing but -- He was confusing.  I'm sorry.
12    Not this.  He was confusing.  Because then he
13    would say, well, maybe we don't need the skin
14    graft from your arm.  We just don't know until
15    we get into the surgery and I was like, okay, I
16    don't want you to experiment or test on me.  I
17    want you to know what you're doing.
18  Q. So one reason you decided not to have the
19    surgery is because Dr. Brown told you that he
20    couldn't tell what you needed until he actually
21    did the surgery.  Is that right?
22  A. That's correct.
23  Q. The records that your counsel has been kind

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087   800.708.8087   FAX: 312.704.4950

**E-FILED**
Friday, 28 September, 2007  12:32:27 PM
Clerk, U.S. District Court, ILCD

**IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS
SPRINGFIELD DIVISION**

KIMBERLY WALLIS        )
                                )
          Plaintiff,       )
                                )
     vs.                   )     NO. 3:06-cv-03147-RM-CHE
                                )
CARGILL MEAT SOLUTIONS  )     Judge Richard Mills
CORPORATION, a Delaware Corporation, )     Magistrate Judge Charles H. Evans
                                )
         Defendant.     )

STATE OF KANSAS     )
                    ) SS
COUNTY OF SEDGWICK  )

### AFFIDAVIT OF DAWN ZACKULA

I, Dawn Zackula, being duly sworn under oath, depose and state as follows:

1.     I am over the age of 18 and am competent to make this Affidavit. All facts set forth in this Affidavit are based on my personal knowledge and my review of relevant documents, specifically including the records of Specialty Risk Services ("SRS"), regarding the workers compensation claim of Plaintiff, Kimberly Wallis ("Plaintiff"). If I were called upon to testify, I could and would testify competently as to the facts set forth herein.

2.     I am currently employed by Defendant, Cargill Meat Solutions Corporation ("CMSC"), as a Workers' Compensation Claims Manager and have been employed in that capacity since April 30, 1990. In my position, I am in charge of managing workers' compensation claims made by CMSC employees, including at CMSC's pork processing plant in Beardstown, Illinois.

3.     On September 28, 2005, Plaintiff was involved in a work-related accident while employed by CMSC at its Beardstown plant. As a result of the accident, Plaintiff suffered

1



multiple lacerations to her left hand, her left pinky finger was amputated and she suffered additional injuries to her left index finger and thumb.

4.    After the accident, Plaintiff was treated at Passavant Area Hospital, where she underwent three surgeries on her hand.

5.    Through its workers' compensation program, CMSC paid for all of the expenses associated with this medical treatment and Plaintiff's hospital stay.

6.    Thereafter, Plaintiff continued to see numerous physicians for various consultations and treatments relating to her left hand.  In addition, Plaintiff attended numerous physical therapy sessions from November, 2005 through February, 2006.  Beginning on November 15, 2005 and continuing on a monthly basis thereafter, Plaintiff has visited a clinical psychologist, Dr. Paul Packman, in connection to the September 28, 2005 accident.  CMSC has paid for all of the medical expenses associated with these visits.

7.    In total, CMSC has paid $101,417.17 for medical expenses Plaintiff that has incurred as a result of the September 28, 2005 accident and related treatment.

8.    In addition, CMSC provided Plaintiff with temporary total disability payments covering the period from January, 2006 through May 16, 2007.  CMSC has paid Plaintiff $27,706.62 in aggregate temporary total and permanent partial disability payments.

9.    Plaintiff has accepted all of these workers compensation benefits and, additionally, presently has a pending claim for additional permanent partial disability benefits in connection to her injuries.

10.    I have attached hereto a true and correct copy  of SRS' records concerning workers compensation benefits paid to Plaintiff.

2

FURTHER AFFIANT SAYETH NAUGHT.

DAWN ZACKULA

Subscribed and sworn to before me
this _27_ day of September, 2007.

Notary Public

D. RENAI HARRISON
Notary Public - State of Kansas
My Appt. Expires 4-25-2010

#4742803 (v.1).doc

3

ADMN1006

CLAIMS ADMINISTRATION SYSTEM        CH – CHANGE WORKERS COMP CLAIM DETAIL
  ACCOUNT 42429 CARGILL, INC                 03/18/96    09/24/07 BATCH 3988
  XEY CLAIM NO. SFX LOC.   ACC.DATE  COVER  CDC  CLAIMANT, LAST-FIRST   OPEN
YDU/90911    /C   9999  09 28 05   111   02   WALLIS, KIMBERLY
ST SEV OSHA  DAYS E/A    REPT.DATE  FCO  MKSEG  INSURED'S NAME        UPDATED
IL  5  OFF 0001  E     10 03 05   YVP  190  CARGILL, INC.           09/22/07
       ON  0000        INJURY / BODY PART CAUSE DESCRIPTION
SUIT  HOLD  DTH DATE    EE WAS SKINNING BUTTS &
                        OCCUPATION / DEPARTMENT        SITE CODE 15105
SOC SEC NO.             PORK PRODUCTION
336 66 0024        HANDLER      DATE ASSIGN   POLICY NUMBER      ENTERED
                     3988       12 06 05   41HMC088039         10/13/05
         POL EFF DTE    POL EXP DTE   DIS START DT  DIS END DT
           06 01 05       05 31 06                   10 04 05
            MEDICAL   COMPENSAT   EXPENSE                      CLM.REC
RESERVE    133000    147436     17500
   PAID    101417.17  27706.62  13202.84                      560.00
 OUTSTD     31582.83 119729.38   4297.16
NCCI    2089 CARRIER


  NEXT? __  C  FOR CLAIM NUMBER ___ / _____ / __   XN-EXIT NO ACTION
            XX-MENU, XM-MODULES MENU, XA-NEW ACCOUNT/BATCH, EN-MASTER MENU

Medical   Paid = $101,417.17

Work Comp Indemnity = $27,706.62
     Statutory Amputation
          Paid to Kim Wallis

# PAYMENT NARRATIVE CODES

## MEDICAL

| CODE | DESCRIPTION |
|------|-------------|
| 106E | Attendant Care $F-$T |
| 106G | Board Ordered IME AME QME M/L $F |
| LIEN | Full Satisfaction of Lien |
| 106A | Med Trans $F-$T |
| 106C | Misc. Medical $F-$T |
| 106D | Nursing $F-$T |
| PIME | Prepay IME |
| PRTE | Prepay Rating |
| REIM | Reimbursement $F-$T |
| 106B | RX - $F-$T   *Prescription* |
| 106H | Vended Case Management $F-$T |

1016    DR
1015    MEDICAL

## EXPENSE

| CODE | DESCRIPTION |
|------|-------------|
| 2070 | Associated Legal/Trial Expense $I $F-$T |
| 2072 | Special Investigation Expenses |
| 2073 | Independent Medical Exam |
| 2076 | Miscellaneous Expense |
| 2078 | Compensation Attorney Fees $I $F-$T |
| 2084 | Alternate Dispute Resolution Fees |
| 2176 | Police Report |

## INDEMNITY

| CODE | DESCRIPTION |
|------|-------------|
| ADJS | Rate Adjustment $F-$T |
| CSUP | Child Support Lien |
| JPET | Joint Petition |
| LUMP | Lump Sum Settlement $F-$T |
| TAXS | OK WC Taxes (MITF/OHSF) |
| WCCC | Work Comp Court Costs |
| 3001 | Death Benefits |
| 301A | Death Benefits - Interest |
| 301B | Death Benefits - Funeral Expense |
| 301C | Death Benefits - Lump Sum |
| 301G | Death Benefits - Claimant Attorney |
| 301H | Death Benefits - Employers Liability |
| 3002 | Permanent Total Disability |
| 302G | Permanent Total - Atty Fees |
| 3004 | PPD $F-$T |
| 304A | Permanent Partial - Interest |
| 304C | Permanent Partial - Lump Sum |
| 304X | Permanent Partial - Scheduled Indem |
| 304Y | Permanent Partial - Non-Sched Indem |
| TTDP | TTD $F-$T |
| 305A | Temporary Total Disability - Interest |
| 305B | Temp Total - Atty Fees $F-$T |
| 305C | Temporary Total Disability - Lump Sur |
| 305D | Temporary Partial Disability |
| 3010 | Voc Rehab - Maintenance |
| 3011 | Voc Rehab Evaluation $F-$T |
| 3012 | Voc Rehab - Training |
| 3024 | Advance - Jones Act |
| 3026 | Maintenance - Jones Act |

# PAYMENT TYPE CODES

## MEDICAL

| CODE | DESCRIPTION |
|------|-------------|
| 106A | Medical Transportation |
| 106B | Drug Charges |
| 106C | Misc. Medical |
| 106D | Nursing |
| 106E | Attendant Care |
| 106G | Board Ordered IME AME QME M/L |
| 106H | Vended Case Management |

## EXPENSE

| CODE | DESCRIPTION |
|------|-------------|
| 2040 | Subrogation Recovery Expense |
| 2070 | Associated Legal/Trial Expense |
| 2072 | Special Investigation Expense |
| 2073 | Independent Medical Exam |
| 2076 | Miscellaneous Expense |
| 2078 | Compensation Attorney Fees |
| 2084 | Alternate Dispute Resolution Fees |

## INDEMNITY

| CODE | DESCRIPTION |
|------|-------------|
| 3001 | Death Benefits |
| 301A | Death Benefits - Interest |
| 301B | Death Benefits - Funeral Expense |
| 301C | Death Benefits - Lump Sum |
| 301H | Death Benefits - Employers Liability |
| 311G | TR Death Benefits - Clmt Atty (1099) |
| 3002 | Permanent Total Disability |
| 312G | TR Perm Total - Clmt Atty (1099) |
| 3003 | Major Perm Partial Disab |
| 303A | Permanent Partial Disability - Interest |
| 303C | Permanent Partial Disability - Lump Sum |
| 303X | Perm Partial - Sched Indemnity |
| 303Y | Perm Partial  - Non-Sched Indemnity |
| 313G | TR Mjr Perm Partial - Clmt Atty (1099) |
| 3004 | Minor Perm Partial Disab |
| 304A | Permanent Partial - Interest |
| 304C | Permanent Partial - Lump Sum |
| 314B | TR Perm Partial - Clmt Atty (1099) |
| 3005 | Temporary Disability |
| 305A | Temporary Total Disability - Interest |
| 305C | Temporary Total Disability - Lump Sum |
| 305D | Temporary Partial Disability |
| 315B | TR Temp Total - Clmt Atty (1099) |
| 3010 | Voc Rehab - Maintenance |
| 3011 | Voc Rehab Evaluation $F-$T |
| 3012 | Voc Rehab - Training |

```
                                                              ADMN1030

CLAIMS ADMINISTRATION SYSTEM        1L - LOOK AT CLAIM, NO CHANGE
 ACCOUNT 42429 CARGILL, INC                 03/18/96   09/24/07 BATCH 3988
 KEY CLAIM NO. SFX LOC.  ACC.DATE  COVER  CDC  CLAIMANT,  LAST-FIRST    OPEN
YDU/90911    /C  9999  09/28/05   111    02   WALLIS, KIMBERLY
------------------------------------------------------------------------
|  PAY DATE  CHECK NO PTYP AMOUNT       VEND   PAYEE NAME    MMDDYY/MMDDYY S |
|                                                                            |
|  _ 09/22/07        2067        9.00         *FS NC08     092207/        O |
|  _ 09/19/07 33630911 1016    400.00 1411510 MICHAEL E     490.00/101705 O |
|  _ 09/13/07 33630204 1016     59.81 1885240 SIU PHYSIC     70.00/081707 O |
|  _ 09/12/07 33630017 1015    122.74 0128483 MEMORIAL M    170.00/110806 O |
|  _ 09/11/07 33629821 1016    117.80 3027039 PAUL M PAC    155.00/082707 O |
|  _ 09/05/07 33629165 106B     32.89 0000421 WALGREENS      32.89/100305 O |
|  _ 09/04/07 33628979 106B    111.87 0000421 WALGREENS     111.87/101705 O |
|  _ 08/31/07        2070     1225.00         *FS NC08     083107/        O |
|  _ 08/21/07 33627233 1016    117.80 3027039 PAUL M PAC    155.00/073107 O |
|  _ 08/18/07        2067       18.00         *FS NC08     081807/        O |
|  _ 07/28/07        2066       45.18         *FS NC08     072807/        O |
|  _ 07/19/07        2067       18.00         *FS NC08     071907/        O |
| Beginning of Payments   F1=Help F3=Exit        F8=Fwd F11=TTLS F12=Cancl |
------------------------------------------------------------------------
 NEXT? __ C  FOR CLAIM NUMBER ___ / _____ / __
           XX-MENU, XM-MODULES MENU, XA-NEW ACCOUNT/BATCH, EN-MASTER MENU
```

```
                                                                   ADMN1030

CLAIMS ADMINISTRATION SYSTEM          1L - LOOK AT CLAIM, NO CHANGE
ACCOUNT 42429 CARGILL, INC                    03/18/96    09/24/07 BATCH 3988
XEY CLAIM NO. SFX LOC.  ACC.DATE   COVER  CDC  CLAIMANT, LAST-FIRST      OPEN
YDU/90911    /C  9999  09/28/05    111    02  WALLIS, KIMBERLY
----------------------------------------------------------------------------
¦  PAY DATE CHECK NO PTYP AMOUNT        VEND    PAYEE NAME    MMDDYY/MMDDYY S ¦
¦                                                                            ¦
¦    _____  _____  ____  _____       ____    _____     ____ ____   _  ¦
¦ _  07/19/07      2067      18.00      *FS NC08             071907/       O  ¦
¦ _  07/17/07 33622625 106H    263.20 4187729 COVENTRY H    052507/061507 O  ¦
¦ _  07/11/07 33622035 1016    117.80 3027039 PAUL M PAC     155.00/062607 O  ¦
¦ _  06/29/07      2078    1162.50      *FS NC08             062907/       O  ¦
¦ _  06/29/07 33620708 1016   1506.25 0642100 REG ORTHOP   1850.00/100105 O  ¦
¦ _  06/28/07 MCM ADJ  1016      0.00 0642100              100105/100105 O  ¦
¦ _  06/27/07 33620397 1016    117.80 3027039 PAUL M PAC     155.00/061107 O  ¦
¦ _  06/06/07 33615080 106B    225.04 0500315 TMESYS INC    319.75/052407 O  ¦
¦ _  06/06/07 33615081 106B    112.63 0500315 TMESYS INC    160.08/052407 O  ¦
¦ _  06/06/07 33615082 106B    111.81 0500315 TMESYS INC    158.91/052407 O  ¦
¦ _  06/06/07 33615083 106B     28.35 0500315 TMESYS INC     44.00/052507 O  ¦
¦ _  05/16/07 33568630 106H    498.24 2317054 CONCENTRA     030607/030607 O  ¦
¦              F1=Help F3=Exit F7=Bkwd F8=Fwd F11=TTLS F12=Cancl              ¦
¦                                                                            ¦
----------------------------------------------------------------------------
 NEXT? __ C  FOR CLAIM NUMBER ___ / _____ / __
             XX-MENU, XM-MODULES MENU, XA-NEW ACCOUNT/BATCH, EN-MASTER MENU
```

ADMN1030

```
CLAIMS ADMINISTRATION SYSTEM        1L - LOOK AT CLAIM, NO CHANGE
 ACCOUNT 42429 CARGILL, INC                     03/18/96    09/24/07 BATCH 3988
 XEY CLAIM NO. SFX LOC.  ACC.DATE  COVER  CDC  CLAIMANT, LAST-FIRST     OPEN
YDU/90911     /C  9999  09/28/05   111   02  WALLIS, KIMBERLY
------------------------------------------------------------------------------
¦   PAY DATE CHECK NO PTYP AMOUNT       VEND    PAYEE NAME     MMDDYY/MMDDYY S ¦
¦                                                             _____ _____ _¦
¦ _  05/16/07 33568630 106H     498.24 2317054 CONCENTRA      030607/030607 O ¦
¦ _  05/16/07 33568631 106H      37.60 4183085 CONCENTRA      040207/041607 O ¦
¦ _  05/16/07 33568632 3005      75.09 9999996 WALLIS, KI     051807/051907 O ¦
¦   05/15/07          2067        9.00         *FS NC08       051507/         O ¦
¦ _  05/14/07 33564791 3005     525.60 9999996 WALLIS, KI     050407/051707 O ¦
¦ _  05/07/07 33545438 106B     225.04 0500315 TMESYS INC     319.75/042407 O ¦
¦ _  05/07/07 33545439 106B     112.63 0500315 TMESYS INC     160.08/042407 O ¦
¦ _  05/07/07 33545440 106B     104.68 0500315 TMESYS INC     148.79/042407 O ¦
¦ _  05/07/07 33545441 106B      28.35 0500315 TMESYS INC      44.00/042407 O ¦
¦ _  04/30/07 33514436 3005     525.60 9999996 WALLIS, KI     042007/050307 O ¦
¦   04/27/07          2078      937.50         *FS NC08       042707/         O ¦
¦ _  04/16/07 33470204 3005     525.60 9999996 WALLIS, KI     040607/041907 O ¦
¦                     F1=Help F3=Exit F7=Bkwd F8=Fwd F11=TTLS F12=Cancl        ¦
------------------------------------------------------------------------------
 NEXT?  __  C  FOR CLAIM NUMBER ___ / _____ / __
              XX-MENU, XM-MODULES MENU, XA-NEW ACCOUNT/BATCH, EN-MASTER MENU
```

ADMN1030

```
CLAIMS ADMINISTRATION SYSTEM          1L - LOOK AT CLAIM, NO CHANGE
 ACCOUNT 42429 CARGILL, INC                   03/18/96    09/24/07 BATCH 3988
 XEY CLAIM NO. SFX LOC.  ACC.DATE  COVER  CDC  CLAIMANT,  LAST-FIRST    OPEN
YDU/90911    /C   9999 09/28/05   111   02   WALLIS, KIMBERLY
-----------------------------------------------------------------------------
¦   PAY DATE CHECK NO PTYP AMOUNT       VEND    PAYEE NAME     MMDDYY/MMDDYY S ¦
¦                                                                             ¦
¦   _____  _____  ____  _____     _____  _____     _____ _____ _ ¦
¦ _ 04/16/07 33470204 3005     525.60 9999996 WALLIS, KI     040607/041907 O ¦
¦ _ 04/12/07 33464054 1016     972.80 3027039 PAUL M PAC    1280.00/012307 O ¦
¦ _ 04/05/07 33443371 106B     224.77 0500315 TMESYS INC     319.38/032307 O ¦
¦ _ 04/05/07 33443372 106B      81.89 0500315 TMESYS INC     127.65/032307 O ¦
¦ _ 04/05/07 33443373 106B     112.63 0500315 TMESYS INC     160.08/032307 O ¦
¦ _ 04/05/07 33443374 106B      28.35 0500315 TMESYS INC      44.00/032307 O ¦
¦ _ 04/02/07 33426601 3005     525.60 9999996 WALLIS, KI     032307/040507 O ¦
¦ _ 03/24/07          2066     595.29         *FS NC08       032407/       O ¦
¦ _ 03/23/07          2078     521.43         *FS NC08       032307/       O ¦
¦ _ 03/19/07 33381392 106C      66.80 2317054 CONCENTRA      010207/011507 O ¦
¦ _ 03/19/07 33381393 106C     127.84 2317054 CONCENTRA      011907/021407 O ¦
¦ _ 03/19/07 33381394 106C      82.72 2317054 CONCENTRA      021907/022707 O ¦
¦                     F1=Help F3=Exit F7=Bkwd F8=Fwd F11=TTLS F12=Cancl      ¦
-----------------------------------------------------------------------------
 NEXT?  __  C  FOR CLAIM NUMBER ___ / _____ / __
                 XX-MENU, XM-MODULES MENU, XA-NEW ACCOUNT/BATCH, EN-MASTER MENU
```

```
                                                                    ADMN1030

CLAIMS ADMINISTRATION SYSTEM        1L - LOOK AT CLAIM, NO CHANGE
 ACCOUNT 42429 CARGILL, INC                  03/18/96      09/24/07 BATCH 3988
 XEY CLAIM NO. SFX LOC.  ACC.DATE  COVER  CDC  CLAIMANT,  LAST-FIRST     OPEN
YDU/90911    /C  9999  09/28/05   111   02   WALLIS, KIMBERLY
---------------------------------------------------------------------------
¦  PAY DATE CHECK NO PTYP AMOUNT       VEND   PAYEE NAME    MMDDYY/MMDDYY S ¦
¦                                                                         ¦
¦        ____ _____ ____ _____     ____   _____    _____ _ ¦
¦ _ 03/19/07 33381394 106C     82.72 2317054 CONCENTRA     021907/022707 O ¦
¦ _ 03/19/07 33381395 106E    177.08 9999994 REGINA DRI    011507/011507 O ¦
¦ _ 03/19/07 33381396 3005    525.60 9999996 WALLIS, KI    030907/032207 O ¦
¦ _ 03/14/07          2067     27.00         *FS NC00      031407/        O ¦
¦ _ 03/05/07 33331982 3005    525.60 9999996 WALLIS, KI    022307/030807 O ¦
¦ _ 03/05/07 33336612 106B     28.35 0500315 TMESYS INC     44.00/021907 O ¦
¦ _ 03/05/07 33336613 106B     81.89 0500315 TMESYS INC    127.65/021907 O ¦
¦ _ 03/05/07 33336614 106B    104.68 0500315 TMESYS INC    148.79/022207 O ¦
¦ _ 02/20/07          1R06  28000.00                              /       O ¦
¦ _ 02/20/07          2R00   1000.00                              /       O ¦
¦ _ 02/20/07 33291010 106B    224.77 0500315 TMESYS INC    319.38/020107 O ¦
¦ _ 02/20/07 33291011 106B     58.35 0500315 TMESYS INC     90.88/020407 O ¦
¦                   F1=Help F3=Exit F7=Bkwd F8=Fwd F11=TTLS F12=Cancl     ¦
---------------------------------------------------------------------------
 NEXT? __  C  FOR CLAIM NUMBER ___ / _____ / __
            XX-MENU, XM-MODULES MENU, XA-NEW ACCOUNT/BATCH, EN-MASTER MENU
```

```
                                                                ADMN1030
CLAIMS ADMINISTRATION SYSTEM        1L - LOOK AT CLAIM, NO CHANGE
 ACCOUNT 42429 CARGILL, INC                   03/18/96    09/24/07 BATCH 3988
 XEY CLAIM NO. SFX LOC.  ACC.DATE  COVER  CDC  CLAIMANT, LAST-FIRST    OPEN
YDU/90911    /C  9999  09/28/05   111    02   WALLIS, KIMBERLY
------------------------------------------------------------------------------
¦  PAY DATE CHECK NO PTYP AMOUNT      VEND    PAYEE NAME     MMDDYY/MMDDYY S ¦
¦                                                                           ¦
¦  _ 02/20/07 33291011 106B       58.35 0500315 TMESYS INC     90.88/020407 O ¦
¦  _ 02/19/07 33283529 3005      525.60 9999996 WALLIS, KI   020907/022207 O ¦
¦  _ 02/19/07 33285631 1016      399.00 1611342 SIU PHYSIC   525.00/110806 O ¦
¦  _ 02/16/07 33280211 3005      525.60 9999996 WALLIS, KI   060206/061506 O ¦
¦  _ 02/16/07 33280212 3005      525.60 9999996 WALLIS, KI   061606/062906 O ¦
¦  _ 02/16/07 33280213 3005      525.60 9999996 WALLIS, KI   063006/071306 O ¦
¦  _ 02/16/07 33280214 3005      525.60 9999996 WALLIS, KI   071406/072706 O ¦
¦  _ 02/16/07 33280215 3005      525.60 9999996 WALLIS, KI   072806/081006 O ¦
¦  _ 02/16/07 33280216 3005      525.60 9999996 WALLIS, KI   081106/082406 O ¦
¦  _ 02/16/07 33280217 3005      525.60 9999996 WALLIS, KI   082506/090706 O ¦
¦  _ 02/16/07 33280218 3005      525.60 9999996 WALLIS, KI   090806/092106 O ¦
¦  _ 02/16/07 33280219 3005      525.60 9999996 WALLIS, KI   092206/100506 O ¦
¦                     F1=Help F3=Exit F7=Bkwd F8=Fwd F11=TTLS F12=Cancl    ¦
------------------------------------------------------------------------------
 NEXT?  __  C  FOR CLAIM NUMBER ___ / _____ / __
              XX-MENU, XM-MODULES MENU, XA-NEW ACCOUNT/BATCH, EN-MASTER MENU
```

```
                                                                    ADMN1030
CLAIMS ADMINISTRATION SYSTEM          1L - LOOK AT CLAIM, NO CHANGE
 ACCOUNT 42429 CARGILL, INC                      03/18/96    09/24/07 BATCH 3988
 XEY CLAIM NO. SFX LOC.  ACC.DATE  COVER  CDC  CLAIMANT,  LAST-FIRST    OPEN
YDU/90911     /C  9999  09/28/05   111    02   WALLIS, KIMBERLY
-------------------------------------------------------------------------------
┆   PAY DATE CHECK NO PTYP AMOUNT      VEND    PAYEE NAME    MMDDYY/MMDDYY S ┆
┆                                                                          ┆
┆   _____ _____ ____ _____   ____    _____   _____ _ ┆
┆ _ 02/16/07 33280219 3005      525.60 9999996 WALLIS, KI   092206/100506 O ┆
┆ _ 02/16/07 33280220 3005      525.60 9999996 WALLIS, KI   100606/101906 O ┆
┆ _ 02/16/07 33280221 3005      525.60 9999996 WALLIS, KI   102006/110206 O ┆
┆ _ 02/16/07 33280222 3005      525.60 9999996 WALLIS, KI   110306/111606 O ┆
┆ _ 02/16/07 33280223 3005      525.60 9999996 WALLIS, KI   111706/113006 O ┆
┆ _ 02/16/07 33280224 3005      525.60 9999996 WALLIS, KI   120106/121406 O ┆
┆ _ 02/16/07 33280225 3005      525.60 9999996 WALLIS, KI   121506/122806 O ┆
┆ _ 02/16/07 33280226 3005      525.60 9999996 WALLIS, KI   122906/011107 O ┆
┆ _ 02/16/07 33280227 3005      525.60 9999996 WALLIS, KI   011207/012507 O ┆
┆ _ 02/16/07 33280228 3005      525.60 9999996 WALLIS, KI   012607/020807 O ┆
┆   02/16/07          2067       -9.00- *FS NC08    021607/              O ┆
┆ _ 02/13/07 33272664 1016    19843.14 0642100 REG ORTHOP  29600.00/092805 O ┆
┆                       F1=Help F3=Exit F7=Bkwd F8=Fwd F11=TTLS F12=Cancl ┆
┆                                                                          ┆
-------------------------------------------------------------------------------
  NEXT? __  C  FOR CLAIM NUMBER ___ / _____ / __
             XX-MENU, XM-MODULES MENU, XA-NEW ACCOUNT/BATCH, EN-MASTER MENU
```

```
                                                                    ADMN1030
CLAIMS ADMINISTRATION SYSTEM        1L - LOOK AT CLAIM, NO CHANGE
 ACCOUNT 42429 CARGILL, INC                  03/18/96    09/24/07 BATCH 3988
 XEY CLAIM NO. SFX LOC.   ACC.DATE  COVER  CDC  CLAIMANT,  LAST-FIRST    OPEN
YDU/90911    /C  9999  09/28/05     111   02   WALLIS, KIMBERLY
```
--------------------------------------------------------------------------

| | PAY DATE | CHECK NO | PTYP | AMOUNT | VEND | PAYEE NAME | MMDDYY/MMDDYY | S |
|---|---|---|---|---|---|---|---|---|
| _ | 02/13/07 | 33272664 | 1016 | 19843.14 | 0642100 | REG ORTHOP | 29600.00/092805 | O |
| _ | 02/12/07 | | 1R06 | ~~31000.00~~ | | | / | O |
| _ | 02/12/07 | | 2R00 | ~~5000.00~~ | | | / | O |
| _ | 02/08/07 | MCM-ADJ | 1016 | ~~0.00 0642100~~ | | | 092805/092805 | O |
| _ | 02/05/07 | 33222192 | 106H | 525.00 | 2331314 | SIU PHYSIC | 110806/110806 | O |
| _ | 02/05/07 | 33233449 | 106B | 28.35 | 0500315 | TMESYS INC | 44.00/012407 | O |
| _ | 01/31/07 | 33202929 | 1016 | 41.56 | 1625034 | CLINICAL R | 48.50/110806 | O |
| _ | 01/24/07 | 33156921 | 106B | 58.35 | 0500315 | TMESYS INC | 90.88/010207 | O |
| _ | 01/12/07 | 33087044 | 106B | 224.77 | 0500315 | TMESYS INC | 319.38/122706 | O |
| _ | 01/12/07 | 33087045 | 106B | 104.68 | 0500315 | TMESYS INC | 148.79/122906 | O |
| _ | 01/10/07 | 33062283 | 106E | 90.00 | 9999994 | REGINA DRI | 103106/103106 | O |
| _ | 01/05/07 | | 2078 | 1312.50 | | *FS NC08 | 010507/ | O |

```
              F1=Help F3=Exit F7=Bkwd F8=Fwd F11=TTLS F12=Cancl
```
--------------------------------------------------------------------------

```
 NEXT?  __  C  FOR CLAIM NUMBER ___ / _____ / __
          XX-MENU, XM-MODULES MENU, XA-NEW ACCOUNT/BATCH, EN-MASTER MENU
```

ADMN1030

CLAIMS ADMINISTRATION SYSTEM          1L - LOOK AT CLAIM, NO CHANGE
 ACCOUNT 42429 CARGILL, INC                     03/18/96    09/24/07 BATCH 3988
 XEY CLAIM NO. SFX LOC.   ACC.DATE   COVER   CDC   CLAIMANT,  LAST-FIRST    OPEN
YDU/90911    /C  9999  09/28/05   111    02   WALLIS, KIMBERLY

--------------------------------------------------------------------------------
| PAY DATE  CHECK NO  PTYP  AMOUNT      VEND     PAYEE NAME    MMDDYY/MMDDYY S |
|                                                                             |
| ____      _____   ____  _____      ____     _____    _____  _____ _ |
| _ 01/05/07           2078    ~~1312.50~~   ~~FS NC08~~        010507/       O |
| _ 12/29/06 33010042 106C     80.00 0155739 KARE & THE      011507/011507 O |
| _ 12/29/06 33010043 106A     89.20 9999997 WALLIS KIM      011507/011507 O |
| _ 12/26/06 32995409 106B    224.50 0500315 TMESYS INC     304.28/120106 O |
| _ 12/26/06 32995410 106B     58.35 0500315 TMESYS INC      90.88/120206 O |
| _ 12/26/06 32995411 106B     85.18 0500315 TMESYS INC     121.09/120806 O |
| _ 12/21/06 32967911 2073   1600.00 0155739 KARE & THE     011006/112706 O |
| _ 12/20/06           1R06  ~~5000.00~~                            /      O |
| _ 12/20/06           2R00  ~~5500.00~~                            /      O |
| _ 12/20/06           3R03  ~~5000.00~~                            /      O |
| _ 12/19/06 32951218 106H    415.00 3795673 CONCENTRA      101706/103006 O |
| _ 12/11/06 32907436 106B    117.35 0500315 TMESYS INC     158.69/111606 O |
|                                                                             |
|               F1=Help F3=Exit F7=Bkwd F8=Fwd F11=TTLS F12=Cancl           |
--------------------------------------------------------------------------------

 NEXT? __  C  FOR CLAIM NUMBER ___ / _____ / __
           XX-MENU, XM-MODULES MENU, XA-NEW ACCOUNT/BATCH, EN-MASTER MENU

```
                                                                    ADMN1030
CLAIMS ADMINISTRATION SYSTEM        1L - LOOK AT CLAIM, NO CHANGE
 ACCOUNT 42429 CARGILL, INC                    03/18/96    09/24/07 BATCH 3988
 XEY CLAIM NO. SFX LOC.  ACC.DATE  COVER CDC  CLAIMANT, LAST-FIRST    OPEN
YDU/90911    /C  9999 09/28/05    111  02   WALLIS, KIMBERLY
-------------------------------------------------------------------------------
 ¦  PAY DATE CHECK NO PTYP AMOUNT      VEND    PAYEE NAME    MMDDYY/MMDDYY S ¦
 ¦                                                                         ¦
 ¦  _ _____ _____ ____ _____      ____    _____    _____ _____ _ ¦
 ¦  _ 12/11/06 32907436 106B    117.35 0500315 TMESYS INC    158.69/111606 O ¦
 ¦  _ 11/27/06 32822740 106B     62.57 0500315 TMESYS INC     90.88/110206 O ¦
 ¦  _ 11/16/06          2067     -9.00-         *FS NC08      111606/       O ¦
 ¦  _ 10/27/06          2078   -470.45-         *FS NC08      102706/       O ¦
 ¦  _ 10/26/06 29919796 106C     80.00 0155740 WAYNE STIL    103106/103106 O ¦
 ¦  _ 10/24/06 29908889 106B    404.42 0500315 TMESYS INC    553.85/101206 O ¦
 ¦  _ 10/24/06 29908890 106B    572.30 3517201 TPS IN TRU    572.30/031606 O ¦
 ¦  _ 10/24/06 29908891 106B    433.50 3848670 TPS IN TRU    433.50/030806 O ¦
 ¦  _ 10/18/06          2067     -9.00-         *FS NC08      101806/       O ¦
 ¦  _ 10/13/06 29836725 3003    525.60 9999997 WALLIS KIM    092506/100806 O ¦
 ¦  _ 10/10/06 29804485 106A    114.72 9999997 WALLIS KIM    103106/110806 O ¦
 ¦  _ 09/29/06 29739321 3003    525.60 9999997 WALLIS KIM    091106/092406 O ¦
 ¦                   F1=Help F3=Exit F7=Bkwd F8=Fwd F11=TTLS F12=Cancl     ¦
-------------------------------------------------------------------------------
 NEXT? __ C  FOR CLAIM NUMBER ___ / _____ / __
              XX-MENU, XM-MODULES MENU, XA-NEW ACCOUNT/BATCH, EN-MASTER MENU
```

```
                                                                    ADMN1030
CLAIMS ADMINISTRATION SYSTEM        1L - LOOK AT CLAIM, NO CHANGE
 ACCOUNT 42429 CARGILL, INC                  03/18/96     09/24/07 BATCH 3988
 XEY CLAIM NO. SFX LOC.  ACC.DATE  COVER  CDC  CLAIMANT,  LAST-FIRST    OPEN
YDU/90911    /C  9999 09/28/05   111   02   WALLIS, KIMBERLY
-----------------------------------------------------------------------------
¦  PAY DATE CHECK NO PTYP AMOUNT      VEND   PAYEE NAME    MMDDYY/MMDDYY S ¦
¦                                                                         ¦
¦ _ 09/29/06 29739321 3003     525.60 9999997 WALLIS KIM  091106/092406 O ¦
¦ _ 09/25/06 29710698 106B     401.45 0500315 TMESYS INC  548.67/091406 O ¦
¦ _ 09/15/06 59951352 1017     154.67 3288836 APEX PHYSI  205.00/102405 O ¦
¦ _ 09/13/06 59927234 3003    1051.20 9999997 WALLIS KIM  081406/091006 O ¦
¦ _ 09/11/06 59915039 106B      13.25 0500315 TMESYS INC   18.34/083106 O ¦
¦ _ 09/01/06          2078    -637.50        *TS=NC98      090106/       O ¦
¦ _ 08/24/06 59815945 106B     412.17 0500315 TMESYS INC  558.51/080106 O ¦
¦ _ 08/24/06 59815946 106B      62.57 0500315 TMESYS INC   90.88/080706 O ¦
¦ _ 08/15/06 59738828 3003     525.60 9999997 WALLIS KIM  073006/081306 O ¦
¦ _ 08/09/06 27000709 40ZH    -560.00        *PSCH52RBF    080906/       O ¦
¦ _ 08/03/06 59661321 3003     525.60 9999997 WALLIS KIM  071506/072906 O ¦
¦ _ 07/24/06 59592645 106B     104.03 0500315 TMESYS INC  140.59/071506 O ¦
¦              F1=Help F3=Exit F7=Bkwd F8=Fwd F11=TTLS F12=Cancl          ¦
-----------------------------------------------------------------------------
 NEXT? __  C  FOR CLAIM NUMBER ___ / _____ / __
           XX-MENU, XM-MODULES MENU, XA-NEW ACCOUNT/BATCH, EN-MASTER MENU
```

```
                                                                    ADMN1030
CLAIMS ADMINISTRATION SYSTEM          1L - LOOK AT CLAIM, NO CHANGE
  ACCOUNT 42429 CARGILL, INC                   03/18/96     09/24/07 BATCH 3988
  XEY CLAIM NO. SFX LOC.  ACC.DATE  COVER  CDC  CLAIMANT,  LAST-FIRST     OPEN
YDU/90911     /C  9999  09/28/05   111    02  WALLIS, KIMBERLY
--------------------------------------------------------------------------------
¦                                                                             ¦
¦  PAY DATE  CHECK NO PTYP AMOUNT       VEND    PAYEE NAME      MMDDYY/MMDDYY S ¦
¦                                                                           _ ¦
¦  _ 07/24/06 59592645 106B     104.03 0500315 TMESYS INC       140.59/071506 O ¦
¦  _ 07/22/06          2067      -9.00                          072206/       O ¦
¦  _ 07/19/06 59555694 3003     525.60 9999997 WALLIS KIM       070106/071406 O ¦
¦  _ 07/13/06          2066      -1.64         *FS-NC08         071306/       O ¦
¦  _ 07/11/06 59500459 106C     182.50 9999994 CONCENTRA        121305/011206 O ¦
¦  _ 06/30/06          2078   -1012.50         <FS-NC08         063006/       O ¦
¦  _ 06/27/06          2066      -5.56         *FS-NC08         062706/       O ¦
¦  _ 06/26/06 58415458 106B     591.97 0500315 TMESYS INC       805.28/060506 O ¦
¦  _ 06/14/06          2067     -27.00         *FS-NC08         061406/       O ¦
¦  _ 06/13/06 58324437 1016      87.30 1625034 CLINICAL R        97.00/010906 O ¦
¦  _ 06/05/06 58260524 3005     525.60 9999996 WALLIS, KI       051906/060106 O ¦
¦  _ 05/24/06 58187616 3005     525.60 9999997 WALLIS KIM       051906/060106 O ¦
¦                                                                             ¦
¦              F1=Help F3=Exit F7=Bkwd F8=Fwd F11=TTLS F12=Cancl               ¦
--------------------------------------------------------------------------------
  NEXT? __ C  FOR CLAIM NUMBER ___ / _____ / __
          XX-MENU, XM-MODULES MENU, XA-NEW ACCOUNT/BATCH, EN-MASTER MENU
```

```
                                                                            ADMN1030
CLAIMS ADMINISTRATION SYSTEM          1L - LOOK AT CLAIM, NO CHANGE
 ACCOUNT 42429 CARGILL, INC                        03/18/96      09/24/07 BATCH 3988
 XEY CLAIM NO. SFX LOC.   ACC.DATE   COVER  CDC  CLAIMANT, LAST-FIRST      OPEN
YDU/90911    /C   9999  09/28/05     111    02   WALLIS, KIMBERLY
 ---------------------------------------------------------------------------
 |                                                                          |
 |  PAY DATE CHECK NO PTYP AMOUNT       VEND     PAYEE NAME    MMDDYY/MMDDYY S |
 |                                                                        _ |
 | _ 05/24/06 58187616 3005      525.60 9999997 WALLIS KIM    051906/060106 O |
 | _ 05/24/06 58197453 106B      591.97 0500315 *FS TMESYS    042706/042706 O |
 | _ 05/19/06          2078     671.07  *FS NC08    051906/         O |
 | _ 05/17/06          2066      8.08   *FS NC08    051706/         O |
 | _ 05/17/06 58144506 106B      109.56 3809084 TPS IN TRU   109.56/100705 O |
 | _ 05/11/06 58097765 3005     1051.20 9999997 WALLIS KIM    042106/051806 O |
 | _ 05/11/06          2067     117.00  *FS NC08    051106/         O |
 | _ 05/03/06 58045736 1016      149.24 1388854 M GREATTIN   182.00/122005 O |
 | _ 04/28/06 58019233 1016      612.50 1885240 SIU PHYSIC   612.50/120805 O |
 | _ 04/24/06 57979406 106B      114.00 0500315 *FS TMESYS   040406/040406 O |
 | _ 04/22/06          2066      1.76   *FS NC08    042206/         O |
 | _ 04/19/06 57944284 1017      175.50 1885240 SIU PHYSIC   216.00/011306 O |
 |                                                                          |
 |              F1=Help F3=Exit F7=Bkwd F8=Fwd F11=TTLS F12=Cancl           |
 ---------------------------------------------------------------------------
  NEXT?  __  C  FOR CLAIM NUMBER ___ / _____ / __
                  XX-MENU, XM-MODULES MENU, XA-NEW ACCOUNT/BATCH, EN-MASTER MENU
```

```
                                                                    ADMN1030

CLAIMS ADMINISTRATION SYSTEM          1L - LOOK AT CLAIM, NO CHANGE
 ACCOUNT 42429 CARGILL, INC                  03/18/96    09/24/07 BATCH 3988
 XEY CLAIM NO. SFX LOC.  ACC.DATE  COVER  CDC  CLAIMANT,  LAST-FIRST    OPEN
YDU/90911    /C  9999  09/28/05   111    02   WALLIS, KIMBERLY
-------------------------------------------------------------------------------
¦   PAY DATE CHECK NO PTYP AMOUNT       VEND    PAYEE NAME    MMDDYY/MMDDYY S ¦
¦                                                                          _ ¦
¦ _ 04/19/06 57944284 1017      175.50 1885240 SIU PHYSIC    216.00/011306 O ¦
¦ _ 04/18/06 57933130 1016       57.62 1388854 M GREATTIN     68.00/031406 O ¦
¦ _ 04/17/06 57925008 1015      149.72 0128527 PASSAVANT     197.00/030806 O ¦
¦ _ 04/17/06 57925009 1016       55.76 1388854 M GREATTIN    136.00/020706 O ¦
¦ _ 04/15/06          2067      -27.00 *FG-NC08             041506/        O ¦
¦ _ 04/13/06 57908215 1016      560.00 3069326 ANESTHESIA    560.00/092805 O ¦
¦ _ 04/12/06 57897173 1016      112.18 3027039 PAUL M PAC    125.00/022806 O ¦
¦ _ 04/11/06 57880746 2076      317.50 1009870 CRAWFORD &   100405/100405 O ¦
¦ _ 04/10/06 57876754 1017      174.00 1885240 SIU PHYSIC    174.00/011106 O ¦
¦ _ 04/07/06 57863798 1017      873.90 1885240 SIU PHYSIC    886.00/020706 O ¦
¦ _ 04/05/06 57845612 1016       57.62 0128667 SPRINGFIEL     68.00/022306 O ¦
¦ _ 03/28/06 57787445 1017       80.00 0129614 PHYSICAL T     80.00/110905 O ¦
¦                          F1=Help F3=Exit F7=Bkwd F8=Fwd F11=TTLS F12=Cancl ¦
-------------------------------------------------------------------------------

 NEXT? __  C  FOR CLAIM NUMBER ___ / _____ / __
             XX-MENU, XM-MODULES MENU, XA-NEW ACCOUNT/BATCH, EN-MASTER MENU
```

```
                                                                    ADMN1030
CLAIMS ADMINISTRATION SYSTEM        1L - LOOK AT CLAIM, NO CHANGE
  ACCOUNT 42429 CARGILL, INC                  03/18/96    09/24/07 BATCH 3988
  XEY CLAIM NO. SFX LOC.  ACC.DATE   COVER   CDC  CLAIMANT, LAST-FIRST    OPEN
YDU/90911    /C  9999  09/28/05    111    02   WALLIS, KIMBERLY
--------------------------------------------------------------------------
┊   PAY DATE  CHECK NO PTYP AMOUNT       VEND     PAYEE NAME    MMDDYY/MMDDYY S ┊
┊                                                                              ┊
┊  _ 03/28/06 57787445 1017      80.00 0129614 PHYSICAL T     80.00/110905 O ┊
┊  _ 03/24/06          1R06  10000.00                               /        O ┊
┊  _ 03/24/06          2R00   2500.00                               /        O ┊
┊  _ 03/22/06 57746443 1016     738.70 0128667 SPRINGFIEL   840.00/021306 O ┊
┊  _ 03/21/06 57731611 2073     750.00 9999994 MIDWEST OC  102705/102705 O ┊
┊  _ 03/21/06 57731612 3005    1752.00 9999997 WALLIS KIM  030106/032106 O ┊
┊  _ 03/11/06          2067      90.00         *FG-NC08       031106/        O ┊
┊  _ 03/10/06 57675198 1016      47.25 1388854 M GREATTIN    68.00/020706 O ┊
┊  _ 02/28/06 57596263 3005    1752.00 9999997 WALLIS KIM  020806/022806 O ┊
┊  _ 02/21/06 57552491 1016    2730.00 3069326 ANESTHESIA 2730.00/092805 O ┊
┊  _ 02/17/06          2066       7.45         *FG-NC00       021706/        O ┊
┊  _ 02/16/06 57527647 106B     128.99 0000421 WALGREENS   128.99/120805 O ┊
┊                                                                              ┊
┊              F1=Help F3=Exit F7=Bkwd F8=Fwd F11=TTLS F12=Cancl             ┊
--------------------------------------------------------------------------
  NEXT?  __  C  FOR CLAIM NUMBER ___ / _____ / __
          XX-MENU, XM-MODULES MENU, XA-NEW ACCOUNT/BATCH, EN-MASTER MENU
```

```
                                                                          ADMN1030
CLAIMS ADMINISTRATION SYSTEM          1L - LOOK AT CLAIM, NO CHANGE
 ACCOUNT 42429 CARGILL, INC                      03/18/96     09/24/07 BATCH 3988
 XEY CLAIM NO. SFX LOC.  ACC.DATE   COVER  CDC  CLAIMANT,  LAST-FIRST     OPEN
YDJ/90911    /C   9999  09/28/05    111    02  WALLIS, KIMBERLY
---------------------------------------------------------------------------------
┆  PAY DATE CHECK NO PTYP AMOUNT        VEND    PAYEE NAME     MMDDYY/MMDDYY S ┆
┆  _____  _____ ____ _____      _____   _____     _____ _ ┆
┆ _ 02/16/06 57527647 106B     128.99 0000421 WALGREENS        128.99/120805 O ┆
┆ _ 02/16/06 57527648 1016     712.49 3027039 PAUL M PAC      1025.00/011606 O ┆
┆ _ 02/16/06 57527649 1016     112.18 3027039 PAUL M PAC       125.00/013106 O ┆
┆ _ 02/15/06          2067     -31.00         *PS-NC08         021506/        O ┆
┆ _ 02/14/06 57508027 1016     747.99 1611342 SIU PHYSIC       776.00/112105 O ┆
┆ _ 02/09/06 57469411 3005    1168.00 9999997 WALLIS KIM      011106/020706 O ┆
┆ _ 02/08/06 57465752 1016     910.00 1738309 ANESTHESIA       910.00/100105 O ┆
┆ _ 02/08/06 57465753 1016     654.00 1885240 SIU PHYSIC       654.00/010906 O ┆
┆ _ 02/06/06 57446611 1015     314.30 0131586 SARAH D CU       314.30/010906 O ┆
┆ _ 02/02/06 57429352 1015   55280.63 0128527 PASSAVANT     55280.63/100305 O ┆
┆ _ 01/27/06          2078   -1950.00         *PS-NC08         012706/        O ┆
┆ _ 01/24/06          2067     -95.00         *PS-NC08         012406/        O ┆
┆                    F1=Help F3=Exit F7=Bkwd F8=Fwd F11=TTLS F12=Cancl       ┆
---------------------------------------------------------------------------------
 NEXT? __  C  FOR CLAIM NUMBER ___ / _____ / __
           XX-MENU, XM-MODULES MENU, XA-NEW ACCOUNT/BATCH, EN-MASTER MENU
```

ADMN1030

```
CLAIMS ADMINISTRATION SYSTEM          1L - LOOK AT CLAIM, NO CHANGE
 ACCOUNT 42429 CARGILL, INC                   03/18/96    09/24/07 BATCH 3988
 XEY CLAIM NO. SFX LOC.  ACC.DATE   COVER  CDC  CLAIMANT, LAST-FIRST    OPEN
YDU/90911    /C  9999  09/28/05    111   02    WALLIS, KIMBERLY
-----------------------------------------------------------------------------
:  PAY DATE CHECK NO PTYP AMOUNT       VEND    PAYEE NAME    MMDDYY/MMDDYY S :
:  _____ _____ ____ _____      ____    _____    _____ _ :
:  _ 01/24/06          2067    36.00            *ES NC08      012406/       O :
:  _ 01/24/06 99990911 1706    115.87           NH CASH       110405/110405 O :
:  _ 01/24/06 99990939 1706    224.57           NH CASH       112205/112205 O :
:  _ 01/24/06 99990953 2776      8.19           NH CASH       102405/102405 O :
:  _ 01/24/06 99991049 2776      6.90           NH CASH       110505/110505 O :
:  _ 01/24/06 99991050 2776      6.80           NH CASH       111205/111205 O :
:  _ 01/24/06 99991051 2776     11.75           NH CASH       120605/120605 O :
:  _ 01/23/06 99990872 1706     11.87           NH CASH       102505/102505 O :
:  _ 01/20/06 96575010 1016    150.00 1411510  MICHAEL E      185.00/120105 O :
:  _ 01/18/06 96557366 1015    289.90 0128527  PASSAVANT      289.90/100505 O :
:  _ 01/17/06          1R06   1000.00                              /        O :
:  _ 01/17/06          3R05   90170.00                             /        O :
:                       F1=Help F3=Exit F7=Bkwd F8=Fwd F11=TTLS F12=Cancl   :
-----------------------------------------------------------------------------
  NEXT? __  C  FOR CLAIM NUMBER ___ / _____ / __
         XX-MENU, XM-MODULES MENU, XA-NEW ACCOUNT/BATCH, EN-MASTER MENU
```

```
                                                                    ADMN1030
CLAIMS ADMINISTRATION SYSTEM        1L - LOOK AT CLAIM, NO CHANGE
 ACCOUNT 42429 CARGILL, INC                 03/18/96      09/24/07 BATCH 3988
 XEY CLAIM NO. SFX LOC.  ACC.DATE  COVER  CDC  CLAIMANT,  LAST-FIRST    OPEN
YDU/90911    /C  9999 09/28/05   111   02   WALLIS, KIMBERLY
-------------------------------------------------------------------------------
┆                                                                             ┆
┆   PAY DATE CHECK NO PTYP AMOUNT        VEND    PAYEE NAME    MMDDYY/MMDDYY S ┆
┆                                                                             ┆
┆ _ 01/17/06          3R05    00170.80                               /      O ┆
┆ _ 01/17/06          3R04    25300.00                               /      O ┆
┆ _ 01/16/06 96535517 3005      584.00 9999997 WALLIS KIM   122805/011006 O ┆
┆ _ 01/14/06          2066       1.91   *PS-NC00            011406/         O ┆
┆ _ 01/12/06 96522637 1016      188.98 3096553 PATHOLOGY     243.00/092905 O ┆
┆ _ 01/11/06 96512828 1015      131.25 1497250 ANDERSON H    175.00/100805 O ┆
┆ _ 01/06/06 96481794 1016       59.00 2491308 MARSHALL B     59.00/100605 O ┆
┆ _ 01/05/06 96471513 1016      121.84 1655648 CLINICAL R    143.00/092805 O ┆
┆ _ 01/04/06 96459623 1016      186.20 1011872 PRAIRIELAN    186.20/092805 O ┆
┆ _ 12/27/05 96414270 1016       63.75 0642100 REG ORTHOP     75.00/092805 O ┆
┆ _ 12/20/05 96373197 106A      160.32 9999997 WALLIS KIM   011006/011006 O ┆
┆ _ 12/13/05 96322929 305A     1752.00 9999997 WALLIS KIM   111505/122705 O ┆
┆                   F1=Help F3=Exit F7=Bkwd F8=Fwd F11=TTLS F12=Cancl       ┆
-------------------------------------------------------------------------------
 NEXT? __  C  FOR CLAIM NUMBER ___ / _____ / __
            XX-MENU, XM-MODULES MENU, XA-NEW ACCOUNT/BATCH, EN-MASTER MENU
```

ADMN1030

```
CLAIMS ADMINISTRATION SYSTEM        1L - LOOK AT CLAIM, NO CHANGE
 ACCOUNT 42429 CARGILL, INC                   03/18/96    09/24/07 BATCH 3988
 XEY CLAIM NO. SFX LOC.  ACC.DATE  COVER  CDC  CLAIMANT, LAST-FIRST      OPEN
 YDU/90911    /C  9999  09/28/05   111   02   WALLIS, KIMBERLY
------------------------------------------------------------------------------
¦  PAY DATE CHECK NO PTYP AMOUNT       VEND    PAYEE NAME    MMDDYY/MMDDYY S ¦
¦                                                           _____ _____ _ ¦
¦  _ 12/13/05 96322929 305A     1752.00 9999997 WALLIS KIM   111505/122705 O ¦
¦  _ 10/31/05 03136952 2767        7.50 8999999 NAVIGATOR    111505/        O ¦
¦  _ 10/29/05 68731872 1706      651.62 8999999 BEARDSTOWN   092805/092805 O ¦
¦  _ 10/28/05 90486252 3704     1051.20 8999999 KIMBERLY W   101305/110905 O ¦
¦  _ 10/26/05 RSV-CHG  3R05        54.00                      111505/       O ¦
¦  _ 10/22/05 90485433 1776       28.80 8999999 KIMBERLY W   102705/102705 O ¦
¦  _ 10/15/05 90485235 3704      525.60 8999999 KIMBERLY W   092905/101205 O ¦
¦  _ 10/15/05 90485244 3705      125.13 8999999 KIMBERLY W   100105/100305 O ¦
¦  _ 10/14/05 00141143 2775       20.00 8999999 CRAWFORD &   111505/       O ¦
¦  _ 10/14/05 08023027 2776        9.00 8999999 CRAWFORD &   101205/101205 O ¦
¦  _ 10/13/05 RSV-CHG  1R06    20000.00                       111505/       O ¦
¦  _ 10/13/05 RSV-CHG  3R05     2500.00                       111505/       O ¦
¦                       F1=Help F3=Exit F7=Bkwd F8=Fwd F11=TTLS F12=Cancl   ¦
------------------------------------------------------------------------------
 NEXT? __  C  FOR CLAIM NUMBER ___ / _____ / __
             XX-MENU, XM-MODULES MENU, XA-NEW ACCOUNT/BATCH, EN-MASTER MENU
```

**E-FILED**
Friday, 28 September, 2007  12:32:58 PM
Clerk, U.S. District Court, ILCD

# LANGFORD AND ASSOCIATES

873 South Park Avenue
Springfield, Illinois 62704-2333

Telephone: 217.787.2807
Facsimile: 217.698.9633
E-Mail: LANGFORD@FGI.NET

August 17, 2007

Mr. R. Gerald Barris
**SORLING, NORTHRUP, HANNA, CULLEN & COCHRAN, LTD.**
Attorneys at Law
607 East Adams Street,  Suite 800
Springfield, Illinois 62701

RE: *Kimberly Wallis v. Cargill Meat Solutions Corp.*
U.S. District Court Central IL (Spfd) 06-03147

Dear Mr. Barris:

Enclosed please find a revised opinion with regard to the projected economic losses of Kimberly Wallis.  This valuation is based upon the information provided as of this date and is subject to revision based upon additional information concerning the labor agreement between Cargill Meat Solutions Corp and the United Food and Commercial Workers, Local 431.

At such time as the additional information becomes available, I will be please to amend and extend this report as required.

If you have any questions concerning the assumptions noted, please do not hesitate to contact me.

Yours truly,

Thomas W. Langford

**EXHIBIT**

D

# LANGFORD AND ASSOCIATES

873 South Park Avenue
Springfield, Illinois 62704-2333

Telephone: 217.787.2807
Facsimile: 217.698.9633
E-Mail: LANGFORD@FGI.NET

August 17, 2007

Mr. R. Gerald Barris
**SORLING, NORTHRUP, HANNA, CULLEN & COCHRAN, LTD.**
Attorneys at Law
607 East Adams Street, Suite 800
Springfield, Illinois 62701

RE: *Kimberly Wallis v. Cargill Meat Solutions Corp.*
U.S. District Court Central IL (Spfd) 06-03147

Dear Mr. Barris:

Per your request, I have revised the calculations (originally dated April 30, 2007) of the expected present cash value of the economic losses of Kimberly Wallis due to injuries sustained September 28, 2005 while employed by Cargill Meat Solutions Corporation. These revisions are predicated upon the additional information provided by your office relating to the expectation that Ms. Wallis is unable to work, the medical benefits and the retirement benefits payable by Cargill Meat Solutions Corp. Such calculations are in accordance with generally accepted economic principles and techniques. The valuations are based upon information provided as of this date and are subject to revision based upon additional information. The date of this valuation is January 1, 2008.

## GENERAL ASSUMPTIONS

Kimberly Wallis is a female Caucasian resident of Illinois, born March 30, 1976 and will be 29.4976 years of age as of the date of valuation. She has three children: Sabrina I. Bron, born July 18, 2001; Kashmira Bron, born December 8, 2002; and, Louis N. Bron, born September 2, 2004.

It is assumed that the appropriate probabilities of mortality and survival are those which may be derived from the most recently published data by sex, race, and single year of age, as found in: National Center for Health Statistics, *United States Life Tables: 2003* (revised March 28, 2007), National Vital Statistics Reports, Volume 54, Number 14.

The probabilities of employment and probabilities of non-participation in the labor force due to mental of physical disability are calculated from the most recently available annual national employment statistics as published by the U. S. Bureau of Labor Statistics in *Employment and Earnings*.

# LANGFORD AND ASSOCIATES

R. Gerald Barris
*Wallis v. Cargill*

August 17, 2007
page two

873 South Park Avenue
Springfield, Illinois 62704-2333

Telephone: 217.787.2807
Facsimile: 217.698.9633
E-Mail: LANGFORD@FGI.NET

It is assumed that the appropriate rates to discount the value of future earnings and benefits to present cash value are the annual average effective yields of the relatively risk-free notes and bonds of the U. S. Department of the Treasury as of August 13, 2007. It is also assumed that the long-term interest rates for the years 3038 and thereafter are 5.010 percent per year.

## LOST EARNINGS

Kimberly Wallis was employed by Cargill Meat Solutions Corp. at Beardstown, Illinois commencing March 1, 2004 at a wage rate of $10.35 per hour. As of June 28, 2005 she commenced working as a butt skinner, (pay grade 2) at a wage rate of 11.50 per hour. She was injured September 28, 2005 and has been unable to return to active employment with Cargill as of this date.

It is noted that the base wage rate as of January 10, 2005 was $11.35 per hour; $11.65 per hour as of January 16, 2006; and $11.95 per hour as of January 15, 2007. Jobs in Pay Grade 2 are at the above base rate plus $0.15 per hour. The current labor contract with the United Food and Commercial Workers, Local 431 expires August 6, 2007.

It is conservatively assumed for purposes of this analysis, the future base wage rates will increase in absolute dollar amount not less than the statutory increase in the minimum wage rate as current in Illinois. (See Tables ONE and TWO).  It is noted that this assumed a significant reduction in the relationship between the Cargill basic wage rate and the statutory minimum hourly wage rate based upon the 2005 rates.

It is noted that Kimberly Wallis normally worked 40 hours per week. The contractual agreement specifies a minimum of 35 hours per week. For purposes of this analysis, it is assumed that she would have and will work at the rate of 40 hours per week.

The membership dues to the United Food and Commercial Workers, Local 431, is at the rate of $8.71 per week during the term of the current contract. It is assumed that the rate of increase of union dues in future contracts will be at approximately the same as the increase in base wage rate. See Table ONE.

The detailed projected loss of earnings of Kimberly Wallis for the period September 28, 2005 through December 31, 2007 shown in Table THREE.  The weekly data shown in Table THREE are aggregated and reduced by the expected probabilities of unemployment and non-participation in the labor force by reason of mental or physical incapacity. See Table FOUR.

# LANGFORD AND ASSOCIATES

R. Gerald Barris
873 South Park Avenue
Springfield, Illinois 62704-2333

August 17, 2007

*Wallis v. Cargill*

page three
Telephone: 217.787.2807
Facsimile: 217.698.9633
E-MAIL: LANGFORD@FGI.NET

The lost earnings of Kimberly Wallis during the period September 28, 2005 through December 31, 2007 is forty nine thousand seven hundred sixty seven dollars and 63 cents, ($49,767.63).

It is assumed that Kimberly Wallis, in the absence of the injuries incurred, would have cease employment in the job grade with Cargill Meat Solutions Corp upon reaching the age of qualification for un-reduced Social Security benefits, that is age 67, March 30, 2043. The expected present cash value of the projected future lost earnings from January 1, 2008 to retirement is five hundred seventy four thousand eight hundred ninety nine dollars and 64 cents, ($574,899.64). See Table FOUR.

## LOST RETIREMENT BENEFITS

The retirement benefits which would accrue to Kimberly Wallis, were she to remain employed at Cargill Meat Solutions Corp until age 67 would be at the rate of $20.00 per month per year of accrued service. That is, as of March 30, 2043 she would have accrued 39.08 years of retirement benefits, or a monthly benefit in the amount of $781.60 for the remainder of her life. This represents an expected present cash value of $84,362.36. See Table FIVE.

It is noted that she had accrued 1.57808 years of service prior to the injury. Although this service was not fully vested, the accrued benefit would have provided approximately $31.56 per month, with an expected present cash value of $3,406.62. See Table SIX. Such previously accrued benefit is subtracted from the projected benefit to obtain the net expected present cash value of the economic loss of retirement benefits of Kimberly Wallis due to the injuries of eighty thousand nine hundred fifty five dollars and 74 cents, ($80,955.74).

## LOST MEDICAL BENEFITS

As an active employee of Cargill Meat Solutions Corp, Kimberly Wallis and her dependents were provided medical and dental benefits. The valuation of these benefits is conservatively estimated using the direct costs to the employer of the medical and dental benefits as reported under the terms of the Consolidated Omnibus Budget Reconciliation Acts of 1985 (COBRA), excluding the allowable 2 percent billing charge. This value as of April 1, 2005 was stated to be $877.34 for family coverage for production employees.

It is suggested that these costs represent a significant understatement of the market value of equivalent medical and dental plan coverage for Kimberly Wallis and her dependents assuming the availability of comparable individual (non-group) coverage. In part, the differential costs may be attributed to the reduced statistical risk of large group coverage and the bargaining power of a large employer relative to individual coverage.

# LANGFORD AND ASSOCIATES

R. Gerald Barris
*Wallis v. Cargill*
873 South Park Avenue
Springfield, Illinois 62704-2333

August 17, 2007
Page Four
Telephone: 217.787.2807
Facsimile: 217.698.9633
E-Mail: LANGFORD@FGI.NET

It has been observed that during the period 1980 to present, the rate of health care costs in the American economy have increased at a rate of almost double the rate observed for the prices of all goods and services purchased by urban wage earners in the United States. That is, the Consumer Price Index during the period 1980 through July 2007 for all goods and services has increased at a compound annual rate of 3.44 percent per year. The price index for all medical care during the same period has increased at the rate of 5.95 percent per year. The rate of increase for medical care services (physicians and other medical care services) has been at the compound annual rate of 6.16 percent per year. The comparable price index for hospital and related services has increased at the compound annual rate of 7.66 percent per year. See Table SEVEN.

For purposes of this analysis, it is assumed that the annual rate of increase of the value of the medical and dental insurance benefits provided by Cargill Meat Solutions Corp will increase at the annual rate of 5.95 percent per year. It is noted that the employee contribution for this medical and dental coverage is $20.00 per week. It is projected that such employee share of the cost shall increase at the compound annual rate of 5.95 percent per year.

The net value of the lost medical and dental benefits of Kimberly Wallis during the period September 29, 2005 through the date of valuation, January 1, 2008 is $21,554.38. The net expected present cash value of the projected lost medical and dental benefits during the period January 1, 2008 through retirement at March 30, 2043 is $414,381.71. See Table EIGHT.

## SUMMARY

The above enumerated economic losses of Kimberly Wallis during the period September 29, 2005 until the date of valuation, January 1, 2008 is calculated to be $71,322.01. The expected present cash value of the projected economic losses of Kimberly Wallis during the period after January 1, 2008 is calculated to be $1,070,237.09. That is, the total expected present cash value of the calculated economic losses of Kimberly Wallis is one million one hundred forty one thousand five hundred fifty nine dollars and 10cents, ($1,141,559.10). See Table NINE.

## DISCLAIMERS

Prior to the request to value the economic losses of Kimberly Wallis, to the best of my knowledge, I have not met nor known of Kimberly Wallis, or members of her family.

R. Gerald Barris
*Wallis v. Cargill*

August 17, 2007
page five

Further, I have no direct or indirect economic interest in Cargill Meat Solutions Corp or related corporations.

The compensation for this valuation is at the standard rate and is not dependent upon the magnitude of the resulting valuation nor the outcome of the matter at law.

Yours truly,

Thomas W. Langford
**LANGFORD AND ASSOCIATES**

Attachments: Tables ONE - NINE

**TABLE ONE**                 *revised*

# PROJECTED WEEKLY WAGE RATES

Kimberly Wallis

Cargill Meat Solutions Corp.

| Date | Base | Grade 2 | Total | Weekly 40 hrs/wk | Union Dues/wk | NET EARN |
|---|---|---|---|---|---|---|
| *1* | *2* | *3* | *4* | *5* | *6* | *7* |
| 28-Sep-05 | $ 11.35 | $ 0.15 | $ 11.50 | $ 460.00 | $ 8.71 | $ 451.29 |
| 16-Jan-06 | $ 11.65 | $ 0.15 | $ 11.80 | $ 472.00 | $ 8.71 | $ 463.29 |
| 15-Jan-07 | $ 11.95 | $ 0.15 | $ 12.10 | $ 484.00 | $ 8.71 | $ 475.29 |
| 15-Jan-08 | $ 12.20 | $ 0.15 | $ 12.35 | $ 494.00 | $ 9.14 | $ 484.86 |
| 15-Jan-09 | $ 12.45 | $ 0.16 | $ 12.61 | $ 504.41 | $ 9.33 | $ 495.08 |
| 15-Jan-10 | $ 12.70 | $ 0.16 | $ 12.86 | $ 514.54 | $ 9.52 | $ 505.02 |
| 15-Jan-11 | $ 13.05 | $ 0.17 | $ 13.22 | $ 528.69 | $ 9.78 | $ 518.91 |
| 15-Jan-12 | $ 13.41 | $ 0.17 | $ 13.58 | $ 543.23 | $ 10.05 | $ 533.18 |
| 15-Jan-13 | $ 13.78 | $ 0.18 | $ 13.95 | $ 558.17 | $ 10.33 | $ 547.84 |
| 15-Jan-14 | $ 14.16 | $ 0.18 | $ 14.34 | $ 573.52 | $ 10.61 | $ 562.91 |
| 15-Jan-15 | $ 14.54 | $ 0.19 | $ 14.73 | $ 589.29 | $ 10.90 | $ 578.39 |
| 15-Jan-16 | $ 14.94 | $ 0.19 | $ 15.14 | $ 605.50 | $ 11.20 | $ 594.30 |
| 15-Jan-17 | $ 15.36 | $ 0.20 | $ 15.55 | $ 622.15 | $ 11.51 | $ 610.64 |
| 15-Jan-18 | $ 15.78 | $ 0.20 | $ 15.98 | $ 639.26 | $ 11.83 | $ 627.43 |
| 15-Jan-19 | $ 16.21 | $ 0.21 | $ 16.42 | $ 656.84 | $ 12.15 | $ 644.69 |
| 15-Jan-20 | $ 16.66 | $ 0.21 | $ 16.87 | $ 674.90 | $ 12.49 | $ 662.42 |
| 15-Jan-21 | $ 17.12 | $ 0.22 | $ 17.34 | $ 693.46 | $ 12.83 | $ 680.63 |
| 15-Jan-22 | $ 17.59 | $ 0.23 | $ 17.81 | $ 712.53 | $ 13.18 | $ 699.35 |
| 15-Jan-23 | $ 18.07 | $ 0.23 | $ 18.30 | $ 732.13 | $ 13.54 | $ 718.58 |
| 15-Jan-24 | $ 18.57 | $ 0.24 | $ 18.81 | $ 752.26 | $ 13.92 | $ 738.34 |
| 15-Jan-25 | $ 19.08 | $ 0.25 | $ 19.32 | $ 772.95 | $ 14.30 | $ 758.65 |
| 15-Jan-26 | $ 19.60 | $ 0.25 | $ 19.86 | $ 794.20 | $ 14.69 | $ 779.51 |
| 15-Jan-27 | $ 20.14 | $ 0.26 | $ 20.40 | $ 816.04 | $ 15.10 | $ 800.95 |
| 15-Jan-28 | $ 20.70 | $ 0.27 | $ 20.96 | $ 838.48 | $ 15.51 | $ 822.97 |
| 15-Jan-29 | $ 21.26 | $ 0.27 | $ 21.54 | $ 861.54 | $ 15.94 | $ 845.60 |
| 15-Jan-30 | $ 21.85 | $ 0.28 | $ 22.13 | $ 885.23 | $ 16.38 | $ 868.86 |
| 15-Jan-31 | $ 22.45 | $ 0.29 | $ 22.74 | $ 909.58 | $ 16.83 | $ 892.75 |
| 15-Jan-32 | $ 23.07 | $ 0.30 | $ 23.36 | $ 934.59 | $ 17.29 | $ 917.30 |
| 15-Jan-33 | $ 23.70 | $ 0.31 | $ 24.01 | $ 960.29 | $ 17.77 | $ 942.53 |
| 15-Jan-34 | $ 24.35 | $ 0.31 | $ 24.67 | $ 986.70 | $ 18.25 | $ 968.45 |
| 15-Jan-35 | $ 25.02 | $ 0.32 | $ 25.35 | $ 1,013.84 | $ 18.76 | $ 995.08 |
| 15-Jan-36 | $ 25.71 | $ 0.33 | $ 26.04 | $ 1,041.72 | $ 19.27 | $ 1,022.44 |
| 15-Jan-37 | $ 26.42 | $ 0.34 | $ 26.76 | $ 1,070.36 | $ 19.80 | $ 1,050.56 |
| 15-Jan-38 | $ 27.15 | $ 0.35 | $ 27.49 | $ 1,099.80 | $ 20.35 | $ 1,079.45 |
| 15-Jan-39 | $ 27.89 | $ 0.36 | $ 28.25 | $ 1,130.04 | $ 20.91 | $ 1,109.14 |
| 15-Jan-40 | $ 28.66 | $ 0.37 | $ 29.03 | $ 1,161.12 | $ 21.48 | $ 1,139.64 |
| 15-Jan-41 | $ 29.45 | $ 0.38 | $ 29.83 | $ 1,193.05 | $ 22.07 | $ 1,170.98 |
| 15-Jan-42 | $ 30.26 | $ 0.39 | $ 30.65 | $ 1,225.86 | $ 22.68 | $ 1,203.18 |
| 15-Jan-43 | $ 31.09 | $ 0.40 | $ 31.49 | $ 1,259.57 | $ 23.30 | $ 1,236.27 |

*Wallis v. Cargill*

# TABLE TWO

### Illinois Minimum Hourly Wage Rate

| | | |
|---|---|---|
| 1983 | $ | 2.30 |
| 1-Jan-84 | $ | 2.65 |
| 1-Oct-84 | $ | 3.00 |
| 1-Jul-85 | $ | 3.35 |
| 1-Apr-90 | $ | 3.80 |
| 1-Jan-97 | $ | 4.25 |
| 1-Jan-98 | $ | 4.75 |
| 1-Jan-04 | $ | 5.15 |
| 1-Jan-05 | $ | 5.50 |
| 1-Jul-06 | $ | 6.50 |
| 1-Jul-07 | $ | 7.50 |
| 1-Jul-08 | $ | 7.75 |
| 1-Jul-09 | $ | 8.00 |
| 1-Jul-10 | $ | 8.25 |

820 ILCS 105/4 as amended by PA 94-1072

*Langford and Associates*

*Wallis v. Cargill*                                **TABLE THREE**

### DETAILED PROJECTED LOST EARNINGS: KIMBERLY WALLIS
September 28, 2005 through December 31, 2007

| From | To | Rate | Hours | Gross | Dues | Disability | NET LOSS |
|------|-----|------|-------|-------|------|-----------|----------|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 28-Sep-05 | 1-Oct-05 | 11.5 | 16 | $ 184.00 | $ 8.71 | $ 90.00 | $ 85.29 |
| 2-Oct-05 | 8-Oct-05 | 11.5 | 40 | $ 460.00 | $ 8.71 | $ 225.00 | $ 226.29 |
| 9-Oct-05 | 15-Oct-05 | 11.5 | 40 | $ 460.00 | $ 8.71 | $ 225.00 | $ 226.29 |
| 16-Oct-05 | 22-Oct-05 | 11.5 | 40 | $ 460.00 | $ 8.71 | $ 225.00 | $ 226.29 |
| 23-Oct-05 | 29-Oct-05 | 11.5 | 40 | $ 460.00 | $ 8.71 | $ 225.00 | $ 226.29 |
| 30-Oct-05 | 5-Nov-05 | 11.5 | 40 | $ 460.00 | $ 8.71 | $ 225.00 | $ 226.29 |
| 6-Nov-05 | 12-Nov-05 | 11.5 | 40 | $ 460.00 | $ 8.71 | $ 225.00 | $ 226.29 |
| 13-Nov-05 | 19-Nov-05 | 11.5 | 40 | $ 460.00 | $ 8.71 | $ 225.00 | $ 226.29 |
| 20-Nov-05 | 26-Nov-05 | 11.5 | 40 | $ 460.00 | $ 8.71 | $ 225.00 | $ 226.29 |
| 27-Nov-05 | 3-Dec-05 | 11.5 | 40 | $ 460.00 | $ 8.71 | $ 225.00 | $ 226.29 |
| 4-Dec-05 | 10-Dec-05 | 11.5 | 40 | $ 460.00 | $ 8.71 | $ 225.00 | $ 226.29 |
| 11-Dec-05 | 17-Dec-05 | 11.5 | 40 | $ 460.00 | $ 8.71 | $ 225.00 | $ 226.29 |
| 18-Dec-05 | 24-Dec-05 | 11.5 | 40 | $ 460.00 | $ 8.71 | $ 225.00 | $ 226.29 |
| 25-Dec-05 | 31-Dec-05 | 11.5 | 40 | $ 460.00 | $ 8.71 | $ 225.00 | $ 226.29 |
| 2005 | | | | $ 6,164.00 | $ 121.94 | $ 3,015.00 | $ 3,027.06 |
| | | | | | | | |
| 1-Jan-06 | 7-Jan-06 | 11.5 | 40 | $ 460.00 | $ 8.71 | $ 225.00 | $ 226.29 |
| 8-Jan-06 | 14-Jan-06 | 11.8 | 40 | $ 472.00 | $ 8.71 | $ 225.00 | $ 238.29 |
| 15-Jan-06 | 21-Jan-06 | 11.8 | 40 | $ 472.00 | $ 8.71 | $ 225.00 | $ 238.29 |
| 22-Jan-06 | 28-Jan-06 | 11.8 | 40 | $ 472.00 | $ 8.71 | $ 225.00 | $ 238.29 |
| 29-Jan-06 | 2-Feb-06 | 11.8 | 24 | $ 283.20 | $ 8.71 | $ 135.00 | $ 139.49 |
| 2-Feb-06 | 4-Feb-06 | 11.8 | 14 | $ 165.20 | $ - | $ - | $ 165.20 |
| 5-Feb-06 | 11-Feb-06 | 11.8 | 40 | $ 472.00 | $ 8.71 | $ - | $ 463.29 |
| 12-Feb-06 | 18-Feb-06 | 11.8 | 40 | $ 472.00 | $ 8.71 | $ - | $ 463.29 |
| 19-Feb-06 | 25-Feb-06 | 11.8 | 40 | $ 472.00 | $ 8.71 | $ - | $ 463.29 |
| 26-Feb-06 | 4-Mar-06 | 11.8 | 40 | $ 472.00 | $ 8.71 | $ - | $ 463.29 |
| … | … | … | … | … | … | … | … |
| 24-Dec-06 | 30-Dec-06 | 11.8 | 40 | $ 472.00 | $ 8.71 | $ - | $ 463.29 |
| 2006 | | | | $ 24,532.00 | $ 452.92 | $ 1,035.00 | $ 23,044.08 |
| | | | | | | | |
| 1-Jan-07 | 6-Jan-07 | 11.8 | 40 | $ 472.00 | $ 8.71 | | $ 463.29 |
| 7-Jan-07 | 12-Jan-07 | 11.8 | 40 | $ 472.00 | $ 8.71 | | $ 463.29 |
| 13-Jan-07 | 14-Jan-07 | 11.8 | 16 | $ 188.80 | $ 8.71 | | $ 180.09 |
| 15-Jan-07 | 19-Jan-07 | 12.1 | 24 | $ 290.40 | $ - | | $ 290.40 |
| 20-Jan-07 | 26-Jan-07 | 12.1 | 40 | $ 484.00 | $ 8.71 | | $ 475.29 |
| 27-Jan-07 | 2-Feb-07 | 12.1 | 40 | $ 484.00 | $ 8.71 | | $ 475.29 |
| … | … | … | … | … | … | | … |
| 23-Dec-07 | 29-Dec-07 | 12.1 | 40 | $ 484.00 | $ 8.71 | | $ 475.29 |
| 30-Dec-07 | 31-Dec-07 | 12.1 | 8 | $ 96.80 | $ 8.71 | | $ 88.09 |
| 2007 | | | | $ 25,139.20 | $ 452.92 | | $ 24,686.28 |

*Langford and Associates*

*Wallis v. Cargill*

*revised*

## TABLE FOUR

### EXPECTED PRESENT CASH VALUE OF LOST EARNINGS: KIMBERLY WALLIS
as of January 1, 2008

Assuming employment 40 hours per week until age 67 (March 30, 2043)

| Year | Age | P(Dying) | P(Surving) | P(Emp) | P(LFP) | Interest Rates | Earnings Hourly | Annual | Disability | Union Dues | Expected | E P C V |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
| 2005 | 29 | 0.000000 | 1.000000 | 0.979000 | 0.999330 | 0.000000 | 11.50 | $6,164.00 | $3,015.00 | 121.94 | $2,961.51 | $2,961.51 |
| 2006 | 30 | 0.000000 | 1.000000 | 0.981500 | 0.999120 | 0.000000 | 11.80 | $24,532.00 | $1,035.00 | 452.92 | $22,597.86 | $22,597.86 |
| 2007 | 31 | 0.000000 | 1.000000 | 0.981500 | 0.999120 | 0.000000 | 12.10 | $25,139.20 | $ - | 452.92 | $24,208.26 | $24,208.26 |
| | | | | | | | | $55,835.20 | $4,050.00 | $1,027.78 | $49,767.63 | $49,767.63 |
| 2008 | 31 | 0.000589 | 0.999411 | 0.981500 | 0.999120 | 0.046690 | 12.35 | $25,668.00 | | 474.37 | $24,691.25 | $24,134.26 |
| 2009 | 32 | 0.000629 | 0.998782 | 0.981500 | 0.999120 | 0.045010 | 12.61 | $25,220.00 | | 484.86 | $24,226.64 | $22,678.41 |
| 2010 | 33 | 0.000680 | 0.998103 | 0.981500 | 0.999120 | 0.044770 | 12.86 | $25,720.00 | | 494.62 | $24,690.00 | $22,129.38 |
| 2011 | 34 | 0.000743 | 0.997361 | 0.981500 | 0.999120 | 0.045330 | 13.22 | $27,428.00 | | 508.08 | $26,328.99 | $22,544.85 |
| 2012 | 35 | 0.000813 | 0.996551 | 0.982500 | 0.999160 | 0.045550 | 13.58 | $28,168.80 | | 522.05 | $27,046.49 | $22,113.97 |
| 2013 | 36 | 0.000891 | 0.995663 | 0.982500 | 0.999160 | 0.045960 | 13.95 | $28,928.80 | | 536.41 | $27,751.21 | $21,749.49 |
| 2014 | 37 | 0.000982 | 0.994685 | 0.982500 | 0.999160 | 0.046130 | 14.34 | $29,737.60 | | 551.16 | $28,499.30 | $21,258.25 |
| 2015 | 38 | 0.001088 | 0.993603 | 0.982500 | 0.999160 | 0.047670 | 14.73 | $30,546.40 | | 566.32 | $29,242.41 | $20,661.93 |
| 2016 | 39 | 0.001204 | 0.992407 | 0.982500 | 0.999160 | 0.048000 | 15.14 | $31,396.00 | | 581.89 | $30,019.74 | $20,152.83 |
| 2017 | 40 | 0.001323 | 0.991094 | 0.983500 | 0.999250 | 0.048160 | 15.55 | $32,247.20 | | 597.89 | $30,826.73 | $19,718.11 |
| 2018 | 41 | 0.001444 | 0.989662 | 0.983500 | 0.999250 | 0.049200 | 15.98 | $33,138.40 | | 614.33 | $31,633.00 | $19,104.18 |
| 2019 | 42 | 0.001567 | 0.988111 | 0.983500 | 0.999250 | 0.049600 | 16.42 | $34,051.20 | | 631.23 | $32,453.41 | $18,598.86 |
| 2020 | 43 | 0.001696 | 0.986435 | 0.983500 | 0.999250 | 0.049430 | 16.87 | $34,984.00 | | 648.59 | $33,285.83 | $18,088.11 |
| 2021 | 44 | 0.001833 | 0.984627 | 0.983500 | 0.999250 | 0.050430 | 17.34 | $35,958.40 | | 666.42 | $34,150.44 | $17,576.82 |
| 2022 | 45 | 0.001983 | 0.982674 | 0.984000 | 0.999280 | 0.050600 | 17.81 | $36,933.60 | | 684.75 | $35,025.63 | $17,121.58 |
| 2023 | 46 | 0.002146 | 0.980565 | 0.984000 | 0.999280 | 0.050750 | 18.30 | $37,949.60 | | 703.58 | $35,911.93 | $16,672.40 |
| 2024 | 47 | 0.002315 | 0.978296 | 0.984000 | 0.999280 | 0.050800 | 18.81 | $39,007.20 | | 722.93 | $36,827.54 | $16,258.92 |
| 2025 | 48 | 0.002488 | 0.975861 | 0.984000 | 0.999280 | 0.050900 | 19.32 | $40,064.80 | | 742.81 | $37,731.65 | $15,826.38 |
| 2026 | 49 | 0.002670 | 0.973355 | 0.984000 | 0.999280 | 0.050900 | 19.86 | $41,184.00 | | 763.24 | $38,682.42 | $15,459.31 |
| 2027 | 50 | 0.002866 | 0.970466 | 0.987000 | 0.999210 | 0.050870 | 20.40 | $42,304.80 | | 784.22 | $39,739.05 | $15,101.22 |
| 2028 | 51 | 0.003089 | 0.967468 | 0.987000 | 0.999210 | 0.050750 | 20.96 | $43,465.60 | | 805.79 | $40,703.30 | $14,753.39 |
| 2029 | 52 | 0.003348 | 0.964229 | 0.987000 | 0.999210 | 0.050750 | 21.54 | $44,668.80 | | 827.95 | $41,690.12 | $14,381.23 |
| 2030 | 53 | 0.003654 | 0.960706 | 0.987000 | 0.999210 | 0.050600 | 22.13 | $45,892.00 | | 850.72 | $42,675.17 | $14,055.10 |
| 2031 | 54 | 0.004006 | 0.956858 | 0.987000 | 0.999210 | 0.050600 | 22.74 | $47,156.80 | | 874.11 | $43,675.70 | $13,691.82 |
| 2032 | 55 | 0.004398 | 0.952650 | 0.986000 | 0.999710 | 0.050520 | 23.36 | $48,443.20 | | 898.15 | $44,646.72 | $13,347.00 |
| 2033 | 56 | 0.004823 | 0.948053 | 0.986000 | 0.999710 | 0.050440 | 24.01 | $49,790.40 | | 922.85 | $45,667.19 | $13,020.79 |
| 2034 | 57 | 0.005295 | 0.943034 | 0.986000 | 0.999710 | 0.050360 | 24.67 | $51,159.20 | | 948.23 | $46,674.20 | $12,694.49 |
| 2035 | 58 | 0.005816 | 0.937549 | 0.986000 | 0.999710 | 0.050280 | 25.35 | $52,568.80 | | 974.31 | $47,681.31 | $12,372.52 |
| 2036 | 59 | 0.006403 | 0.931545 | 0.986000 | 0.999710 | 0.050200 | 26.04 | $54,000.80 | | 1,001.10 | $48,666.31 | $12,049.69 |
| 2037 | 60 | 0.007091 | 0.924940 | 0.986000 | 0.999540 | 0.050100 | 26.76 | $55,493.60 | | 1,028.63 | $49,673.88 | $11,744.21 |
| 2038 | 61 | 0.007875 | 0.917656 | 0.986000 | 0.999540 | 0.050100 | 27.49 | $57,008.00 | | 1,056.92 | $50,627.42 | $11,398.58 |
| 2039 | 62 | 0.008697 | 0.909675 | 0.986000 | 0.999540 | 0.050100 | 28.25 | $58,583.20 | | 1,085.98 | $51,573.96 | $11,057.70 |
| 2040 | 63 | 0.009504 | 0.901029 | 0.986000 | 0.999540 | 0.050100 | 29.03 | $60,200.80 | | 1,115.85 | $52,494.42 | $10,718.07 |
| 2041 | 64 | 0.010304 | 0.891745 | 0.986000 | 0.999540 | 0.050100 | 29.83 | $61,859.20 | | 1,146.53 | $53,384.76 | $10,379.83 |
| 2042 | 65 | 0.011166 | 0.881787 | 0.986000 | 0.999340 | 0.050100 | 30.65 | $63,560.00 | | 1,178.06 | $54,201.71 | $10,035.87 |
| 2043 | 66 | 0.012171 | 0.871055 | 0.986000 | 0.999340 | 0.050100 | 31.49 | $65,302.40 | | 1,210.46 | $13,413.32 | $2,365.09 |
| | | | | | | | | | | | $574,899.64 | |

$624,667.26

*Langford and Associates*

*Wallis v. Cargill*

# TABLE FIVE

### EXPECTED PRESENT CASH VALUE OF PROJECTED RETIREMENT BENEFITS: KIMBERLY WALLIS

as of January 1, 2008      Assuming employment until age 67 (March 30, 2043)
     Assuming constant $20.00 per year service

| Year | Age | P(Dying) | P(Survng) | Interest Rates | Retirement Annuity Monthly | Annualized | E P C V |
|------|-----|----------|-----------|----------------|----------------------------|------------|---------|
| 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
| 2008 | 31 | 0.000589 | 0.999411 | 0.046690 | | | |
| 2009 | 32 | 0.000629 | 0.998782 | 0.045010 | | | |
| 2010 | 33 | 0.000680 | 0.998103 | 0.044770 | | | |
| 2011 | 34 | 0.000743 | 0.997361 | 0.045330 | | | |
| 2012 | 35 | 0.000813 | 0.996551 | 0.045550 | | | |
| 2013 | 36 | 0.000891 | 0.995663 | 0.045960 | | | |
| 2014 | 37 | 0.000982 | 0.994685 | 0.046130 | | | |
| 2015 | 38 | 0.001088 | 0.993603 | 0.047670 | | | |
| 2016 | 39 | 0.001204 | 0.992407 | 0.048000 | | | |
| 2017 | 40 | 0.001323 | 0.991094 | 0.048160 | | | |
| 2018 | 41 | 0.001444 | 0.989662 | 0.049200 | | | |
| 2019 | 42 | 0.001567 | 0.988111 | 0.049600 | | | |
| 2020 | 43 | 0.001696 | 0.986435 | 0.050000 | | | |
| 2021 | 44 | 0.001833 | 0.984627 | 0.050430 | | | |
| 2022 | 45 | 0.001983 | 0.982674 | 0.050600 | | | |
| 2023 | 46 | 0.002146 | 0.980565 | 0.050750 | | | |
| 2024 | 47 | 0.002315 | 0.978296 | 0.050800 | | | |
| 2025 | 48 | 0.002488 | 0.975861 | 0.050900 | | | |
| 2026 | 49 | 0.002670 | 0.973255 | 0.050900 | | | |
| 2027 | 50 | 0.002866 | 0.970466 | 0.050870 | | | |
| 2028 | 51 | 0.003089 | 0.967468 | 0.050750 | | | |
| 2029 | 52 | 0.003348 | 0.964229 | 0.050750 | | | |
| 2030 | 53 | 0.003654 | 0.960706 | 0.050600 | | | |
| 2031 | 54 | 0.004006 | 0.956858 | 0.050600 | | | |
| 2032 | 55 | 0.004398 | 0.952650 | 0.050520 | | | |
| 2033 | 56 | 0.004825 | 0.948053 | 0.050440 | | | |
| 2034 | 57 | 0.005295 | 0.943034 | 0.050360 | | | |
| 2035 | 58 | 0.005816 | 0.937549 | 0.050280 | | | |
| 2036 | 59 | 0.006403 | 0.931545 | 0.050200 | | | |
| 2037 | 60 | 0.007091 | 0.924940 | 0.050100 | | | |
| 2038 | 61 | 0.007875 | 0.917656 | 0.050100 | | | |
| 2039 | 62 | 0.008697 | 0.909675 | 0.050100 | | | |
| 2040 | 63 | 0.009504 | 0.901029 | 0.050100 | | | |
| 2041 | 64 | 0.010304 | 0.891745 | 0.050100 | | | |
| 2042 | 65 | 0.011166 | 0.881787 | 0.050100 | | | |
| 2043 | 66 | 0.012171 | 0.871055 | 0.050100 | | | |
| 2044 | 67 | 0.013328 | 0.859445 | 0.050100 | $ 781.60 | $9,135.01 | $ 5,653.44 |
| 2045 | 68 | 0.014639 | 0.846863 | 0.050100 | $ 781.60 | $9,135.01 | $ 7,015.54 |
| 2046 | 69 | 0.016092 | 0.833236 | 0.050100 | $ 781.60 | $9,135.01 | $ 6,573.32 |
| 2047 | 70 | 0.017627 | 0.818548 | 0.050100 | $ 781.60 | $9,135.01 | $ 6,149.37 |
| 2048 | 71 | 0.019272 | 0.802773 | 0.050100 | $ 781.60 | $9,135.01 | $ 5,743.13 |
| 2049 | 72 | 0.021145 | 0.785799 | 0.050100 | $ 781.60 | $9,135.01 | $ 5,353.48 |
| 2050 | 73 | 0.023329 | 0.767467 | 0.050100 | $ 781.60 | $9,135.01 | $ 4,979.14 |
| 2051 | 74 | 0.025809 | 0.747660 | 0.050100 | $ 781.60 | $9,135.01 | $ 4,619.21 |
| 2052 | 75 | 0.028406 | 0.726422 | 0.050100 | $ 781.60 | $9,135.01 | $ 4,273.88 |
| 2053 | 76 | 0.031093 | 0.703835 | 0.050100 | $ 781.60 | $9,135.01 | $ 3,943.42 |
| 2054 | 77 | 0.034126 | 0.679816 | 0.050100 | $ 781.60 | $9,135.01 | $ 3,627.13 |
| 2055 | 78 | 0.037737 | 0.654162 | 0.050100 | $ 781.60 | $9,135.01 | $ 3,323.73 |
| 2056 | 79 | 0.041987 | 0.626696 | 0.050100 | $ 781.60 | $9,135.01 | $ 3,032.26 |
| 2057 | 80 | 0.046694 | 0.597433 | 0.050100 | $ 781.60 | $9,135.01 | $ 2,752.76 |
| 2058 | 81 | 0.051726 | 0.566530 | 0.050100 | $ 781.60 | $9,135.01 | $ 2,485.83 |
| 2059 | 82 | 0.057325 | 0.534053 | 0.050100 | $ 781.60 | $9,135.01 | $ 2,231.53 |
| 2060 | 83 | 0.063754 | 0.500005 | 0.050100 | $ 781.60 | $9,135.01 | $ 1,989.58 |
| 2061 | 84 | 0.071194 | 0.464408 | 0.050100 | $ 781.60 | $9,135.01 | $ 1,759.77 |
| 2062 | 85 | 0.078859 | 0.427786 | 0.050100 | $ 781.60 | $9,135.01 | $ 1,543.66 |
| 2063 | 86 | 0.087062 | 0.390542 | 0.050100 | $ 781.60 | $9,135.01 | $ 1,342.03 |
| 2064 | 87 | 0.096024 | 0.353040 | 0.050100 | $ 781.60 | $9,135.01 | $ 1,155.29 |
| 2065 | 88 | 0.105796 | 0.315690 | 0.050100 | $ 781.60 | $9,135.01 | $ 983.77 |
| 2066 | 89 | 0.116426 | 0.278936 | 0.050100 | $ 781.60 | $9,135.01 | $ 827.77 |
| 2067 | 90 | 0.127962 | 0.243243 | 0.050100 | $ 781.60 | $9,135.01 | $ 687.41 |
| 2068 | 91 | 0.140448 | 0.209080 | 0.050100 | $ 781.60 | $9,135.01 | $ 562.67 |
| 2069 | 92 | 0.153923 | 0.176897 | 0.050100 | $ 781.60 | $9,135.01 | $ 453.35 |
| 2070 | 93 | 0.168426 | 0.147103 | 0.050100 | $ 781.60 | $9,135.01 | $ 359.01 |
| 2071 | 94 | 0.183976 | 0.120040 | 0.050100 | $ 781.60 | $9,135.01 | $ 278.98 |
| 2072 | 95 | 0.200594 | 0.095960 | 0.050100 | $ 781.60 | $9,135.01 | $ 212.38 |
| 2073 | 96 | 0.218284 | 0.075014 | 0.050100 | $ 781.60 | $9,135.01 | $ 158.10 |
| 2074 | 97 | 0.237041 | 0.057232 | 0.050100 | $ 781.60 | $9,135.01 | $ 114.87 |
| 2075 | 98 | 0.256844 | 0.042533 | 0.050100 | $ 781.60 | $9,135.01 | $ 81.29 |
| 2076 | 99 | 0.277657 | 0.030723 | 0.050100 | $ 781.60 | $9,135.01 | $ 55.92 |
| 2077 | 100 | 0.261268 | 0.022696 | 0.050100 | $ 781.60 | $9,135.01 | $ 39.34 |

Total      $ 84,362.36

*Langford and Associates*

*Wallis v. Cargill*

**TABLE SIX**

**EXPECTED PRESENT CASH VALUE OF PROJECTED RETIREMENT BENEFITS: KIMBERLY WALLIS**
as of January 1, 2008          Assuming employment until age 67 (March 30, 2043)
                               Assuming constant $20.00 per year service for 1.57808 years

| Year | Age | P(Dying) | P(Survng) | Interest Rates | Retirement Annuity Monthly | Annualized | E P C V |
|------|-----|----------|-----------|----------------|---------|------------|---------|
| *1* | *2* | *3* | *4* | *5* | *6* | *7* | *8* |
| 2008 | 31 | 0.000589 | 0.999411 | 0.046690 | | | |
| 2009 | 32 | 0.000629 | 0.998782 | 0.045010 | | | |
| 2010 | 33 | 0.000680 | 0.998103 | 0.044770 | | | |
| 2011 | 34 | 0.000743 | 0.997361 | 0.045330 | | | |
| 2012 | 35 | 0.000813 | 0.996551 | 0.045550 | | | |
| 2013 | 36 | 0.000891 | 0.995663 | 0.045960 | | | |
| 2014 | 37 | 0.000982 | 0.994685 | 0.046130 | | | |
| 2015 | 38 | 0.001088 | 0.993603 | 0.047670 | | | |
| 2016 | 39 | 0.001204 | 0.992407 | 0.048000 | | | |
| 2017 | 40 | 0.001323 | 0.991094 | 0.048160 | | | |
| 2018 | 41 | 0.001444 | 0.989662 | 0.049200 | | | |
| 2019 | 42 | 0.001567 | 0.988111 | 0.049600 | | | |
| 2020 | 43 | 0.001696 | 0.986435 | 0.050000 | | | |
| 2021 | 44 | 0.001833 | 0.984627 | 0.050430 | | | |
| 2022 | 45 | 0.001983 | 0.982674 | 0.050600 | | | |
| 2023 | 46 | 0.002146 | 0.980565 | 0.050750 | | | |
| 2024 | 47 | 0.002315 | 0.978296 | 0.050800 | | | |
| 2025 | 48 | 0.002488 | 0.975861 | 0.050900 | | | |
| 2026 | 49 | 0.002670 | 0.973255 | 0.050900 | | | |
| 2027 | 50 | 0.002866 | 0.970466 | 0.050870 | | | |
| 2028 | 51 | 0.003089 | 0.967468 | 0.050750 | | | |
| 2029 | 52 | 0.003348 | 0.964229 | 0.050750 | | | |
| 2030 | 53 | 0.003654 | 0.960706 | 0.050600 | | | |
| 2031 | 54 | 0.004006 | 0.956858 | 0.050600 | | | |
| 2032 | 55 | 0.004398 | 0.952650 | 0.050520 | | | |
| 2033 | 56 | 0.004825 | 0.948053 | 0.050440 | | | |
| 2034 | 57 | 0.005295 | 0.943034 | 0.050360 | | | |
| 2035 | 58 | 0.005816 | 0.937549 | 0.050280 | | | |
| 2036 | 59 | 0.006403 | 0.931545 | 0.050200 | | | |
| 2037 | 60 | 0.007091 | 0.924940 | 0.050100 | | | |
| 2038 | 61 | 0.007875 | 0.917656 | 0.050100 | | | |
| 2039 | 62 | 0.008697 | 0.909675 | 0.050100 | | | |
| 2040 | 63 | 0.009504 | 0.901029 | 0.050100 | | | |
| 2041 | 64 | 0.010304 | 0.891745 | 0.050100 | | | |
| 2042 | 65 | 0.011166 | 0.881787 | 0.050100 | | | |
| 2043 | 66 | 0.012171 | 0.871055 | 0.050100 | | | |
| 2044 | 67 | 0.013328 | 0.859445 | 0.050100 | $ 31.56 | $ 368.88 | $ 228.29 |
| 2045 | 68 | 0.014639 | 0.846863 | 0.050100 | $ 31.56 | $ 368.88 | $ 283.29 |
| 2046 | 69 | 0.016092 | 0.833236 | 0.050100 | $ 31.56 | $ 368.88 | $ 265.44 |
| 2047 | 70 | 0.017627 | 0.818548 | 0.050100 | $ 31.56 | $ 368.88 | $ 248.32 |
| 2048 | 71 | 0.019272 | 0.802773 | 0.050100 | $ 31.56 | $ 368.88 | $ 231.91 |
| 2049 | 72 | 0.021145 | 0.785799 | 0.050100 | $ 31.56 | $ 368.88 | $ 216.18 |
| 2050 | 73 | 0.023329 | 0.767467 | 0.050100 | $ 31.56 | $ 368.88 | $ 201.06 |
| 2051 | 74 | 0.025809 | 0.747660 | 0.050100 | $ 31.56 | $ 368.88 | $ 186.53 |
| 2052 | 75 | 0.028406 | 0.726422 | 0.050100 | $ 31.56 | $ 368.88 | $ 172.58 |
| 2053 | 76 | 0.031093 | 0.703835 | 0.050100 | $ 31.56 | $ 368.88 | $ 159.24 |
| 2054 | 77 | 0.034126 | 0.679816 | 0.050100 | $ 31.56 | $ 368.88 | $ 146.47 |
| 2055 | 78 | 0.037737 | 0.654162 | 0.050100 | $ 31.56 | $ 368.88 | $ 134.21 |
| 2056 | 79 | 0.041987 | 0.626696 | 0.050100 | $ 31.56 | $ 368.88 | $ 122.45 |
| 2057 | 80 | 0.046694 | 0.597433 | 0.050100 | $ 31.56 | $ 368.88 | $ 111.16 |
| 2058 | 81 | 0.051726 | 0.566530 | 0.050100 | $ 31.56 | $ 368.88 | $ 100.38 |
| 2059 | 82 | 0.057325 | 0.534053 | 0.050100 | $ 31.56 | $ 368.88 | $ 90.11 |
| 2060 | 83 | 0.063754 | 0.500005 | 0.050100 | $ 31.56 | $ 368.88 | $ 80.34 |
| 2061 | 84 | 0.071194 | 0.464408 | 0.050100 | $ 31.56 | $ 368.88 | $ 71.06 |
| 2062 | 85 | 0.078859 | 0.427786 | 0.050100 | $ 31.56 | $ 368.88 | $ 62.33 |
| 2063 | 86 | 0.087062 | 0.390542 | 0.050100 | $ 31.56 | $ 368.88 | $ 54.19 |
| 2064 | 87 | 0.096024 | 0.353040 | 0.050100 | $ 31.56 | $ 368.88 | $ 46.65 |
| 2065 | 88 | 0.105796 | 0.315690 | 0.050100 | $ 31.56 | $ 368.88 | $ 39.73 |
| 2066 | 89 | 0.116426 | 0.278936 | 0.050100 | $ 31.56 | $ 368.88 | $ 33.43 |
| 2067 | 90 | 0.127962 | 0.243243 | 0.050100 | $ 31.56 | $ 368.88 | $ 27.76 |
| 2068 | 91 | 0.140448 | 0.209080 | 0.050100 | $ 31.56 | $ 368.88 | $ 22.72 |
| 2069 | 92 | 0.153925 | 0.176897 | 0.050100 | $ 31.56 | $ 368.88 | $ 18.31 |
| 2070 | 93 | 0.168426 | 0.147103 | 0.050100 | $ 31.56 | $ 368.88 | $ 14.50 |
| 2071 | 94 | 0.183976 | 0.120040 | 0.050100 | $ 31.56 | $ 368.88 | $ 11.27 |
| 2072 | 95 | 0.200594 | 0.095960 | 0.050100 | $ 31.56 | $ 368.88 | $ 8.58 |
| 2073 | 96 | 0.218284 | 0.075014 | 0.050100 | $ 31.56 | $ 368.88 | $ 6.38 |
| 2074 | 97 | 0.237041 | 0.057232 | 0.050100 | $ 31.56 | $ 368.88 | $ 4.64 |
| 2075 | 98 | 0.256844 | 0.042533 | 0.050100 | $ 31.56 | $ 368.88 | $ 3.28 |
| 2076 | 99 | 0.277657 | 0.030723 | 0.050100 | $ 31.56 | $ 368.88 | $ 2.26 |
| 2077 | 100 | 0.261268 | 0.022696 | 0.050100 | $ 31.56 | $ 368.88 | $ 1.59 |

Total          $ 3,406.62

*Langford and Associates*

## TABLE SEVEN
### MEDICAL SERVICES PRICE INDICES
1982-84 = 100.0

| Year | CPI uwe | Medical Care | Medical Care Services | Hospital & Rel Services |
|---|---|---|---|---|
| 1980 | 82.9 | 75.6 | 75.7 | 69.5 |
| 1981 | 91.4 | 83.5 | 83.4 | 79.3 |
| 1982 | 96.9 | 92.5 | 92.6 | 90.3 |
| 1983 | 99.8 | 100.5 | 100.6 | 101.4 |
| 1984 | 103.3 | 106.9 | 106.8 | 109.2 |
| 1985 | 106.9 | 113.6 | 113.3 | 115.9 |
| 1986 | 108.6 | 122 | 122 | 122.7 |
| 1987 | 112.5 | 130.2 | 130.3 | 131.1 |
| 1988 | 117 | 139 | 139 | 143.3 |
| 1989 | 122.6 | 149.6 | 149.6 | 159.4 |
| 1990 | 129 | 162.7 | 162.8 | 176.1 |
| 1991 | 134.3 | 176.5 | 176.7 | 193.7 |
| 1992 | 138.2 | 189.6 | 190.3 | 211.6 |
| 1993 | 142.1 | 200.9 | 202.7 | 229.2 |
| 1994 | 145.6 | 210.4 | 213 | 242.7 |
| 1995 | 149.8 | 219.8 | 223.8 | 255.2 |
| 1996 | 154.1 | 227.6 | 232.1 | 266.5 |
| 1997 | 157.6 | 234 | 238.8 | 274.7 |
| 1998 | 159.7 | 241.4 | 246.6 | 283.7 |
| 1999 | 163.2 | 249.7 | 254.9 | 295.5 |
| 2000 | 168.9 | 259.9 | 265.9 | 313.2 |
| 2001 | 173.5 | 271.8 | 278.5 | 333.9 |
| 2002 | 175.9 | 284.6 | 292.5 | 363.3 |
| 2003 | 179.8 | 296.3 | 305.9 | 391.3 |
| 2004 | 184.5 | 309.5 | 321.5 | 414.1 |
| 2005 | 191 | 322.8 | 337.3 | 436.2 |
| 2006 | 197.1 | 335.7 | 351.1 | 463.7 |
| 2007 | 203.7 | 351.3 | 370.7 | 494.1 |
| annual average increase | 0.0344 | 0.0595 | 0.0616 | 0.0766 |

*data shown for 2007 is as of July 2007.*

Source: U. S. Bureau of Labor Statistics

*Wallis v. Cargill*

*Langford and Associates*

*Wallis v Cargill*                                              **TABLE EIGHT**

## EXPECTED PRESENT CASH VALUE OF PROJECTED NET MEDICAL BENEFITS: KIMBERLY WALLIS

as of January 1, 2008            Employee contribution assumed to be $20..00 per week, increase at 5.95 % per year

| Year | Kimberly Wallis Age | P(Dying) | P(Survng) | P(Emp) | P(LFP) | Interest Rates | Gross Value | Monthly Employee Contrib | Net Value | Annualized | Annual Expected | E P C V |
|------|------|----------|-----------|--------|--------|----------------|-------------|--------------------------|-----------|------------|-----------------|---------|
| *1* | *2* | *3* | *4* | *5* | *6* | *7* | *8* | *9* | *10* | *11* | *12* | *13* |
| 2005 | 29 | 0.000000 | 1.000000 | 0.979000 | 0.999330 | 0.000000 | $ 877.34 | $ 86.67 | $ 790.67 | $ 9,488.08 | $ 2,392.06 | $ 2,392.06 |
| 2006 | 30 | 0.000000 | 1.000000 | 0.981500 | 0.999120 | 0.000000 | $ 877.34 | $ 86.67 | $ 790.67 | $ 9,488.08 | $ 9,304.36 | $ 9,304.36 |
| 2007 | 31 | 0.000000 | 1.000000 | 0.981500 | 0.999120 | 0.000000 | $ 929.54 | $ 91.82 | $ 837.72 | $10,052.62 | $ 9,857.96 | $ 9,857.96 |
|  |  |  |  |  |  |  |  |  |  |  |  | $ 21,554.38 |
| 2008 | 31 | 0.000589 | 0.999411 | 0.981500 | 0.999120 | 0.046690 | $ 984.85 | $ 97.29 | $ 887.56 | $10,650.75 | $10,438.37 | $ 10,202.90 |
| 2009 | 32 | 0.000629 | 0.998782 | 0.981500 | 0.999120 | 0.045010 | $1,043.45 | $ 103.08 | $ 940.37 | $11,284.47 | $11,052.49 | $ 10,346.16 |
| 2010 | 33 | 0.000680 | 0.998103 | 0.981500 | 0.999120 | 0.044770 | $1,105.53 | $ 109.21 | $ 996.32 | $11,955.90 | $11,702.14 | $ 10,488.51 |
| 2011 | 34 | 0.000743 | 0.997361 | 0.981500 | 0.999120 | 0.045330 | $1,171.31 | $ 115.71 | $1,055.61 | $12,667.27 | $12,389.21 | $ 10,608.57 |
| 2012 | 35 | 0.000813 | 0.996551 | 0.982500 | 0.999160 | 0.045550 | $1,241.01 | $ 122.59 | $1,118.41 | $13,420.98 | $13,129.59 | $ 10,744.83 |
| 2013 | 36 | 0.000891 | 0.995663 | 0.982500 | 0.999160 | 0.045960 | $1,314.85 | $ 129.88 | $1,184.96 | $14,219.52 | $13,898.40 | $ 10,855.05 |
| 2014 | 37 | 0.000982 | 0.994685 | 0.982500 | 0.999160 | 0.046130 | $1,393.08 | $ 137.61 | $1,255.47 | $15,065.59 | $14,710.90 | $ 10,973.18 |
| 2015 | 38 | 0.001088 | 0.993603 | 0.982500 | 0.999160 | 0.047670 | $1,475.97 | $ 145.80 | $1,330.17 | $15,961.99 | $15,569.24 | $ 10,979.52 |
| 2016 | 39 | 0.001204 | 0.992407 | 0.982500 | 0.999160 | 0.048000 | $1,563.79 | $ 154.48 | $1,409.31 | $16,911.73 | $16,475.75 | $ 11,060.49 |
| 2017 | 40 | 0.001323 | 0.991094 | 0.983500 | 0.999250 | 0.048160 | $1,656.83 | $ 163.67 | $1,493.16 | $17,917.97 | $17,452.28 | $ 11,163.23 |
| 2018 | 41 | 0.001444 | 0.989662 | 0.983500 | 0.999250 | 0.049200 | $1,755.41 | $ 173.41 | $1,582.01 | $18,984.09 | $18,463.98 | $ 11,150.99 |
| 2019 | 42 | 0.001567 | 0.988111 | 0.983500 | 0.999250 | 0.049600 | $1,859.86 | $ 183.72 | $1,676.14 | $20,113.65 | $19,531.93 | $ 11,193.63 |
| 2020 | 43 | 0.001696 | 0.986435 | 0.983500 | 0.999250 | 0.050000 | $1,970.52 | $ 194.65 | $1,775.87 | $21,310.41 | $20,658.98 | $ 11,226.46 |
| 2021 | 44 | 0.001833 | 0.984627 | 0.983500 | 0.999280 | 0.050430 | $2,087.77 | $ 206.24 | $1,881.53 | $22,578.38 | $21,848.07 | $ 11,244.94 |
| 2022 | 45 | 0.001983 | 0.982674 | 0.984000 | 0.999280 | 0.050600 | $2,211.99 | $ 218.51 | $1,993.48 | $23,921.79 | $23,114.55 | $ 11,299.08 |
| 2023 | 46 | 0.002146 | 0.980565 | 0.984000 | 0.999280 | 0.050750 | $2,343.60 | $ 231.51 | $2,112.09 | $25,345.14 | $24,437.32 | $ 11,345.22 |
| 2024 | 47 | 0.002315 | 0.978296 | 0.984000 | 0.999280 | 0.050800 | $2,483.05 | $ 245.28 | $2,237.76 | $26,853.17 | $25,831.40 | $ 11,404.26 |
| 2025 | 48 | 0.002488 | 0.975861 | 0.984000 | 0.999280 | 0.050900 | $2,630.79 | $ 259.88 | $2,370.91 | $28,450.94 | $27,300.27 | $ 11,450.98 |
| 2026 | 49 | 0.002670 | 0.973255 | 0.984000 | 0.999280 | 0.050900 | $2,787.32 | $ 275.34 | $2,511.98 | $30,143.77 | $28,847.40 | $ 11,513.86 |
| 2027 | 50 | 0.002866 | 0.970466 | 0.987000 | 0.999210 | 0.050870 | $2,953.17 | $ 291.72 | $2,661.44 | $31,937.32 | $30,566.98 | $ 11,615.75 |
| 2028 | 51 | 0.003089 | 0.967468 | 0.987000 | 0.999210 | 0.050750 | $3,128.88 | $ 309.08 | $2,819.80 | $33,837.59 | $32,285.70 | $ 11,702.33 |
| 2029 | 52 | 0.003348 | 0.964229 | 0.987000 | 0.999210 | 0.050750 | $3,315.05 | $ 327.47 | $2,987.58 | $35,850.93 | $34,092.17 | $ 11,760.28 |
| 2030 | 53 | 0.003684 | 0.960706 | 0.987000 | 0.999210 | 0.050600 | $3,512.30 | $ 346.96 | $3,165.34 | $37,984.06 | $35,988.68 | $ 11,852.90 |
| 2031 | 54 | 0.004006 | 0.956858 | 0.987000 | 0.999210 | 0.050600 | $3,721.28 | $ 367.60 | $3,353.68 | $40,244.11 | $37,977.27 | $ 11,905.42 |
| 2032 | 55 | 0.004398 | 0.952650 | 0.986000 | 0.999710 | 0.050520 | $3,942.69 | $ 389.47 | $3,553.22 | $42,638.64 | $40,039.41 | $ 11,969.66 |
| 2033 | 56 | 0.004825 | 0.948053 | 0.986000 | 0.999710 | 0.050440 | $4,177.28 | $ 412.65 | $3,764.64 | $45,175.64 | $42,217.06 | $ 12,037.08 |
| 2034 | 57 | 0.005295 | 0.943034 | 0.986000 | 0.999710 | 0.050360 | $4,425.83 | $ 437.20 | $3,988.63 | $47,863.59 | $44,492.16 | $ 12,101.02 |
| 2035 | 58 | 0.005816 | 0.937549 | 0.986000 | 0.999710 | 0.050280 | $4,689.17 | $ 463.21 | $4,225.96 | $50,711.47 | $46,865.26 | $ 12,160.77 |
| 2036 | 59 | 0.006403 | 0.931545 | 0.986000 | 0.999710 | 0.050200 | $4,968.17 | $ 490.77 | $4,477.40 | $53,728.80 | $49,335.80 | $ 12,215.46 |
| 2037 | 60 | 0.007091 | 0.924940 | 0.986500 | 0.999540 | 0.050100 | $5,263.78 | $ 519.97 | $4,743.81 | $56,925.67 | $51,918.11 | $ 12,274.80 |
| 2038 | 61 | 0.007875 | 0.917656 | 0.986500 | 0.999540 | 0.050100 | $5,576.97 | $ 550.91 | $5,026.06 | $60,312.74 | $54,574.08 | $ 12,287.15 |
| 2039 | 62 | 0.008697 | 0.909675 | 0.986500 | 0.999540 | 0.050100 | $5,908.80 | $ 583.69 | $5,325.11 | $63,901.35 | $57,318.36 | $ 12,289.32 |
| 2040 | 63 | 0.009504 | 0.901029 | 0.986500 | 0.999540 | 0.050100 | $6,260.38 | $ 618.42 | $5,641.96 | $67,703.48 | $60,151.60 | $ 12,281.43 |
| 2041 | 64 | 0.010304 | 0.891745 | 0.986500 | 0.999540 | 0.050100 | $6,632.87 | $ 655.22 | $5,977.65 | $71,731.84 | $63,073.94 | $ 12,263.74 |
| 2042 | 65 | 0.011166 | 0.881787 | 0.986000 | 0.999340 | 0.050100 | $7,027.53 | $ 694.20 | $6,333.32 | $75,999.89 | $66,033.91 | $ 12,270.70 |
| 2043 | 66 | 0.012171 | 0.871055 | 0.986000 | 0.999340 | 0.050100 | $7,445.66 | $ 735.51 | $6,710.16 | $80,521.88 | $69,111.38 | $ 12,186.00 |
|  |  |  |  |  |  |  |  |  |  |  |  | $414,381.71 |

$435,936.09

*Wallis v. Cargill*

**TABLE NINE**

## SUMMARY OF ECONOMIC LOSSES
### KIMBERLY WALLIS

| | September 29, 2005 to December 31, 2007 | January 1, 2008 to future | TOTAL |
|---|---|---|---|
| LOST EARNINGS | $ 49,767.63 | $ 574,899.64 | $ 624,667.27 |
| LOST HEALTH BENEFITS | $ 21,554.38 | $ 414,381.71 | $ 435,936.09 |
| LOST RETIREMENT BENEFITS | | $ 80,955.74 | $ 80,955.74 |
| TOTAL | $ 71,322.01 | $ 1,070,237.09 | $ 1,141,559.10 |

*Langford and Associates*

# LANGFORD AND ASSOCIATES

873 South Park Avenue
Springfield, Illinois 62704-2333

### STATEMENT

as of August 17, 2007

Mr. R. Gerald Barris, Esq.
Sorling, Northrup, Hanna, Cullen & Cochran, Ltd.
Attorneys at Law
607 East Adams Street, Suite 800
Springfield, Illinois 62701

In Re:    **Kimberly Wallis v. Cargill Meat Solutions Corp**
U.S. District Court Central IL (Spfd) 06-03147

| | | | | |
|---|---|---|---|---|
| 12-Apr-07 | prelim mtg | 1.00 | $ 125.00 | $ 125.00 |
| 13-Apr-07 | review | 4.50 | $ 562.50 | $ 687.50 |
| 17-Apr-07 | review | 2.50 | $ 312.50 | $ 1,000.00 |
| 19-Apr-07 | calc | 5.00 | $ 625.00 | $ 1,625.00 |
| 24-Apr-07 | calc | 2.75 | $ 343.75 | $ 1,968.75 |
| 26-Apr-07 | calc | 4.00 | $ 500.00 | $ 2,468.75 |
| 29-Apr-07 | calc | 3.75 | $ 468.75 | $ 2,937.50 |
| 30-Apr-07 | prelim rept | 5.25 | $ 656.25 | $ 3,593.75 |
| 7-May-07 | review report | 1.75 | $ 218.75 | $ 3,812.50 |
| 14-Aug-07 | add info | 2.00 | $ 250.00 | $ 4,062.50 |
| 16-Aug-07 | rev calc | 6.50 | $ 812.50 | $ 4,875.00 |
| 17-Aug-07 | rev calc & op | 8.75 | $ 1,093.75 | $ 5,968.75 |

47.75

# Case Report

**Case Search**

## Case Summary

### Case Information

**Case Number:** SC050255

**Case Title:** SAMUEL J MAY VS AMGEN INC

**Case Category:** Civil - Unlimited

**Case Type:** Wrongful Termination

**Judicial Officer:**

**Filing Date:** 4/26/2007

**Case Status:** Pending

**Location:** Simi Valley

## Participants

| Name | Filing Document | Role | Attorney | Filed By |
|------|-----------------|------|----------|----------|
| AMGEN INC | Complaint | Defendant | | MAY, SAMUEL |
| MAY, SAMUEL | Complaint | Plaintiff | STEELE, GEOFFREY | MAY, SAMUEL |

## Pending Hearings

| Event Description | Event Type | Event Date | Event Time | Location | Department |
|-------------------|------------|------------|------------|----------|------------|
| | Case Management Conference (Filing of Case Management Statement) | 10/25/2007 | 1:30 PM | Simi Valley | S1CM |
| | Court's Order to Show Cause re Sanctions for Failure to File Default on Complaint as to All Non-Responding Parties | 10/25/2007 | 1:30 PM | Simi Valley | S1CM |

**Additional Recent Events exist on the case. Please see the Case Calendar Events screen.

## Past Events

**No results found**

## Register of Actions

| ROA # | Entry |
|-------|-------|
| 1 | 04/26/2007: Complaint filed<br>Filed by:MAY, SAMUEL(Plaintiff)<br>Refers to:AMGEN INC(Defendant) |
| 2 | 04/26/2007: Declaration re: Court Assignment filed |
| 3 | 04/26/2007: Summons Issued; 30 day - Original retained in Court file |
| 4 | 04/26/2007: Track Assignment: Standard |
| 5 | 04/26/2007: Case assigned to Courtroom S3 |
| 6 | 04/26/2007: Uniform Civil Filing Fee Paid by SAMUEL J MAY (Complaint or other first paper in unlimited civil case (amount over $25,000) Receipt Number: 704260108 for $320.0 |
| 7 | OSC for Sanctions/Dismissal for Failure to File Proof of Service/Publication - File Proof of Service of Complaint of Samuel J May as to Defendant Amgen Inc scheduled for 08/16/2007 at 01:30:00 PM in S1CM at Simi Valley. |

CaseInformationSummary

| | |
|---|---|
| 8 | OSC for Sanctions/Dismissal for Failure to File Proof of Service/Publication - File Proof of Service of Complaint of Samuel J May as to Defendant Amgen Inc scheduled for 08/16/2007 at 01:30:00 PM in S1CM was vacated. |
| 9 | Proof of Service of 30-day Summons & Complaint - Personal (By serving Cindi Richardson) filed by MAY, SAMUEL J on 08/15/2007. |
| 10 | Case Management Conference (Filing of Case Management Statement) - scheduled for 10/25/2007 at 01:30:00 PM in S1CM at Simi Valley |
| 11 | Court's Order to Show Cause re Sanctions for Failure to File Default on Complaint as to All Non-Responding Parties - scheduled for 10/25/2007 at 01:30:00 PM in S1CM at Simi Valley. |